## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE,
## NASHVILLE DIVISION

DR. JOSEPH CICCIO; DR. VISHU RAJ,
DR. ARTHUR KAPIT; and DENA
NIGOHOSIAN,

   Plaintiffs,

v.

SMILEDIRECTCLUB, LLC; DAVID
KATZMAN; STEVEN KATZMAN; and
CAMELOT VENTURE GROUP,

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No: _____

## COMPLAINT FOR FALSE ADVERTISING, FRAUD, NEGLIGENCE,
## AND UNFAIR AND DECEPTIVE TRADE PRACTICES

  Plaintiffs Dr. Joseph Ciccio, Dr. Vishu Raj, and Dr. Arthur Kapit, individually and on behalf of a class of dentists and orthodontists, and Deena Nigohosian, individually and on behalf of a class of consumers, for their complaint as against defendants SmileDirectClub, LLC ("SmileDirect"), David Katzman, Steven Katzman, and Camelot Venture Group ("Camelot"), do hereby allege as follows:

## INTRODUCTION

  1.  SmileDirect is a company under siege. It is currently subject to a barrage of litigation and customer complaints that challenge its business model and set forth substantiated allegations that SmileDirect is operating illegally in violation of provisions of the federal Food, Drug, and Cosmetic Act (the "FD&C Act").

  2.  More specifically, SmileDirect is currently subject to:

a. At least 40 state claims filed by the relevant state affiliate of the American Association of Orthodontists alleging, in a substantiated fashion, that SmileDirect is illegally operating as a dentist without proper licensing in the subject state. Indeed, a Federal District Court in Georgia recently found that SmileDirect was in fact illegally operating as a dentist in connection with its ordinary course practices. *See* Exhibit A, attached hereto.

b. A lengthy, detailed and substantiated Citizen Petition filed by the American Dental Association with the federal Food and Drug Administration alleging in a detailed and substantiated fashion that SmileDirect is in continuing violation of the FD&C Act because it is selling plastic aligners that it manufactures in Tennessee (a) without a valid prescription and (b) without having had such aligners approved pursuant to a 510(k) clearance procedure. *See* Exhibit B, attached hereto.

c. A complaint filed by the American Dental Association with the Federal Trade Commission ("FTC") requesting that the FTC investigate numerous false and misleading claims made by SmileDirect to fraudulently entice customers to purchase its products and services. The ADA's detailed lengthy complaint alleges that SmileDirect has made false and misleading claims and engages in unfair and deceptive practices within the meaning of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See* Exhibit C, attached hereto.

d. Thousands of substantiated, serious customer complaints with respect to the efficacy of the SmileDirect aligner treatment and injuries suffered with respect thereto. Among these thousands of complaints are complaints that the product did

not work, that the product came in a broken fashion, and that the product made consumers' teeth "worse" and, in certain instances, substantially worse:

- "Product made my teeth worse with spacing and gaps. Did not work as described and was led to believe it would get fixed ... After five months and four aligners and a cracked tooth and numerous attempts to talk to customers service to fix my issues all of which led nowhere."

- "Please don't do this to yourself - especially if you're just trying to save money ... A few months closer to the seventh month, my crown and implant - which was super expensive to get done - came off together. When I called them about this, they kept making me email people ... I am here months later with about the same smile as before, $1700 down the drain, and my crown and implant not intact."

3.     Rather than address and seek to remedy these substantiated complaints alleging illegal operation, false advertising, and violations of the FTCA and the FD&C Act, SmileDirect instead has taken the low road by (a) refusing to make refunds to customers who have had bona fide problems with the aligners and/or damage relating their teeth and (b) bringing litigation against the ADA, ADA state affiliates, and their board members to deflect the claims contained in their state-filed complaints with respect to SmileDirect's illegal operation.

4.     Moreover, SmileDirect has engaged in a deliberate, intentional, and well-lawyered campaign to stifle any legitimate, publicly-stated concerns or criticisms of its product and/or business practices.

5.     Indeed, SmileDirect has retained numerous law firms in the United States and elsewhere, who on a regular and continuous basis have sent threatening, overbroad, and improper

letters to dentists, orthodontists, and others who have expressed professional opinions with respect to the inadequacy of the SmileDirect treatment. Moreover, on information and belief, SmileDirect has had its agents post false negative internet reviews of orthodontists who have questioned SmileDirect's results.

6.      These dentists, orthodontists, and other parties have received a barrage of "cease and desist" letters from SmileDirect's counsel threatening lawsuits and threatening the filing of ethical complaints with regulators against such professionals who have merely voiced legitimate, substantiated opinions regarding the clear inadequacy of the SmileDirect Program. *See* Exhibit D, attached hereto.

7.      SmileDirect's litigation offensive is purposeful. SmileDirect needed to deflect, defer and cover up legitimate criticism of its inadequate practices and illegal business model because SmileDirect was in the process of "going public".

8.      SmileDirect filed a prospectus pursuant to which it intended to raise more than $1 billion in the public equity markets and pursuant to which it valued itself at more than $8 billion ("Prospectus").

9.      The Prospectus fails to disclose to the public the numerous bona fide complaints with respect to SmileDirect's illegal practice of dentistry and defective business model.

10.      Moreover, the Prospectus contains numerous representations about SmileDirect's business that are inconsistent with other written representations made by SmileDirect in its advertising and extensive online marketing.

11.      In sum, despite having been found to be illegally operating as dentists, despite a business model that is destined to fail, and despite thousands of bona fide consumer complaints, SmileDirect is waging a war against longstanding regulatory authorities and its own customers to

prevent the pot from boiling over while it raises money in the public markets without proper disclosure as to its illegal, improper business practices and ineffective orthodontic treatment.

12.      Plaintiffs seek to represent two distinct classes. The first class consists of consumers nationwide who have been deceived and have received fraudulent and misleading written marketing material with respect to the SmileDirect aligners and services. These parties seek to proceed under Tennessee law, which governs the relationship between them and SmileDirect, as well as certain other state laws. The second class consists of orthodontists in the United States who have been directly injured by SmileDirect's commercial advertising or promotion in interstate commerce that misrepresents the nature, characteristics, or qualities of it goods, services, and/or commercial activities in violation of the Lanham Act, 15 U.S.C. § 1125(a).

## PARTIES

13.      Plaintiff Dr. Joseph Ciccio is a licensed orthodontist practicing in New York. He provides traditional orthodontic services in accordance with the standard of care. His business has been reduced due to unfair competition from the Defendants.

14.      Plaintiff Dr. Vishu Raj is a licensed orthodontist practicing in Texas. He provides traditional orthodontic services in accordance with the standard of care. His business has been reduced due to unfair competition from the Defendants.

15.      Plaintiff Dr. Arthur Kapit is a licensed orthodontist practicing in Florida. He provides traditional orthodontic services in accordance with the standard of care. His business has been reduced due to unfair competition from the Defendants.

16.      Plaintiff Dena Nigohosian is a resident of Michigan who purchased aligners from SmileDirect based on Defendants' written representations. SmileDirect developed a plan of

5

treatment to correct, among other things, Plaintiff Nigohosian's snaggletooth and represented that that her snaggletooth would be corrected. However, SmileDirect's aligners, in fact, worsened the snaggletooth, did not correct its placement, and caused the snaggletooth to become loose and sensitive.

17.     Defendant SmileDirectClub, LLC ("SmileDirect"), is a limited liability company organized under the laws of the state of Tennessee with its principal place of business in Nashville, Tennessee. SmileDirect operates its business in and from Tennessee. SmileDirect manufactures its aligners in Tennessee and directs its marketing efforts from Tennessee.

18.     Defendant David Katzman is an individual who is the chief executive officer and chairman of SmileDirect and through his stock ownership, stock voting agreement, and position as the managing partner of Camelot Venture Group controls the business operations of SmileDirect.

19.     Defendant Steven Katzman is the chief operating officer of SmileDirect and through his stock ownership, stock voting agreement, and position as an advisor of Camelot Venture Group controls the business operations of SmileDirect.

20.     Defendant Camelot Venture Group ("Camelot") is a partnership with its principal place of business in Michigan. Camelot is controlled by its managing partner, David Katzman, and is, as described on its website, the largest shareholder of SmileDirect and the managing member of the limited liability corporation that controls SmileDirect. As such, Camelot—through its stock ownership, through its control as the managing member of the SmileDirect, and through its ability to appoint David Katzman and Steven Katzman as the operating officers of SmileDirect—controls SmileDirect and is directly liable for its actions and violations of state and federal law.

21.     David Katzman and Steven Katzman did not work directly for SmileDirect at all relevant times. Instead, they were employed by Camelot, which, pursuant to a management agreement with SmileDirect, appointed them as Named Executive Officers ("NEOs") of SmileDirect. Camelot also appointed Susan Greenspon as general counsel of SmileDirect and directed day-to-day management of SmileDirect through other Camelot employees. As such, Camelot, along with the Katzmans, controlled the day-to-day operations of SmileDirect.

22.     David Katzman acknowledged, in the Prospectus, that he was the founder of SmileDirect and that he and the Camelot management team "worked side by side with [SmileDirect] team members." Camelot was paid at least $150,000 per month for the direct management services it provided to SmileDirect.

23.     The Katzman Defendants have appeared on national television to discuss their control of SmileDirect's defense against the FTC and FDA complaints described above, demonstrating their intimate knowledge and control of SmileDirect's marketing and sales strategy, including the decision to market SmileDirect aligners without FDA approval. The Katzman Defendants and Camelot have positioned themselves as the decision makers for Smile Direct with respect to the issues alleged in this action.

24.     The actions of Smile Direct alleged in this complaint relate to decisions about marketing and business organization that were made at the executive level by Camelot and the NEOs it appointed. Those decisions, upon information and belief, were authorized, approved, and directed by each Defendant, who was thus a knowing participant in each such decision and the action resulting from each such decision. Each Defendant is thus liable, under Tennessee law, for his or its "own acts and conduct" causing the injuries and giving rise to the causes of action alleged herein.

## JURISDICTION AND VENUE

25.     This court has subject matter jurisdiction under Section 39 of the Lanham Act, 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331 and 1338 and over the common-law and state-law claims pursuant to 28 U.S.C. §§ 1338 and 1367. This court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d) and 1453 because the number of proposed class members exceeds 100, the amount in controversy exceeds the sum or value of $5 million, exclusive of interests and costs, and Plaintiffs and other class members are citizens of a different state from Defendants.

26.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because SmileDirect maintained its principal place of business in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

27.     This court has personal jurisdiction over each defendant because each defendant, directly with its directors, officers, employees, representatives, and/or agents participated in acts or practices giving rise to the claims herein in this district.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

28.     SmileDirect was founded in or about 2014. Its initial management and capital were provided directly by Camelot, which remained its largest voting shareholder and the managing member of the LLC, controlling its day-to-day business operations through both management and stockholder control.

29.     David Katzman and Steven Katzman, both of whom own and control Camelot, provide their services, respectively, as chief executive officer and chief operating officer pursuant to contractual agreements with Camelot and not directly to SmileDirect. Stated differently, it is Camelot who selected David Katzman and Steven Katzman to be the chief

executive officer and chief operating officer, respectively, of SmileDirect and who directly controls their services to SmileDirect.

30.     SmileDirect describes itself as a "med-tech platform for transforming smiles." It states that its business purpose is to disrupt the current orthodontic model. SmileDirect also describes itself as a "middle man, making virtual connections between patients and dentists." In fact, the description of its business contained in the prospectus and in its uniform marketing makes clear that SmileDirect is operating in the field of dentistry/orthodontics in every state in the United States—illegally.

31.     SmileDirect describes a "member journey" that customers of SmileDirect engage in as follows: "Members start their journey by visiting our website, where they can learn about how our process works, read firsthand reviews from other members, and view before and after photos. . . . Members can then order their aligners remotely."

32.     The remote ordering of a SmileDirect-manufactured aligner occurs in steps. First, a member orders an "easy to use" "impression kit" online. This impression kit is mailed by SmileDirect to the customer and contains impression material, which must be mixed and fabricated by the customer. The impression material must be used within 30 minutes of its home fabrication by the customer. The member then returns the completed impression in a shipping box so the impression can be employed by SmileDirect in connection with its manufacture of aligners for the member.

33.     The impression material is used to create a digital picture of the member's mouth that SmileDirect's "doctors" employ to draft a "treatment plan" that contains protocols for how the member's teeth might move during treatment. SmileDirect's disclosure makes clear that the treatment plan itself is prepared not by U.S. orthodontists or dentists, but by its staff of 100

doctors employed as independent contractors in Costa Rica. *See* Exhibit E, attached hereto. Stated differently, almost all the work in connection with the so-called treatment plan is prepared by persons who are not licensed as orthodontists or dentists in the United States.

34.     SmileDirect states that a U.S. licensed orthodontist "approves" the treatment plan. In fact, to the extent that U.S. doctors or orthodontists are involved in the process, they are minimally involved. SmileDirect has acknowledged in its "ELP participation agreement for 2017" that, to the extent a U.S. dentist "participates" in approving the treatment program, they are only paid if they actually approve the program and then are paid only $50.

35.     SmileDirect's own practices make clear that the approval of the so-called "treatment program" for the aligners, which it manufactures itself, is in fact done in Costa Rica by unlicensed dentists and/or orthodontists and not by prescription of a U.S. orthodontist or dentist who has engaged in acceptable, legitimate review of the patient's orthodontic condition consistent with industry standards of patient care.

36.     Following a member's payment of the fee for the aligners of approximately $1,900, SmileDirect itself manufactures the aligners in Tennessee on a 3-D printer. The aligners are then sent to the member with instructions for their use.

37.     While SmileDirect states that the average treatment lasts approximately six months, many treatments last many months longer.

38.     SmileDirect states in its prospectus that "a treating doctor monitors a member's progress," but this is untrue. Indeed, SmileDirect members do not even know the identity of the dentists who are involved in their case (to the extent that they are involved). SmileDirect refuses to disclose the names, addresses, and any identifying information with respect to such dentists, and therefore no patient-doctor relationship is ever actually established.

10

39.    The communications between SmileDirect and customers are handled by unlicensed administrative personnel. Complaints filed on the Better Business Bureau website and elsewhere, involving thousands of customers, indicate that these administrative personnel regularly offer orthodontic advice and treatment advice through emails over the internet.

40.    Thus, while SmileDirect states in its offering document that there was "seamless communication with the treating doctor over the course of treatment," this is a falsehood. Similarly, SmileDirect's statement that "each member's treating doctor is available to answer clinical questions" is also a falsehood, given that SmileDirect members do not even know who the "treating doctor" is or how to contact such treating doctor. Their contact with SmileDirect is through unlicensed administrative personnel, who handle the communication and advice offered by SmileDirect in connection with their dangerous and faulty product.

41.    SmileDirect acknowledges that it currently manufactures all of its aligners in Tennessee on a 3-D printer provided by Hewlett-Packard. At no time has SmileDirect sought approval from the FDA for the manufacture and distribution of these aligners, nor has it submitted an application to the FDA under so-called Rule 510(k) seeking approval for the manufacture and distribution of such aligners.

42.    SmileDirect states that it has 700,000 customers and that its revenue this fiscal year will exceed $500 million. SmileDirect is currently operating at a substantial loss. It is currently in the process of offering common shares in a public offering. Subsequent to the public offering, 98% of the voting shares—and day-to-day control of SmileDirect—will be with the Katzman Defendants and Camelot. The Defendants have acknowledged, in the Prospectus, that SmileDirect is a "controlled corporation" under their control.

## SMILEDIRECT'S UNIFORM MISREPRESENTATIONS AND FRAUDULENT MARKETING STATEMENTS

### A. Claiming that SmileDirect customers receive the same level of orthodontic care as patients who engage traditional orthodontists

43.     Dr. Jeffrey Sulitzer, the lead dentist at SmileDirect, has stated that "[a]n individual who is requesting treatment by using SmileDirectClub's aligners is receiving the same level of care from a treating dentist-orthodontist as an individual visiting a traditional orthodontist or dentist for treatment." This statement is repeated online in a blog prepared and used for marketing by SmileDirect called "Grin Life." This statement is materially false, deceptive, and fraudulent.

44.     It is beyond dispute that SmileDirect's business model provides a much lower level of care to customers than traditional orthodontics. Indeed, SmileDirect's entire business model is based upon eliminating direct doctor contact with patients on a regular and continuous basis as is employed in traditional orthodontics where orthodontists physically examine their patients, take radiological images of their teeth and surrounding bone structure, establish a treatment plan, implement the plan, and review the progress of their patients and their devices in-office on a regular basis.

45.     SmileDirect does not provide a patient-doctor relationship and does not identify to customers any doctor who is acting as "their doctor or prescriber." Indeed, among the thousands of complaints filed against SmileDirect are those that indicate that patients were unable to reach any actual doctor to describe and discuss their complaints and injuries resulting from the use of the SmileDirect device.

46.     It is beyond dispute that SmileDirect's version of "teledentistry" is not consistent with the applicable medical standard of care for traditional orthodontists. Its false marketing injures both consumers and competing orthodontists and dentists.

47.     SmileDirect's own literature indicates that it is aware that its process is not anything like traditional orthodontics and is not nearly as comprehensive. Indeed, customers, in connection with obtaining their aligners, must acknowledge that, because they are not using a traditional inpatient service of an orthodontist, that their teeth may be "straighter than they currently are but may still be compromised." This is an unambiguous acknowledgement by SmileDirect that its customers did not receive the same level of care as orthodontic patients do.

48.     Similarly, SmileDirect's acknowledgement that customers who use its appliances do not have to undergo a dental exam by a SmileDirect dentist prior to treatment is a further acknowledgement that their level of care is less than the standard in orthodontics, where such an examination is required.

## B. Asserting that SmileDirect is employing teledentistry in accordance with industry standards

49.     SmileDirect represents to customers, in its marketing materials and its consent and history document, which forms the contract between SmileDirect and the customers, that customers are being served by "teledentistry." This representation is made in an effort to convince customers that they are receiving actual, industry-standard dental care. In fact, SmileDirect does not employ teledentistry.

50.     SmileDirect customers are not required to upload or otherwise provide their existing dental records. The ADA has a policy with respect to teledentistry that establishes the industry standard and that SmileDirect plainly does not meet:

> The dentist is responsible for and retains the authority for ensuring the safety and quality of services provided to patients using teledentistry technologies and methods. Services delivered via teledentistry should be consistent with in-person services, and the delivery of services utilizing these modalities must abide by laws addressing privacy and security of a patient's dental and medical information.

Because SmileDirect "affiliated dentists" do not interact directly or even indirectly with customers, the characterization of its business as teledentistry is fraudulent and misleading.

51. When SmileDirect refers to the potential to chat with "your dental team," what it is in fact referring to is not a dentist, but administrative personnel at SmileDirect. These SmileDirect administrative personnel are offering advice concerning orthodontics in an improper and illegal fashion on a regular basis.

### C. Advertising that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces"

52. In fact, this is a falsehood. SmileDirect knows that many of its customers require more than the initial six-month treatment, which is provided to all patients, and that the time required for traditional orthodontics depends upon the level of care and the level of correction required.

53. SmileDirect, in order to gain unfair competitive advantage against orthodontists and to gain market share, has deliberately misstated the efficacy of its product in comparison to traditional orthodontics. It has no actual support for this statement.

54. In the offering document for SmileDirect's shares and in its other advertising, SmileDirect states that "the treating doctor monitors members' progress" and that there is a "seamless connection with the treating doctor ... over the course of treatment." These statements are false and misleading and anticompetitive.

55. In fact, patients do not interact with "treating doctors" through the SmileDirect internet platform. No doctor is ever identified to the customer as being their treating doctor, and

communications between customers and SmileDirect take place through administrative personnel not trained in orthodontics or dentistry. This internet-based administrative interaction is nothing like a seamless communication between a treating doctor and the patient, indeed the patient does not even know who is purported orthodontist/doctor is.

### D. Engaging in deceptive practices and misrepresentations concerning SmileDirect's return policies

56.     When ordering an impression kit from SmileDirect, SmileDirect describes, in writing, "our smile guarantee." It states that "getting started is risk-free. If invisible aligners aren't a good fit for you, you'll get your money back." The prospectus for the SmileDirect offering also states that there is a "smile guarantee which provides members a refund . . . if they are not entirely satisfied." In sum, the uniform disclosures made by SmileDirect appear to make clear that customers who are not satisfied can avail themselves of the "smile guarantee" and get a total refund.

57.     This offer of a refund is fraudulent and deceptive because, in other disclosures, SmileDirect retracts its offer of a "smile guarantee" and limits or eliminates any refund possibility.

58.     SmileDirect's standard form customer agreement contains a small-print, hidden waiver of any claim that might be asserted by a customer as against SmileDirect. Specifically, in a section of the agreement captioned "telehealth," buried in small print and appearing almost as a non sequitur in that paragraph, customers unknowingly represent that they "release SmileDirectClub from liability for any claim by me or any third party in connection with my participation or use of the invisible aligner treatment."

59.     This deliberately hidden provision, contained in a paragraph that does not address litigation waivers but "telehealth," appears to retract entirely the "smile guarantee"/refund policy stated by SmileDirect in other documents and its prospectus.

60.     Although this waiver is plainly unenforceable under Tennessee and other state law—as providers of medical and related services cannot waive claims as against them for their own fraud and negligence—it is designed deceptively to prevent people from asserting any claim as against SmileDirect and of availing themselves of the so-called "smile guarantee."

61.     SmileDirect's representations and counter-representations with respect to its refund policy are deceptive trade practices and fraudulent under applicable law.

**E. Making misrepresentations and deceptive statements with respect to the ability of SmileDirect's aligners to address "bite issues"**

62.     SmileDirect engages in an extreme form of deception, misrepresentation, and fraudulent practice in connection with its representations concerning the ability of its aligners to address bite issues.

63.     In its advertising and emails to customers, as well as in its prospectus, SmileDirect states that it has helped "thousands of people with bite issues." On its blog, "Grin Life", it specifically states "our aligners may also correct bite issues." These statements are misleading and deceptive because SmileDirect knows that its aligners cannot correct bite issues but only worsen them.

64.     Smile Direct has received many complaints from customers whose spacing issues have been addressed, at least in part, by the aligners but for whom the aligners have worsened their bite issue or created a bite issue.

65.     Despite uniform advertising that its product can correct bite issues, SmileDirect, at the same time, disclaims the ability of its product to correct bite issues in the fine print of its

16

customer contract. Therein, it makes customers represent that they understand that the aligner will only address alignment and will not correct any existing bite issue.

66.    SmileDirect's practice in this regard is a traditional "bait and switch" and a fraudulent and deceptive practice under Tennessee and other states' laws. Its practice of making a bold unambiguous promise that the aligners can correct underbites, overbites, and crossbites and then employing small-print language in a consent and history document to repudiate that promise is the definition of a deceptive practice.

### F. Misrepresenting the effect of SmileDirect's aligners upon customer heart rate and blood pressure.

67.    In its blog, Grin Life, SmileDirect, in a gross and deliberate fraudulent statement, states that use of its product will help reduce customer heart rate and blood pressure.

68.    Stated simply, SmileDirect has no basis for these statements whatsoever. They are untrue, false, misleading, and deceptive. They are also anticompetitive.

### G. Making misrepresentations and deceptive statements with respect to customer satisfaction with SmileDirect aligners.

69.    SmileDirect is engaged in one of the largest nationwide campaigns for advertising ever with respect to a new consumer product, spending hundreds of millions of dollars a year advertising its product on television, on the internet, and in print.

70.    In its prospectus and advertising material, SmileDirect consistently states that "its customers are highly satisfied." SmileDirect statement that its members are highly satisfied is false and deceptive.

71.    SmileDirect knows that it has received thousands of serious customer complaints with respect to the efficacy of its product and its business model. Indeed, the dissatisfaction of

customers with the product is reflective by the fact that it has received only a rating of two on Yelp, a widely used consumer review website.

72.     By stating that its customers are highly satisfied and failing to acknowledge the thousands of complaints that it has received, SmileDirect is engaging in deceptive and misleading conduct. Among the complaints available on the internet are the following:

- "We had nightmare experience with this company. We get no resolution after several emails and phone calls there has to be someone else that we can speak to. Our money is getting stolen from us."

- "[In] the seventh month, my crowning implant - which was super expensive to get done came off together. When I called them about this, they kept making me email people. They are generally super hard to get in contact with."

- "This company is truly a mess!!! Hopefully, my teeth will eventually be straight ... with all their delays, more like one and a half years instead of six months."

- "Had I had the opportunity to do this over again, I would have coughed up the extra dough and done it the right way with Invisalign. The quality of the tray simply weren't up to par. I was convinced that they sent me the wrong trays in later months because I wasn't seeing any incremental movement or straightening."

- Customer describing impact upon use of aligners: "A gap in my top teeth is fixed but I still cannot bite down with my front teeth, i.e. I cannot bite into a sandwich or a piece of meat."

- "Product made my teeth worse with spacing and gaps, did not work as described and was led to believe it would get fixed. I paid the full amount upfront for my

treatment where I was promised straight teeth from one of their smile shop employees. After five months and four broken aligners and a cracked tooth and numerous attempts to talk to the customer service to fix my issues, all of which led nowhere."

- "Product doesn't work, when brought to the attention of the company that it didn't work, the new aligners that were given were completely messed up. I'm eight months into my treatment and am very unhappy. They are made **horribly**. They are loose and don't even move my teeth. I'm spending thousands of dollars on these things for no reason."

- "Half a year of aligners with Smile Direct, and my most prominent teeth were WORSE. My girlfriends experience was just as bad. Her aligners keep cracking."

73.     In sum, SmileDirect has deliberately misrepresented the consumer reaction to its product. The consumer reaction has been substantially negative with thousands of customer complaints, which SmileDirect has not disclosed to the consuming public but instead misrepresented.

**H. Failing to inform consumers that SmileDirect's sale of its self-manufactured aligners violates the FD&C Act.**

74.     On or about April 25, 2019, the American Dental Association filed a detailed 20-page Citizen Petition with the FDA outlining why SmileDirect's self-manufactured and self-distributed aligner practice violates the FD&C Act. The FDA is currently addressing these issues.

75.     On May 8, 2019, a federal district court in Georgia found that SmileDirect is illegally practicing dentistry in the state of Georgia. *See* Exhibit A, attached hereto.

76.     At no time has SmileDirect informed consumers that it is in violation of the FD&C Act and illegally practicing dentistry.

77.     Both of these nondisclosures are highly material and highly fraudulent because consumers would be reluctant to use SmileDirect's aligners in any capacity if they knew that they were being sold in violation of both federal and state law.

78.     SmileDirect's failure to make such disclosures has allowed it to keep its fraudulent schemes secret and to perpetuate its deceptive scheme upon doctors and consumers.

79.     Manufacturers and sellers of medical devices are prohibited from introducing or causing them to be introduced into interstate commerce if such device is misbranded. *See* FD&C Act § 301(a); FD&C Act § 301(b).

80.     The aligners manufactured by SmileDirect in its own facility are class two medical devices regulated by the FDA. These devices are subject to a "by prescription only" restriction that applies to other manufacturers of such aligners but that SmileDirect has effectively and illegally eluded.

81.     As shown herein, the aligner devices manufactured by SmileDirect are not provided by a prescription. Instead, the aligner program is developed by unlicensed medical personnel in Costa Rica, in connection with administrative staff in the United States, and then rubberstamped by doctors, who receive only a $50 fee in connection with such process and, again, only if they approve the customer for treatment. This process does not comply with the requirements for an orthodontic prescription under applicable medical standards.

82.     As a manufacturer of its aligners, SmileDirect was legally obligated to seek FDA clearance for such product, likely pursuant to Rule 510(k). SmileDirect instead has decided to

flout these legal requirements and is selling its product, which should be labeled and sold only by prescription, in an over-the-counter fashion.

83.     SmileDirect's failure to inform consumers that its product is being sold in violation of the very consumer laws that are designed to protect them is a fraudulent practice in and of itself.

84.     Similarly, on or about May 8, 2019, a federal district court in Georgia specifically refused to find that SmileDirect was not acting as a dentist after SmileDirect requested declaratory relief to that effect.

85.     In connection with denying declaratory relief to SmileDirect, the court made clear that SmileDirect's assertion that it was not acting as a dentist in the state of Georgia was baseless.

86.     This decision is likely to be followed by other courts in the near future.

87.     This decision and its import have also not been disclosed to consumers by SmileDirect.

88.     SmileDirect is deliberately hiding from consumers—for competitive and monetary advantage—the fact that it is illegally operating as an unlicensed dentist in connection with its core business. Disclosure of this legal fact would directly impact SmileDirect's business model.

89.     SmileDirect's attempt to profit at the expense of customers and at the expense of traditional orthodontics is negligent, fraudulent, deceptive, and a violation of the Lanham Act.

## CLASS ALLEGATIONS

**A.  Class Definitions**

90.     Plaintiffs seek to represent two classes and three subclasses in this case.

91. The first class defined herein is the class of all dental or orthodontic providers who provide traditional orthodontic services or goods or services similar to those that SmileDirect purportedly offers. This class—the "Provider Class"—asserts claims for violations of the Lanham Act, the Tennessee Consumer Protection Act of 1977, and other unfair or deceptive acts or practices statutes of the respective states in which such providers reside, collectively.

92. Included in the first class are two subclasses. The "Florida Provider Subclass" is the class of all dental or orthodontic providers who provide traditional orthodontic services or goods or services similar to those that SmileDirect purportedly offers in the State of Florida. The "New York Provider Subclass" is the class of all dental or orthodontic providers who provide traditional orthodontic services or goods or services similar to those that SmileDirect purportedly offers in New York.

93. The second class defined herein is the class of all customers who have used or otherwise paid for the SmileDirect aligner program and product. This class—the "Consumer Class"—asserts claims for breach of warranty, violations of the Magnusson-Moss Act, fraud, and violations of the Tennessee Consumer Protection Act of 1977 and other unfair or deceptive acts or practices statutes of the respective states in which such consumers reside, collectively.

94. Included in the second class is one subclass. The "Michigan Consumer Subclass" is the class of all customers who have used or otherwise paid for the SmileDirect aligner program and product in Michigan.

95. Excluded from all classes are defendants, any entity in which defendants have a controlling interest, and the respective officers, directors, legal representatives, employees, successors, subsidiaries, and assigns of such persons and entities.

**B.  Numerosity: Fed. R. Civ. P. 23(a)(1)**

96.  The members of the classes defined herein are so numerous and geographically dispersed that individual joiner of all class members is impracticable.

97.  The Provider Class, based upon available records, includes at least 10,000 members.

98.  The Consumer Class, based upon statements made by SmileDirect, includes hundreds of thousands of members.

99.  The individual's names and addresses for each class are already publicly available or available from the records of SmileDirect.

100.  Class members may be notified of the pendency of this action by judicially-accepted and court-approved notice, directly or via publication.

**C.  Commonality and Predominance: Fed. R. Civ. P. 23(a)(2) & 23(b)(3)**

101.  This action involves common questions of law and fact that predominate over any questions affecting individual class members.

102.  Plaintiffs' claims do not seek personal injury damages of any nature.

103.  The Provider Class seeks only damages related to the profits earned by Defendants in connection with the sale of the SmileDirect aligners and/or the profits lost by such providers as a result of SmileDirect's misrepresentations and deceptive and anti-competitive acts and practices.

104.  The Consumer Class seeks only damages resulting from the misrepresentations and fraudulent and deceptive practices related to the sale and marketing of the SmileDirect aligners in the form or monetary or injunctive relief.

105.     The common questions of law in fact which predominate over questions affecting individual class members include without limitation:

   a.   whether SmileDirect knew or should have known that its aligners were being mis-marketed and misrepresented in nationwide commerce;

   b.   whether SmileDirect was violating federal law, including the FDC&A Act, in connection with its distribution of aligners that required FDA approval, but for which no FDA approval was received;

   c.   whether SmileDirect has made deliberate misrepresentations with respect to the efficacy of its aligners and the purposes for which they may be used;

   d.   whether SmileDirect has been illegally operating as a dentist in the various states in which engages in commerce;

   e.   whether SmileDirect's practice of offering refunds and then refusing to make refunds based upon a fine-print waiver (that is unenforceable under state law) is a deceptive practice; and

   f.   whether SmileDirect's deception and fraudulent marketing violate 15 U.S.C §1125(a).

**D. Adequacy of representation, Fed. R. Civ. P. 23(a)(4)**

106.     Plaintiffs are adequate class representatives because their interests did not conflict with the interest of the other class members whom they seek to represent.

107.     Plaintiffs have retained counsel competent and experienced in complex class action litigation, including consumer litigation and Lanham Act litigation, and Plaintiffs intend to prosecute this action vigorously.

108.     The classes' interests will be fairly and adequately represented by Plaintiffs.

### E. **Declaratory and injunctive relief: Fed. R. Civ. P. 23(b)(2)**

109. The prosecution of separate actions by individual class members in each class would create a risk of inconsistent or varying adjudication with respect to class members that might establish incompatible standards of conduct for Defendants.

110. Such individual actions would create a risk of adjudications that would be dispositive of the interests of all class members and impair their interests.

111. Defendants have acted and/or refused to act on grounds generally applicable to the class making final injunctive relief and declaratory relief appropriate.

### F. **Superiority: Fed. R. Civ. P. 23(b)(3)**

112. A class action is superior to any other available means for a fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this case.

113. The damages or other financial detriment suffered by Plaintiffs and the other class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impossible for class members to individually seek redress for Defendants' unlawful conduct.

114. Even if each class member could afford litigation, individualized litigation would create a potential for inconsistent and contradictory judgments and dramatically increase the delay and expense to all parties and the court system.

115. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, the common use of scale, and comprehensive supervision by a single court.

## INAPPLICABILITY OF ARBITRATION CLAUSE

116.     Contained in the fine print of the customer agreement executed by each customer of SmileDirect is an unenforceable arbitration cause. More importantly, the arbitration clause by its own terms does not apply to any claim that <u>could</u> otherwise be adjudicated in the small claims court in Tennessee, i.e., the General Sessions Court.

117.     Each of the Consumer Class members' claims could otherwise be adjudicated in the General Sessions Court as they only seek monetary damages equal to what they paid to SmileDirect, which, in all cases, is less than $25,000.

## <u>COUNT ONE</u>

## FALSE ADVERTISING UNDER THE LANHAM ACT, 15 U.S.C. § 1125(a)

### (On behalf of the Provider Class)

118.     Plaintiffs Ciccio, Raj, and Kapit repeat and re-allege the allegations set forth in paragraphs 1 through 15, 17 through 92, 95 thorough 97, 99 through 103, and 105 through 115 of this complaint, as though fully set forth herein.

119.     This claim arises under the Lanham Act, 15 U.S.C. § 1125(a).

120.     On the basis of the foregoing paragraphs and allegations, Defendants, in connection with goods or services in interstate commerce, have used a false and misleading description of fact and a false or misleading representation of fact, which, in commercial advertising or promotion misrepresents the nature, characteristics, and qualities of the goods and services sold and marketed by them and at their specific direction.

121.     Moreover, Defendants' intentional and deliberate withholding of material facts with respect to their illegal operation as dentists and their violation of the FD&C Act in

connection with the sale and marketing of their aligner trays also constitutes misrepresentation of the nature, characteristics, and qualities of their products and services.

122. On the basis of the foregoing paragraphs, Defendants have, in connection with goods or services, used a false or misleading description of fact or a false or misleading representation of fact or an omission of material fact, which in commercial advertising or promotion, misrepresented the nature, characteristics, and/or qualities of their aligner trays and related services in interstate commerce.

123. Defendants' statements and omissions have the tendency to deceive and have actually deceived customers purchasing or contemplating the purchase of their products and services.

124. Defendants' deception was material and did influence the purchasing decisions of customers who would otherwise have used traditional orthodontic or dental services.

125. Defendants' false and misleading statements and representations and material omissions were and are made in interstate commerce.

126. Defendants' improper activities, as described above and including the material omissions as described above, were willful and deliberate and part of an intentional business plan to avoid discovery of their deception until SmileDirect became a public company and raised money in the public markets.

127. As a result of Defendants' improper activities, Plaintiffs Ciccio, Raj, and Kapit and the Provider Class have suffered and continue to suffer injury and damages, including but not limited to loss of sales and profits that they would have made but for the false and deceptive advertising and marketing made by Defendants.

128.     This injury will continue, unless Defendants are preliminarily and permanently enjoined by this court.

## COUNT TWO

**BREACH OF EXPRESS WARRANTY UNDER TENNESSEE LAW**

**(On behalf of the Consumer Class)**

129.     Plaintiff Nigohosian repeats and re-alleges the allegations set forth in paragraphs 1 through 12, 16 through 90, 93 thorough 96, 98 through 102, and 104 through 117 of this complaint, as though fully set forth herein.

130.     By advertising that SmileDirect customers receive the same level of orthodontic care as patients who employ traditional orthodontists, Defendants expressly warranted to Plaintiff Nigohosian and Consumer Class Members that SmileDirect's aligners complied with the standards of care of the orthodontic profession.

131.     The aligners did not provide the same level of orthodontic care as a traditional orthodontist. Indeed, they did not even meet the baseline standards of care of the orthodontic profession. Accordingly, SmileDirect breached this express warranty.

132.     Moreover, Defendants made the following express warranties regarding SmileDirect's aligners, uniformly and in writing, through its advertisements:

    a.   that, in developing and producing its aligners, SmileDirect is employing teledentistry in accordance with industry standards;

    b.   that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces;"

    c.   that SmileDirect's aligners were backed by a "smile guarantee;"

    d.   that SmileDirect's aligners address "bite issues;"

e.  that SmileDirect's aligners reduce customers' heart rate and blood pressure; and

f.  that customers are satisfied with SmileDirect aligners.

By advertising these claims, Defendants expressly warranted to purchasers of SmileDirect's aligners, pursuant to Tenn. Code. § 47-2-313, that those aligners would exhibit the characteristics and the combination of characteristics claimed. Such statements became the basis of the bargain for Plaintiff Nigohosian and Consumer Class Members because such statements are among the facts a reasonable consumer would consider material in the purchase of aligners for orthodontic treatment.

133.    In fact, SmileDirect's aligners did not comply with the standards of care of the orthodontic profession. As such, it was unlawful for SmileDirect to sell the aligners to the public.

134.    In addition, Defendants, through their advertising regarding SmileDirect, created an express warranty that SmileDirect's aligners produced certain orthodontic results, purportedly allowing consumers to make apples-to-apples comparisons with other types of orthodontic treatment.

135.    In fact, SmileDirect's aligners did not produce the claimed orthodontic results or otherwise exhibit the characteristics or the combination of characteristics claimed in its advertisements.

136.    As a result of the foregoing breaches of express warranty, Plaintiff Nigohosian and Consumer Class Members have been damaged in that they purchased aligners that were unlawfully sold in breach of such warranties, did not comply with applicable standards of care, did not perform as promised, and were less valuable than what was paid for them.

## COUNT THREE

## VIOLATION OF MAGNUSON-MOSS ACT, 15 U.S.C. §§ 2301, et seq.

### (On behalf of the Consumer Class)

137.   Plaintiff Nigohosian repeats and re-alleges the allegations set forth in paragraphs 1 through 12, 16 through 90, 93 thorough 96, 98 through 102, and 104 through 117 of this complaint, as though fully set forth herein.

138.   The SmileDirect aligners are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

139.   Plaintiff Nigohosian and Consumer Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3), because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

140.   The Defendants are each a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

141.   Section 2310(d)(1) of Chapter 15 of the United States Code provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

142.   Defendants provided Plaintiff Nigohosian and Consumer Class Members with warranties in connection with the purchase of SmileDirect's aligners, each of which was a "written warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

143.   Defendants breached these written warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1).

144.    Any efforts to limit the written warranties in a manner that would exclude coverage of SmileDirect's aligners is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the aligners is null and void.

145.    Pursuant to 15 U.S.C. § 2310(e), Plaintiff Nigohosian is entitled to bring this class action and is not required to give Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff Nigohosian pursuant to Rule 23 of the Federal Rules of Civil Procedure.

146.    Plaintiff Nigohosian's individual claims place into controversy an amount equal to or exceeding $25. The amount in controversy of this entire action, for all class members combined, exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiff Nigohosian, individually and on behalf of the other Consumer Class Members, seek all damages permitted by law, including diminution in value of their aligners, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff Nigohosian and the other Consumer Class Members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiff Nigohosian and the other Consumer Class Members in connection with the commencement and prosecution of this action.

147.    Further, Plaintiffs and the Class are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1).

## COUNT FOUR

## COMMON LAW FRAUD

### (On behalf of the Consumer Class)

148.     Plaintiff Nigohosian repeats and re-alleges the allegations set forth in paragraphs 1 through 12, 16 through 90, 93 thorough 96, 98 through 102, and 104 through 117 of this complaint, as though fully set forth herein.

149.     Defendants intentionally made materially false and misleading uniform misrepresentations in writing regarding the qualities and applications of their aligners and related services.

150.     Defendants also intentionally omitted to state material information necessary for customers to properly evaluate the efficacy of the aligners and related services, including (1) that defendants were illegally operating as dentists in the United States and (2) that the sale of their product without FDA approval was in violation of federal law.

151.     Plaintiff Nigohosian and Consumer Class Members reasonably relied upon Defendants' false and misleading representations made in writing and are presumed to have relied upon the material omissions outlined herein.

152.     Plaintiff Nigohosian and Consumer Class Members did not know and had no reason to know that the products were misrepresented and that Defendants have failed to make material disclosures with respect to their illegal conduct and their violations of federal and state law in connection with the distribution of the aligners and related services.

153.     Defendants intended that Plaintiff Nigohosian and Consumer Class Members would rely upon the misrepresentations and omissions.

154.     Plaintiff Nigohosian and Consumer Class Members have been injured as a result of Defendants' fraudulent conduct.

155.     Defendant is liable to Plaintiff Nigohosian and Consumer Class Members for damages sustained as a result of Defendants' fraud.

## COUNT FIVE

## TENNESSEE CONSUMER PROTECTION ACT,

### (On behalf of Provider and Consumer Classes)

166.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 117 of this complaint, as though fully set forth herein.

167.     Defendants advertised and sold "goods" or "services" in "trade" and "commerce," as meant by Tenn. Code § 47-18-103.

168.     Defendants, operating in Tennessee, engaged in unlawful, unfair, and deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of goods and services in violation of Tenn. Code Ann. § 47-18-104, including but not limited to the following:

> a.  Causing likelihood of confusion or of misunderstanding as to the sponsorship, approval, or certification of goods or services, in violation of Tenn. Code Ann. §§ 47-18-104(b)(2),
>
> b.  Causing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another, in violation of Tenn. Code Ann. §§ 47-18-104(b)(3);
>
> c.  Representing that goods or services have sponsorship, approval, characteristics, uses, and benefits that they do not have or that a person has a sponsorship

approval, status, affiliation or connection that such person does not have, in violation of Tenn. Code Ann. §§ 47-18-104(b)(5);

d.  Representing that goods or services are of a particular standard, quality or grade, in violation of Tenn. Code Ann. §§ 47-18-104(b)(7);

e.  Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law, in violation of Tenn. Code Ann. § 47-18-104(b)(12);

f.  Representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve, in violation of Tenn. Code Ann. § 47-18-104(b)(19); and

g.  Using statements or illustrations in any advertisement which create a false impression of the grade, quality, quantity, make, value, age, size, color, usability or origin of the goods or services offered, or which may otherwise misrepresent the goods or services in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised goods or services to other goods or services, in violation of Tenn. Code Ann. § 47-18-104(b)(21).

169.    The above unlawful, unfair, and deceptive acts and practices by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Class Members that they could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

170.    Defendants knew or should have known that SmileDirect's business practices were unlawful, unfair, and deceptive. Defendants' actions in engaging in the above-named

deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and Class Members.

171.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and Class Members suffered an ascertainable loss of money or property, real or personal, as described above, including, but not limited to, for the Consumer Class, their loss of money paid to SmileDirect and, for the Provider Class, loss of business revenue.

172.    Plaintiffs and Class Members seek declaratory relief, injunctive relief, and attorneys' fees and costs under Tenn. Code Ann. § 47-18-109.

173.    Plaintiffs seek individual relief under Tenn. Code Ann. § 47-18-109, including, but not limited to, declaratory relief, injunctive relief, actual damages, treble damages for each willful or knowing violation, and attorneys' fees and costs.

## COUNT SIX

### MICHIGAN CONSUMER PROTECTION ACT

#### (On behalf of Michigan Consumer Subclass)

174.    Plaintiff Nigohosian repeats and re-alleges the allegations set forth in paragraphs 1 through 12, 16 through 90, 93 thorough 96, 98 through 102, and 104 through 117 of this complaint, as though fully set forth herein.

175.    Defendants, operating in Michigan, engaged in unfair, unconscionable, and deceptive methods, acts, and practices in the conduct of trade and commerce, including causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of their goods or services; representing that their goods and services had approval, characteristics, uses, and benefits that they did not; causing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction;

failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; entering into a consumer transaction in which the consumer waives or purports to waive a right, benefit, or immunity provided by law, unless the waiver is clearly stated and the consumer has specifically consented to it; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner, in violation of Mich. Comp. Laws Ann. § 445.903(1). This includes but is not limited to the following:

    a.  Claiming that SmileDirect customers receive the same level of orthodontic care as patients who employ traditional orthodontists;

    b.  Asserting that SmileDirect is employing teledentistry in accordance with industry standards;

    c.  Advertising that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces;"

    d.  Making misrepresentations and deceptive statements concerning SmileDirect's return policies;

    e.  Making misrepresentations and deceptive statements concerning the ability of SmileDirect's aligners to address "bite issues;"

    f.  Making misrepresentations and deceptive statements concerning the effect of SmileDirect's aligners upon consumer heart rate and blood pressure;

    g.  Making misrepresentations and deceptive statements concerning consumer satisfaction with SmileDirect aligners; and

h.  Failing to inform consumers that SmileDirect's sale of its self-manufactured aligners violates the FD&C Act, in violation of the duties imposed by Mich. Comp. Laws Ann. § 445.72(1).

176.  As a direct and proximate result of these practices, Plaintiff Nigohosian and Michigan Consumer Subclass Members suffered injuries to legally protected interests, as described above, including but not limited to their loss of money paid to SmileDirect.

177.  The above unfair and deceptive practices and acts by SmileDirect were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff Nigohosian and Michigan Consumer Subclass Members that they could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition. These acts were within the penumbra of common law, statutory, or other established concepts of unfairness.

178.  Defendants knew or should have known that SmileDirect's practices were unfair and deceptive. Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Nigohosian and Michigan Consumer Subclass Members.

179.  Plaintiff Nigohosian and Michigan Consumer Subclass Members seek injunctive relief to enjoin Defendants from continuing SmileDirect's unfair and deceptive acts; monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiff Nigohosian and Michigan Consumer Subclass Members; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws Ann. § 445.911.

<u>**COUNT SEVEN**</u>

**FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**

**(On behalf of the Florida Provider Subclass)**

180.    Plaintiff Kapit repeats and re-alleges the allegations set forth in paragraphs 1 through 12, 15, 17 through 92, 95 thorough 97, 99 through 103, and 105 through 115 of this complaint, as though fully set forth herein.

181.    Defendants, operating in Florida, engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, in violation of Fla. Stat. § 501.204(1). This includes but is not limited to the following:

      a.  Claiming that SmileDirect customers receive the same level of orthodontic care as patients who employ traditional orthodontists;

      b.  Asserting that SmileDirect is employing teledentistry in accordance with industry standards;

      c.  Advertising that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces;"

      d.  Making misrepresentations and deceptive statements concerning SmileDirect's return policies;

      e.  Making misrepresentations and deceptive statements concerning the ability of SmileDirect's aligners to address "bite issues;"

      f.  Making misrepresentations and deceptive statements concerning the effect of SmileDirect's aligners upon consumer heart rate and blood pressure;

      g.  Making misrepresentations and deceptive statements concerning consumer satisfaction with SmileDirect aligners; and

h.  Failing to inform consumers that SmileDirect's sale of its self-manufactured aligners violates the FD&C Act.

182.   As a direct and proximate result of Defendants' practices, Plaintiff Kapit and Florida Provider Subclass Members suffered the injury and/or damages described herein, including but not limited to loss of business revenue.

183.   The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff Kapit and Florida Provider Subclass Members that they could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

184.   Defendants knew or should have known that SmileDirect's business practices were unlawful, unfair, and deceptive. Defendants' actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Kapit and Florida Provider Subclass Members.

185.   Plaintiff Kapit and Florida Provider Subclass Members seek actual damages under Fla. Stat. § 501.211(2), and attorneys' fees under Fla. Stat. § 501.2105(1), to be proven at trial.

186.   Plaintiff Kapit and Florida Provider Subclass Members also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, and any other just and proper relief available under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq.

## COUNT EIGHT

## NEW YORK GENERAL BUSINESS LAW § 349

### (On behalf of the New York Provider Subclass)

187.    Plaintiff Ciccio repeats and re-alleges the allegations set forth in paragraphs 1 through 13, 17 through 92, 95 thorough 97, 99 through 103, and 105 through 115 of this complaint, as though fully set forth herein.

188.    Defendants, operating in New York, engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce and furnishing of services, in violation of N.Y. Gen. Bus. Law § 349(a), including but not limited to the following:

a. Claiming that SmileDirect customers receive the same level of orthodontic care as patients who employ traditional orthodontists;

b. Asserting that SmileDirect is employing teledentistry in accordance with industry standards;

c. Advertising that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces;"

d. Making misrepresentations and deceptive statements concerning SmileDirect's return policies;

e. Making misrepresentations and deceptive statements concerning the ability of SmileDirect's aligners to address "bite issues;"

f. Making misrepresentations and deceptive statements concerning the effect of SmileDirect's aligners upon consumer heart rate and blood pressure;

g. Making misrepresentations and deceptive statements concerning consumer satisfaction with SmileDirect aligners; and

h.  Failing to inform consumers that SmileDirect's sale of its self-manufactured aligners violates the FD&C Act.

189.   As a direct and proximate result of Defendants' deceptive trade practices, Plaintiffs Ciccio and New York Provider Subclass Members suffered injury and/or damages, including the loss of business revenue.

190.   The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs Ciccio and New York Provider Subclass Members that they could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

191.   Defendants knew or should have known that SmileDirect's business practices were unlawful, unfair, and deceptive. Defendants' actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Ciccio and New York Provider Subclass Members.

192.   Plaintiff Ciccio and New York Provider Subclass Members seek relief under N.Y. Gen. Bus. Law § 349(h), including, but not limited to, actual damages, treble damages, statutory damages, injunctive relief, and/or attorney's fees and costs.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class Members, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.   That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' attorneys as Class Counsel;

B.      That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.      That the Court award Plaintiffs and the other Class Members compensatory, consequential, and general damages in an amount to be determined at trial;

D.      That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

E.      That the Court award statutory damages, and punitive or exemplary damages, to the extent permitted by law;

F.      That the unlawful acts alleged in this Complaint be adjudged and decreed to be unfair and deceptive business acts and practices in violation of Michigan and Tennessee consumer protection laws;

G.      That Plaintiffs be granted the declaratory relief sought herein;

H.      That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, including fees and expenses;

I.      That the Court award pre- and post-judgment interest at the maximum legal rate; and

J.      That the Court grant all such other relief as it deems just and proper.

DATED: September 24, 2019.

Respectfully submitted,

s/Edward M. Yarbrough
Edward M. Yarbrough, TNBPR#004097
W. Justin Adams, TNBPR#022433
BONE MCALLESTER NORTON PLLC
511 Union Street, Suite 1600
Nashville, Tennessee 37219
TEL: (615) 238-6390
FAX: (615) 687-6990
Email:        eyarbrough@bonelaw.com
Email:        wjadams@bonelaw.com

Robert K. Spotswood, *pro hac vice pending*
Michael T. Sansbury, *pro hac vice pending*
SPOTSWOOD SANSOM & SANSBURY LLC
One Federal Place
1819 Fifth Avenue North
Suite 1050
Birmingham, Alabama 35203
TEL:   (205) 986-3620
FAX:   (205) 986-3639
Email:        rks@spotswoodllc.com
              msansbury@spotswoodllc.com

Richard Stone, *pro hac vice pending*
BLACKNER, STONE & ASSOCS.
123 Australian Avenue
Palm Beach, Florida 33480
TEL: 561-804-9569
Email:        rstoneesq@aol.com

*Attorneys for the Plaintiffs*