# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| DR. JOSEPH CICCIO et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Case No. 3:19-cv-00845** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| SMILEDIRECTCLUB, LLC et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM</u>

Defendants SmileDirectClub, LLC ("SmileDirect"), Camelot Venture Group ("CVG"), Alexander Fenkell, David Katzman, Steven Katzman, and Jeffrey Sulitzer have filed a Motion to Dismiss the Plaintiff Orthodontists' Claims (Docket No. 68), to which the plaintiffs have filed a Response (Docket No. 80), and the defendants have filed a Reply (Docket No. 83). The defendants have also filed a Motion to Strike Certain Allegations (Docket No. 70), to which the plaintiffs have filed a Response (Docket No. 81), and the defendants have filed a Reply (Docket No. 84). Finally, the plaintiffs, including two previously voluntarily dismissed plaintiffs, have filed a Motion to Rejoin Plaintiffs, or in the Alternative, to Intervene (Docket No. 85), to which the defendants have filed a Response (Docket No. 87), the movants have filed a Reply (Docket No. 89), and the defendants have filed a Surreply (Docket No. 93). For the reasons set out herein, the defendants' motions will be denied and the plaintiffs' motion will be granted, with the qualification that it does not effect the binding nature of the court's Order of December 2, 2019 (Docket No. 58).

# I. BACKGROUND[1]

SmileDirect is a Nashville-based Delaware corporation that sells "plastic aligners" for orthodontic use. (Docket No. 36 ¶¶ 2.b, 2.d, 42.) SmileDirect markets its "SmileDirect Program," built around the aligners and teledentistry, as an alternative to conventional orthodontic care. The rise of SmileDirect in the dental marketplace has drawn a substantial amount of attention—including a number of regulatory complaints—from, among others, dentists and orthodontists who consider SmileDirect to be an inferior alternative to established methods of treating orthodontic problems. (*Id.* ¶¶ 2, 6, 78.) For example, the American Dental Association ("ADA") filed a complaint with the Federal Trade Commission alleging that SmileDirect has made "numerous false and misleading claims . . . to fraudulently entice customers to purchase its products and services." (*Id.* ¶ 2.c.) The ADA and its state affiliates have also filed complaints with the Food and Drug Administration and with state licensing authorities. (*Id.* ¶¶ 2.a–.b.) SmileDirect maintains that the onslaught of complaints and litigation that it has faced has been the result of a self-interested desire, on the part of conventional dentists and orthodontists, to protect themselves from competition.

The initial Complaint in this case was filed by a SmileDirect customer, Dena Nigohosian, and three orthodontists, Dr. Joseph Ciccio, Dr. Arthur Kapit, and Dr. Vishu Raj.[2] (Docket No. 1 ¶¶ 13–16.) It pleaded eight counts under various common law and statutory theories of false advertising, consumer protection, and fraud. (*Id.* ¶¶ 118–92.) The plaintiffs named as defendants SmileDirect, SmileDirect shareholder CVG, and SmileDirect executives David and Steven Katzman. (*Id.* ¶¶ 18–20.) On October 25, 2019, the defendants filed several motions: a Motion to

---

[1] Unless otherwise indicated, the facts herein are taken from the Amended Complaint. (Docket No. 36.)

[2] For ease of reading, the court will refer to all the dental provider plaintiffs as "orthodontists." This does not reflect any determination regarding any plaintiff's individual expertise, licensure, or scope of practice, beyond the fact that they claim to provide dental care that addresses conditions also addressed by the SmileDirect Program.

2

Dismiss directed at all claims against CVG and the Katzmans (Docket No. 24); a Motion to Dismiss directed at the orthodontist plaintiffs' claims against SmileDirect (Docket No. 29); a Motion to Compel Arbitration by Nigohosian (Docket No. 27); and a Motion for Rule 11 Sanctions against all plaintiffs and their attorneys (Docket No. 31).

Nigohosian concedes that, as a SmileDirect customer with an online account, she was electronically required to accept terms set forth in an "Informed Consent" document that included an arbitration provision with the following relevant language:

> AGREEMENT TO ARBITRATE – I hereby agree that any dispute regarding the products and services offered my [sic] SmileDirectClub and/or affiliated dental professionals, including but not limited to medical malpractice disputes, will be determined by submission to arbitration and not my [sic] lawsuit filed in any court, except claims within the jurisdiction of Small Claims Court . . . . I agree that the arbitration shall be conducted by a single, neutral arbitrator selected by the parties and shall be resolved using the rules of the American Arbitration Association.

(Docket No. 27 at 3; Docket No. 38 at 2.) She has argued, however, that the arbitration clause does not reach her claims, because, among other things, those claims are "within the jurisdiction of Small Claims Court."

On November 15, 2019, the original plaintiffs—joined by several new consumer plaintiffs[3]—filed an Amended Complaint, which, among other things, added two more individual defendants. (Docket No. 36.) On November 21, 2019, the court denied the pending motions to dismiss as moot in light of the fact that the original complaint had been superseded. (Docket No. 50.)

---

[3] The new consumer plaintiffs were Whitney Blaine, David Capablanca, Emily Gebhard, Krystal Perkins, Romonia Simpson, Anthony Vasquez, Jessica Vaughn, Zoe Williams, Dana Johnson, Penny Young Carrasquillo, R.B., Mike Alkema, Visaka Bhandari, Gabriella Loiseau, Eliana Molina, Blair Lofland, Garbriel Campos, Kenneth Phillips, Pamela Flowers, Jane Lee, Vance Roodzant, and Laurel Wilcox. (Docket No. 36 at 1.)

3

On December 2, 2019, the court granted the Motion to Compel Arbitration in part and denied it in part. (Docket No. 58.) The court did not rule on the ultimate arbitrability of Nigohosian's claims against SmileDirect, but rather concluded that, under the terms of the relevant arbitration clause, the threshold issue of arbitrability should be decided, in the first instance, through the arbitration process. (*Id.* at 6.) The court's Order was directed only at Nigohosian, because she was the only plaintiff subject to the original motion to compel. The new consumer plaintiffs, however, also appear to have signed the same or a similar arbitration clause. The court retained jurisdiction over Nigohosian's claims pending resolution of the arbitration process. (*Id.*)

On December 4, 2019, the court, at the defendants' request, denied their Rule 11 motion as moot. (Docket No. 60.) The defendants had explained that, while they continued to object to language in the Amended Complaint on the grounds they had raised with regard to the Complaint, they now intended to pursue a Rule 12(f) motion to strike, rather than a Rule 11 motion for sanctions. (Docket No. 59 at 1.)

On December 12, 2019, all of the remaining consumer plaintiffs except Nigohosian and one other filed a Notice of Voluntary Dismissal Without Prejudice. (Docket No. 64.) Nigohosian and the other remaining plaintiff filed a Notice of Voluntary Dismissal on January 13, 2020. (Docket No. 78.)

In the meantime, the defendants, on December 13, 2019, filed their promised Motion to Strike. (Docket No. 70.) The defendants ask the court to strike three classes of statements from the Amended Complaint: first, a list of statements, provided in Appendix A to the motion, that the defendants argue are immaterial, impertinent, and/or scandalous; second, "class allegations that on their face require such individualized inquiry as to render a class action improper"; and, finally, any allegations solely in support of the claims of the consumer plaintiffs, all of whom, at the time

4

the motion was filed, had been (or shortly would be) voluntarily terminated from the case. (*Id*. at 1.)

On the same day, the defendants filed a Motion to Dismiss the Plaintiff Orthodontists' Claims. (Docket No. 68.) The defendants argue that the plaintiffs' facts, taken as true, do not support any ground for recovery by the orthodontists, who were not themselves SmileDirect customers. The defendants argue further that the plaintiffs' fraud allegations have not been pleaded with the heightened level of particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. (*Id.* at 1.)

On January 27, 2020, while the defendants' motions were pending, one of the consumers who had voluntarily dismissed her claims in this case, Dana Johnson, filed a Demand for Arbitration against SmileDirect and other defendants with the American Arbitration Association ("AAA"). He purported to act both for himself and on behalf of a class of similarly situated consumers. (Docket No. 85-1 at 1.) On February 26, 2020, AAA Assistant Vice President Adam Shoneck sent the attorneys involved a letter informing them that the AAA's "Healthcare Due Process Protocol" dictates that the AAA "may only proceed forward on arbitration matters arising out of healthcare treatment agreements if the parties agree to binding forms of dispute resolution after a dispute arises." (Docket No. 85-2 at 1 (emphasis in original).) The letter included signature blocks offering the parties the opportunity to agree to arbitration. (*Id.*) Unsurprisingly, Johnson did not consent to arbitrate her claims.

In light of the AAA's determination that it would not arbitrate Johnson's claims, Johnson and Nigohosian have sought to rejoin the case. (Docket No. 85 at 4.) The defendants oppose the request, pointing out, among other things, that the AAA determination that their claims were not

arbitrable was made administratively, not by an arbitrator, and involved only Johnson, not Nigohosian or any other previously named plaintiffs. (Docket No. 87 at 2–3.)

The Amended Complaint includes thirteen counts, some of them attributed to a putative consumer class, some to a putative orthodontist class, some to both, and some to particular geographic subclasses. Each count is attributed to at least one plaintiff, although, for some of the counts, the relevant plaintiff or plaintiffs have had their claims voluntarily dismissed and, at least at this point, have not sought to rejoin the case. The counts are as follows:

| Count | Type | On behalf of | By |
|-------|------|--------------|-----|
| I | False advertising under the Lanham Act, 15 U.S.C. § 1125(a) | Orthodontists | All named orthodontist plaintiffs |
| II | Violation of Magnuson-Moss Act, 15 U.S.C. § 2301 *et seq.* | Consumers | All named consumer plaintiffs |
| III | Breach of express warranty under Tennessee law | Consumers | All named consumer plaintiffs |
| IV | Common law fraud | Consumers | All named consumer plaintiffs |
| V | Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101 *et seq.* | Orthodontists and Consumers | All named plaintiffs |
| VI | California Unfair Competition Law, Cal. Bus. & Prof. Code § 17500 | California Consumers | Blaine, Capablanca, Gebhard, Perkins, Simpson, Vasquez, and Vaughn* |
| VII | Colorado Consumer Protection Act, C.R.S.A. 6-1-105 | Colorado Consumers | Williams* |
| VIII | Florida Deceptive and Unfair Trade Practices Act, Fla Stat. § 501.204(l) | Florida Orthodontists and Consumers | Kapit, Johnson, Young-Carrasquillo, and R.B. |
| IX | Michigan Consumer Protection Act, Mich. Comp. Laws. Ann. § 445.903(1) | Michigan Consumers | Alkema and Nigohosian |

6

| X | New York General Business Law §§ 349 & 350-A | New York Orthodontists and Consumers | Ciccio, Bhandari, Loiseau, and Molina |
|------|---------------------------------------------------------------|---------------------------------------|----------------------------------------|
| XI | Virginia Consumer Protection Act, Va. Code. Ann. § 59.1-200 | Virginia Consumers | Lee* |
| XII | Washington Consumer Protection Act, Was. Rev. Code Ann. § 19.86.020 | Washington Consumers | Roodzant* |
| XIII | Wisconsin Deceptive Trade Practices Act, W.S.A. § 100.18 | Wisconsin Consumers | Wilcox* |

\* All named plaintiffs for this cause of action have been voluntarily dismissed and have not sought to rejoin the case.

## II. LEGAL STANDARD

### A. Joinder/Intervention

Rule 20(a)(1) of the Federal Rules of Civil Procedure permits joinder of plaintiffs if "(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action." "This accords with the general principle under the Federal Rules of Civil Procedure to allow 'the broadest possible scope of action consistent with fairness to the parties.'" *Bridgeport Music, Inc. v. 11C Music*, 202 F.R.D. 229, 231 (M.D. Tenn. 2001) (Campbell, J.) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966)).

Rule 24 provides that "the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "Once these two requirements are established, the district court must then balance undue delay and prejudice to the original parties, if any, and any other relevant factors to determine

whether, in the court's discretion, intervention should be allowed." *United States v. Michigan*, 424 F.3d 438, 445 (6th Cir. 2005).

## B. Motion to Dismiss

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

Rule 9(b) of the Federal Rules of Civil Procedure states that, when pleading fraud, "a party must state with particularity the circumstances constituting fraud." The Sixth Circuit has explained

that, while Rule 9(b) imposes a heightened standard, the underlying purpose of the rule is to serve

the same ends as the general pleading requirements of Rule 8:

> [Rule 9(b)] should not be read to defeat the general policy of "simplicity and flexibility" in pleadings contemplated by the Federal Rules. Rather, Rule 9(b) exists predominantly for the same purpose as Rule 8: to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading. Rule 9(b), however, also reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citations

and quotation marks omitted).

"So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the

nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the

defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met."

*Id.* "Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme

must be pleaded with particularity and the complaint must also 'provide examples of specific'

fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Marlar*

*v. BWXT Y–12, LLC*, 525 F.3d 439, 444–45 (6th Cir. 2008) (quoting *United States ex rel. Bledsoe*

*v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007)).

## C. Motion to Strike

Rule 12(f) of the Federal Rules of Civil Procedure provides only that a "court may strike

from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous

matter." Fed. R. Civ. P. 12(f). "An allegation is 'impertinent' or 'immaterial' when it is not relevant

to the issues involved in the action. 'Scandalous' generally refers to any allegation that

unnecessarily reflects on the moral character of an individual or states anything in repulsive

language that detracts from the dignity of the court." *Neal v. City of Detroit*, No. 17-13170, 2018

WL 1399252, at *1 (E.D. Mich. Mar. 19, 2018) (quoting *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy*, LLC, 107 F. Supp. 3d 772, 801 (E.D. Mich. 2015)). "A 'motion to strike should be granted only when the pleading to be stricken has no possible relation to the controversy.'" *Clark v. Roccanova*, 772 F. Supp. 2d 844, 850 (E.D. Ky. 2011) (quoting *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)).

### III. ANALYSIS

#### A. Consumer Plaintiffs' Request to Intervene in or Rejoin the Case

The defendants argue that Johnson and Nigohosian should not be permitted to rejoin or intervene in this case because they are still obligated, under their respective arbitration clauses, to submit their claims to arbitration. The defendants further argue that, in addition to that obligation, Nigohosian has a continuing duty, imposed by this court's earlier order, to submit to arbitration before reviving her claims in court. Although the plaintiffs contend that the AAA's rejection of Johnson's claims has established that neither consumer plaintiff's claims are arbitrable, the defendants respond that, although the arbitration clauses require the parties to abide by AAA rules, they do not require them to rely on the AAA itself to arbitrate. The defendants argue that, if the AAA will not arbitrate the plaintiffs' claims, the plaintiffs must seek out an alternative venue. The defendants also argue out that the AAA, by its own policies, would arbitrate at least Nigohosian's claims.

The AAA has adopted a short Healthcare Policy Statement explaining that the AAA "will no longer accept the administration of cases involving individual patients without a post-dispute agreement to arbitrate." *Life Care Centers of Am., Inc. v. Estate of Blair by & through Rhoden*, No. CV 17-0249 KBM/KK, 2017 WL 3432209, at *15 (D.N.M. Aug. 9, 2017). The AAA's statement of its policy also, however, "provides that 'the AAA will administer disputes between

10

patients and healthcare providers to the extent a court order directs such a dispute to arbitration where the parties' agreement provided for the AAA's rules or administration.'" *Id.* (*See* Docket No. 88-1 at 1.) That short statement of policy refers to and claims to be "consistent with" the much lengthier Healthcare Due Process Protocol, a document formulated by the AAA, the American Bar Association, and the American Medical Association in 1998 in advance of the AAA's formal adoption of a healthcare policy.[4] Based on the portion of the Healthcare Policy addressing court-ordered arbitrations, some courts have concluded that the Healthcare Policy's bar is not an obstacle to ordering a case into arbitration, despite the fact that the AAA Rules would otherwise call for rejecting the case. *See id.*; *Reed v. Johnson*, No. 4:14-CV-176-SA-JMV, 2016 WL 913232, at *4 (N.D. Miss. Mar. 9, 2016) ("[I]f this Court grants the motion to compel and orders the case to arbitration, the AAA will administer the arbitration notwithstanding the general prohibition discussed above").

Other courts, however, have read the AAA's Healthcare Policy as establishing an obstacle to court-ordered, AAA-administered arbitration in healthcare cases.[5] *See, e.g.*, *Estate of Eckstein ex rel. Luckey v. Life Care Ctrs. of Am., Inc.*, 623 F. Supp. 2d 1235, 1237 (E.D. Wash. 2009) ("Arbitration before the AAA is not possible because the AAA adopted a Healthcare Policy Statement . . . ."). Nevertheless, some of the courts unwilling to order AAA arbitration have concluded that the Healthcare Policy does not prevent a court from ordering arbitration pursuant to AAA *rules*—even if the parties must turn to some other forum to administer the arbitration.

---

[4] Available at https://adr.org/sites/default/files/document_repository/Healthcare-Due-Process-Protocol.pdf.

[5] It may be that this difference in approach taken by various courts is the result of different iterations of the Healthcare Policy Statement, which, by its own terms, is only a statement of the policy, not necessarily a full explanation of the policy as understood by the AAA. On the current record, the court is unable to resolve the question of whether that is the case.

These courts have reasoned that "[t]he fact that AAA no longer hears these types of disputes does not render the Agreement invalid," because "[a]nother arbitrator may be easily substituted." *Eckstein.*, 623 F. Supp. 2d at 1237; *see also Fellerman v. Am. Ret. Corp.*, No. CIVA 03:09-CV-803, 2010 WL 1780406, at *5 (E.D. Va. May 3, 2010) (ordering arbitration despite AAA Healthcare Policy, based on distinction between AAA rules and AAA administration); *Oesterle v. Atria Mgmt. Co.*, LLC, No. 09-4010-JAR, 2009 WL 2043492, at *9 (D. Kan. July 14, 2009) (construing arbitration provision to require only adherence to AAA rules, not AAA policy); *Eckstein,* 623 F. Supp. 2d at 1238 (requiring only AAA rules, not AAA administration). As courts have observed, there is, at least on a purely formal level, a difference between requiring arbitration to be performed pursuant to AAA rules and requiring that it be actually administered by the AAA. *See Covenant Health & Rehab. of Picayune, LP v. Estate of Moulds ex rel. Braddock*, 14 So. 3d 695, 709 (Miss. 2009) (holding that healthcare arbitration clause that explicitly required AAA administration was unenforceable due to the Healthcare Policy).

The plaintiffs respond, however, that the belief that AAA rules and AAA administration can be severed from each other is based on a misunderstanding of those rules, at least with regard to consumer claims. Specifically, the plaintiffs point out that Rule 1(a) of the AAA Consumer Arbitration Rules provides that, "[w]hen parties have provided for the AAA's rules *or* AAA administration as part of their consumer agreement, they shall be deemed to have agreed that the application of the AAA's rules *and* AAA administration of the consumer arbitration shall be an essential term of their consumer agreement." (Docket No. 89-1 at 9 (emphasis added).) Accordingly, although the arbitration agreement in this case refers only to AAA rules, those rules themselves mandate that the provision be construed as acceptance of a binding commitment to AAA administration.

Rule 1(d) of the Consumer Rules addresses situations in which the AAA administratively rejects an arbitration as inconsistent with its due process protocols:

> The AAA administers consumer disputes that meet the due process standards contained in the Consumer Due Process Protocol and the Consumer Arbitration Rules. The AAA will accept cases after the AAA reviews the parties' arbitration agreement and if the AAA determines the agreement substantially and materially complies with the due process standards of these Rules and the Consumer Due Process Protocol. *Should the AAA decline to administer an arbitration, either party may choose to submit its dispute to the appropriate court for resolution.*

(*Id.* at 10 (emphasis added).) Rule 1(d), on its face, refers only to the Consumer Due Process Protocol, not the Healthcare Policy. However, the Consumer Due Process Protocol explicitly reaches "health care services" and provides:

> In some cases, the AAA is developing or has developed special dispute resolution policies and procedures governing particular transactional systems. A recent example is its current initiative with respect to ADR in contracts for health care services. Where the general principles set forth in this Protocol conflict with more specific standards developed under the auspices of the AAA or some other independent organization with relatively broad participation by affected parties, the latter should govern.

(Docket No. 89-4 at 5.)

The plaintiffs draw the court's attention to *Woodward v. Emeritus Corp.*, 368 P.3d 487 (2016), in which the Washington Court of Appeals considered the effect of Rule 1(d) on a healthcare dispute. The parties in *Woodward* were bound by an arbitration clause providing that "[a]rbitrations shall be administered in accordance with the procedures in effect for consumer arbitration adopted by the American Arbitration Association [AAA]." *Id.* at 589. Like the arbitration clause in this case, the clause did not facially require AAA administration. The court acknowledged, however, that "[t]he relevant procedures adopted by the AAA contemplate that the AAA will administer the arbitration, and . . . a threshold procedural step will be for the AAA to review the agreement of the parties in order to determine whether it substantially and materially

complies with the AAA's due process standards." *Id.* at 588. The court concluded that, because the arbitration was one that the AAA would reject, the arbitration provision was, in effect, unenforceable, and the trial court therefore did not err in declining to compel arbitration. (*Id.* at 606.)

Although the conclusion reached by the Washington Court of Appeals differs from that reached by many other courts, those courts do not appear to have based their conclusions on a close reading of the AAA rules themselves, but rather merely on the relevant arbitration provisions and the Healthcare Policy in isolation. The Washington Court of Appeals' analysis, in contrast, seems to be a straightforward application of Consumer Rule 1.1(a) and (d). The only potential for ambiguity would be that Rule 1.1(d) appears to contemplate a rejection under the Due Process Protocol, and the Healthcare Policy Statement is a separate document. The Due Process Protocol, however, acknowledges the Healthcare Policy as a complementary and supplemental standard to the more general standard set out by the Protocol. The policy through which Johnson's arbitration was rejected, moreover, is the same due process review discussed in Rule 1(d), even if a supplemental standard was cited. Johnson has established, therefore, that, by the terms of AAA rules to which the parties mutually agreed, he is free to "submit [his] dispute to the appropriate court for resolution." (Docket No. 89-1 at 10.)

As the defendants point out, however, only Johnson, not Nigohosian, can actually claim that his case has been rejected under the AAA's due process review. Moreover, the defendants have advanced a colorable argument that the AAA would accept Nigohosian's claim pursuant to the court's earlier order, based on an exception in the Healthcare Policy Statement for directly court-ordered arbitration. This court, therefore, cannot assume that the AAA would necessarily reject Nigohosians's claim.

Nigohosian asks the court to rescind its earlier arbitration order because SmileDirect, she alleges, concealed from her that an earlier arbitration request involving another potential plaintiff had been rejected under the Healthcare Policy. SmileDirect's alleged concealment, she argues, prevented her from making an argument based on the Policy and prevented the court from knowing of the Policy's potential applicability. But even if Nigohosian had raised the issue of the Healthcare Policy at the time, the potential exception for court-ordered arbitration, along with the fact that Rule 1(d), by its own terms, applies post-rejection, would prevent this court from assuming that arbitration would be rejected if this court ordered the arbitration before any AAA review had been performed. The court's conclusion, therefore, would have been the same. Insofar as Nigohosian's voluntary dismissal had any effect on the court's order compelling her to submit her claims to review, the court will reinstate the order. The court will make clear, however, that it has made no determination regarding whether her claims are arbitrable under the Healthcare Policy.

Of course, none of this actually says anything about intervention or joinder. Although the parties have largely argued the potential plaintiffs' motion as if it were a defendant-filed motion to compel arbitration, no such motion is actually pending. Moreover, even if one were pending— or even had been granted— the court would be within its discretion to allow the plaintiffs to remain part of the case, albeit subject to a stay, while arbitration proceeded. *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 451 (6th Cir. 2005) (citing 9 U.S.C. §§ 3–4). Other than the defendants' arguments that any consumer plaintiff should first arbitrate his claims, they have advanced no argument that the claims by Johnson and Nigohosian would be inappropriate for permissive joinder under Rule 20(a) or permissive intervention under Rule 24(b). Consumer claims were central to this case from the start. For a brief period of time, there were no consumer plaintiffs, but no

judgment has been entered disposing of the original consumer claims. The court, accordingly, will allow both Johnson and Nihogosian to rejoin the case.

What the court's ruling will mean for the possibility of arbitration, however, may differ between the plaintiffs. Nigohosian is still subject to this court's Order of December 2, 2019, referring the dispute to arbitration. The defendants have suggested that the court's references to "the arbitrator" in that Order suggest that Nigohosian should not be subject to administrative due process review by the AAA's non-arbitrator personnel. Such a reading, however, would effectively be rewriting the AAA rules to which the parties mutually agreed in a contract drafted by SmileDirect. The court, therefore, will make clear that it has made no determination regarding whether the case can or should be considered under the AAA's policies related to healthcare cases. In the meantime, consideration of Nihogosian's claims will be stayed.

In contrast, the AAA process to which the parties mutually agreed has been completed in Johnson's case, and his claims may proceed. It may seem odd that whether the plaintiffs' claims are arbitrable may ultimately depend on mere procedural differences between them. The course a claim will take is, however, frequently the result of procedural choices and determinations that may, at the time, seem minor. The parties agreed to follow AAA rules, and this court can only follow where those rules, within the law, lead.

**B. Motion to Dismiss Claims by Orthodontist Plaintiffs**

The following claims are attributed entirely or in part to the orthodontist plaintiffs: Count I (false advertising under the Lanham Act); Count V (Tennessee Consumer Protection Act); Count VIII (Florida Deceptive and Unfair Trade Practices Act); and Count X (New York General Business Law §§ 349 and 350-A). The defendants argue that all of those claims should be

16

dismissed as to the orthodontists, because they have failed to allege facts on which relief could be granted. The orthodontist plaintiffs oppose the motion in all respects.

### 1. Lanham Act

The defendants argue that the orthodontist plaintiffs have failed to state a claim under the Lanham Act for false advertising because they have not sufficiently identified a communication that satisfies the elements of that cause of action with respect to them. The Lanham Act, 15 U.S.C. § 1051 *et seq.*, is a federal statute that more prominently addresses trademark rights, but it also prohibits unfair competition through the use of misrepresentations of fact about one's own or another's goods, services, or business activities. *See* 15 U.S.C. § 1125(a). Section 1125(a)(1)(B) of the Lanham Act provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . .
>
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B). The Sixth Circuit has described the elements of a Lanham Act false advertising claim as:

> 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually deceives or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; 5) there is some causal link between the challenged statements and harm to the plaintiff.

*Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 798 (6th Cir. 2015) (quoting *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999)).

Although the ultimate subject of a false advertising claim is the effect on consumers, the Lanham Act specifically contemplates enforcement by commercial competitors, not the consumers themselves. "A plaintiff must allege an injury to a commercial interest in reputation or sales. A consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III [of the Constution], but he cannot invoke the protection of the Lanham Act . . . ." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014). In this regard, a false advertising claim mirrors a traditional trademark infringement claim based on likelihood of consumer confusion: while it is consumers who may have been deceived, the lawsuit itself is typically between sellers. *See* 15 U.S.C. § 1125(a)(1)(A) (setting out trademark cause of action based on likelihood of confusion).

As a threshold matter, the court must consider whether this claim is subject to the heightened pleading standard for fraud under Rule 9(b) of the Federal Rules of Civil Procedure. The Sixth Circuit has not resolved whether Rule 9(b) applies to false advertising claims, and the district courts of the circuit have taken a mixed approach to the matter. *Compare Elcometer, Inc. v. TQC-USA, Inc.*, No. 12-CV-14628, 2013 WL 1433388, at *5 (E.D. Mich. Apr. 9, 2013) (holding that Rule 9(b) does not apply), *with Haworth, Inc. v. Tate Access Floors, Inc.*, No. 1:12-CV-252, 2013 WL 12290266, at *4 (W.D. Mich. Sept. 5, 2013) (holding that Rule 9(b) does apply). While Rule 9(b) only mentions "fraud and mistake," the Sixth Circuit recognizes that the particularity requirement applies not only to claims that explicitly go under the name "fraud" but also to any "claims *sounding in* fraud." *Smith v. Bank of Am. Corp.*, 485 F. App'x 749, 751 (6th Cir. 2012)

18

(emphasis added). For example, the Sixth Circuit has held that Rule 9(b) applies to claims under the False Claims Act based on "false or fraudulent claim[s] paid or approved by the Government." *SNAPP, Inc.*, 532 F.3d at 504 (quoting 31 U.S.C. § 3729(a)(2)). Expanding the scope of Rule 9(b) to statutory claims that share critical elements with common law fraud allows the applicability of the Rule to hinge on the substance of the relevant claim, not on cosmetic questions of naming. It does, however, create ambiguity with regard to claims, like Lanham Act false advertising, that fall somewhere between conventional fraud and some other tort.

The plaintiffs disagree that Rule 9(b) applies to their Lanham Act claims, although they argue that, even if it does, their claims should survive. The plaintiffs point out that there are aspects of Lanham Act false advertising, as a cause of action, that arguably make a strict application of Rule 9(b) unnecessary, unworkable, or unfair. For example, while a conventional fraud case may be built around a single utterance between individuals, advertisements are frequently disseminated over and over, sometimes through multiple channels. As the Western District of Tennessee has observed, "[w]here the allegedly misleading advertising has occurred over a long period of time, it would be unreasonable and contrary to the Sixth Circuit's liberal construction of Rule 9(b) to require Plaintiff to identify the exact day, hour or place of every advertisement which made the allegedly misleading statements." *Fed. Exp. Corp. v. U.S. Postal Serv.*, 40 F. Supp. 2d 943, 952 (W.D. Tenn. 1999). Moreover, in a Lanham Act claim, the plaintiff, typically a competitor, is unlikely to have been the actual intended recipient of the relevant communications. It makes less sense, therefore, to impose on the plaintiff a heightened responsibility in describing what was said—a fact about which he, unlike a defrauded person, would have no special knowledge.

On the other hand, however, at least some of the purposes of Rule 9(b) are clearly implicated in the false advertising context. The Sixth Circuit has acknowledged that one purpose

of the Rule is to protect a defendant from "unwarranted damage to its reputation caused by 'spurious charges of immoral and fraudulent behavior.'" *SNAPP, Inc.*, 532 F.3d at 504 (quoting *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)). That risk may be somewhat reduced when advertising is involved, given that the advertisements at issue will often have been publicly available, and the public will already have had the opportunity to form an opinion regardless. Nevertheless, it is undeniable that an allegation of false advertising can harm a company's reputation—perhaps doubly so, given that the allegation often is both that the company was dishonest and that its products or services were worse than promised.

Another purpose of Rule 9(b) is to "discourage[] 'fishing expeditions and strike suits' [that] appear more likely to consume a defendant's resources than to reveal evidence[] of wrongdoing. Because the defendant is informed of which of its specific actions allegedly constitute fraud, it can limit discovery and subsequent litigation to matters relevant to these allegations." *Id.* at 504 (quoting *Bledsoe*, 501 F.3d at 510). A vague, sweeping allegation of false advertising has the capacity to pose such a risk. For example, if a plaintiff vaguely alleges that a product is advertised as being of higher quality than it is, that could open up discovery into every aspect of the product. If the plaintiff is required to specifically identify the difference between the advertised features and the product itself, discovery can be narrowed.

Ultimately, the court is persuaded that Rule 9(b) should apply to Lanham Act false advertising claims. That conclusion, however, comes with two important caveats. First, while Rule 9(b) may require a heightened level of particularity, it does not in any way alter the substance of the relevant cause of action. One cannot assume, therefore, that adequately pleading a cause of action for false advertising requires all the same things that pleading a cause of action for conventional fraud requires. It is the cause of action that dictates what a plaintiff must allege, not

any generalized caselaw under Rule 9(b). Second, as always, Rule 9(b) "should not be read to defeat the general policy of 'simplicity and flexibility' in pleadings" and should not be construed to impose a policy of pure "formalism . . . decoupled from the general rule that a pleading must only be so detailed as is necessary to provide a defendant with sufficient notice to defend against the pleading's claims." *SNAPP, Inc.*, 532 F.3d at 503 (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 678 (6th Cir. 1988)). The court is permitted to consider the nature and circumstances of the cause of action to determine what is necessary to provide the defendant sufficiently particularized notice, as well as what a plaintiff can reasonably be expected to know at the pleading stage.

The defendants argue, first, that the plaintiffs have failed to identify a relevant "commercial advertising or promotion," as required by 15 U.S.C. § 1125(a)(1)(B). "[T]he elusive phrase 'commercial advertising or promotion' . . . is defined neither in statute nor in legislative history." *Grubbs*, 807 F.3d at 800. The Sixth Circuit, however, has adopted the following definition: "(1) commercial speech; (2) for the purpose of influencing customers to buy the defendant's goods or services; (3) that is disseminated either widely enough to the relevant purchasing public to constitute advertising or promotion within that industry or to a substantial portion of the plaintiff's or defendant's existing customer or client base." *Id.* at 801. The relevant commercial speech "need not necessarily resemble traditional television, radio, print, or Internet advertisements." *Id.* at 799 (citing *Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 112 (6th Cir. 1995)).

The plaintiffs allege that SmileDirect has engaged in an "omni-channel approach to marketing, using billboards (including in Times Square and the NYC Subway), Google, Facebook, Instagram, and other social media platforms," as well as having "purchased advertising time during televised national sporting events, such as college football games." (Docket No. 36 ¶ 75.) The

plaintiffs have also compiled a number of "literal falsities" and misleading statements that they attribute to those advertising campaigns, some of which the plaintiffs quote verbatim. (*Id.* ¶¶ 77, 96, 115.) The plaintiffs have also identified, as a further example, a specific blog post from SmileDirect's "Grin Life" blog, containing what the plaintiffs identify as a false or misleading statement equating the care received in the SmileDirect Program with conventional, face-to-face orthodontic care. (*Id.* ¶ 80.) While the plaintiffs have not given specific dates and times for the false or misleading statements in the "omni-channel" marketing effort, that requirement can be, as the court has explained, relaxed in the case of false advertising claims based on sustained, repeated communications. Moreover, courts have acknowledged, in other cases applying Rule 9(b) to complex schemes involving numerous false statements, that a plaintiff can satisfy the Rule by describing the scheme and providing "representative" examples, rather than listing every wrongful act. *See Marlar*, 525 F.3d at 444–45. By identifying specific claims and specific advertising venues through which the claims were conveyed, the plaintiffs have satisfied these requirements sufficiently to serve the purposes of Rule 9(b). The defendants therefore are not entitled to dismissal based on the plaintiffs' alleged failure to plead commercial communications within the meaning of the Lanham Act.

The defendants argue, next, that none of the relevant statements was false or misleading as those terms are used in the Lanham Act. Some of the marketing assertions that the plaintiffs have highlighted, such as the boast that SmileDirect's customers were highly satisfied, may ultimately turn out to be the type of vague puffery that cannot support statutory liability. *But see La.-Pac. Corp. v. James Hardie Bldg. Prod., Inc.*, 928 F.3d 514, 519 (6th Cir. 2019) ("[T]he context of a message can transform unactionable puffery into an empirically verifiable, factual claim."). Other aspects of SmileDirect's characterization of its products and services, however, involve more

concrete and specific assertions amenable to being true or false and being material to customers' decisions. For example, the Grin Life blog post highlighted by the plaintiffs included the claim that "[a]n individual who is requesting treatment by using SmileDirectClub's aligners is receiving the same level of care from a treating dentist-orthodontist as an individual visiting a traditional orthodontist or dentist for treatment." (Docket No. 36 ¶ 80.) The plaintiffs have identified specific ways in which SmileDirect's internet-based teledentistry system falls far below the level of care involved in a traditional dental setting, particularly with regard to the limited diagnostic tools available in the SmileDirect setting and the comparatively lesser role played by dentists rather than non-dentist support personnel. (*Id.* ¶¶ 81–87.) While the phrase "level of care" may contain some vagueness, whether it has a sufficiently fixed meaning that it can serve as the crux of a false advertising claim is a question of fact inappropriate for a Rule 12(b)(6) motion.

The plaintiffs have also alleged that SmileDirect claimed, in its advertising, that SmileDirect's plastic aligners work "three times faster than braces." (*Id.* ¶ 96.) As the plaintiffs point out, such a statement suggests that the aligners perform a comparable service to traditional braces, which the plaintiffs have alleged is false. The plaintiffs have also alleged that SmileDirect has misrepresented its return policy through its "Smile Guarantee" policy, leading customers to believe that joining the SmileDirect Program entailed less financial risk than it did. (*Id.* ¶¶ 101–02.) As with the allegations regarding level of care, the defendants are free to disagree with these claims, but whether they are false presents a question of fact, not one of adequate pleading.

The plaintiffs have also adequately alleged that the relevant statements were material to, and likely influenced, consumers' purchasing decisions. From the plaintiffs' description of SmileDirect's product and marketing, it is clear that consumers with orthodontic needs would consider SmileDirect and more traditional, in-person orthodontic treatment as competitive

23

services. When choosing between competitive services, the degree to which one service actually offers an adequate substitute for the other is an obviously important consideration. Overall cost is also an important consideration, and whether one will be able to get a refund is a component of determining the range of potential costs. The plaintiffs have therefore adequately pleaded the second and third elements of a false advertising claim. Moreover, their description of SmileDirect's massive advertising expenditures pleads entry into interstate commerce, satisfying the fourth.

Finally, the orthodontist plaintiffs have adequately pleaded that they were harmed by SmileDirect's statements. Each of the individual orthodontist plaintiffs specifically alleges that his volume of business was reduced by the diversion of patients to SmileDirect. (Docket No. 36 ¶¶ 16–18.) Although the defendants fault the plaintiffs for failing to allege more facts that would support the conclusion that specific patients chose SmileDirect over them, it is difficult to imagine how an orthodontist could reasonably be expected to know the identities of the patients who merely considered him before going elsewhere. If anyone other than the patients would have that information, it seems more likely that it would be SmileDirect. *See Traxler v. PPG Indus., Inc.*, 158 F. Supp. 3d 607, 630 (N.D. Ohio 2016) ("Rule 9(b)'s particularity requirement may be relaxed when certain information is solely within the defendant's knowledge.") (quoting *SEC v. Blackwell*, 291 F. Supp. 2d 673, 691 (S.D. Ohio 2003)). SmileDirect cannot reasonably dispute that it was placing its services in competition with orthodontists like the orthodontist plaintiffs and that such an orthodontist's loss of business could constitute an economic harm. The orthodontist plaintiffs have therefore adequately pleaded all of the elements of a Lanham Act false advertising claim. That count will not be dismissed.

24

## 2. Tennessee Consumer Protection Act

The defendants argue that the orthodontist plaintiffs do not have "standing" to bring causes of action under the Tennessee Consumer Protection Act, which authorizes a private cause of action on behalf of "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice." Tenn. Code Ann. § 47-18-109(a). "Person," for the purposes of the TCPA, can refer to any "natural person, individual, governmental agency, partnership, corporation, trust, estate, incorporated or unincorporated association, and any other legal or commercial entity however organized." Tenn. Code Ann. § 47-18-103(14). The Tennessee Supreme Court has made clear that, as the statutory language suggests, "it is irrelevant whether a corporation is a 'consumer under the Act because the right of action is given to 'person[s],'" with "consumer" being a separate, defined term used in other provisions. *ATS Se., Inc. v. Carrier Corp.*, 18 S.W.3d 626, 629 (Tenn. 2000); see Tenn. Code Ann. § 47-18-103(3) (defining "consumer"). The same logic would extend to individual plaintiffs—because a cause of action under the Act is not limited to consumers, the plaintiff is not required to show that he is a consumer in order to proceed.

The defendants do not cite any cases from Tennessee state courts for the proposition that a competitor cannot sue under the TCPA based on an "ascertainable loss of money" in the form of lost business, choosing instead to rely on cases from U.S. district courts, particularly *PHG Techs., LLC v. St. John Companies, Inc.,* 459 F. Supp. 2d 640 (M.D. Tenn. 2006) (Echols, J.), and subsequent cases following its reasoning. The very brief standing analysis in *PHG Technologies*, however, did not rely on the text of the TCPA, but rather a citation to general Article III standing principles, particularly those in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). As subsequent

Supreme Court and Sixth Circuit cases have made clear, however, the important guidepost here is the statutory text. If a plaintiff has standing in a bare-minimum constitutional sense—which a competitor alleging past or imminent economic harm typically will, *see Michigan v. Bay Mills Indian Cmty.*, 695 F.3d 406, 411 (6th Cir. 2012) ("[E]vidence of competitive harm is enough to show an injury in fact for standing purposes .")—then the question of whether he can proceed under a particular cause of action is an issue of interpreting the scope of the cause of action, not "standing" as the term is typically used. *See Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 391 (6th Cir. 2016) ("The Supreme Court has explained that the term 'statutory standing' describes an inquiry into the question whether a plaintiff 'falls within the class of plaintiffs whom Congress has authorized to sue' and therefore 'has a cause of action under the statute.' However, this label is 'misleading, since the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case.'") (quoting *Lexmark*, 572 U.S. at 128 n.4)).

The ultimate arbiter of Tennessee law is the Tennessee Supreme Court, and that court has already held that a cause of action under the TCPA can be brought by a person regardless of his status as a non-consumer under the Act. *ATS Se.*, 18 S.W.3d at 629. The only textual requirement is a loss of money or property, which the orthodontist plaintiffs have alleged by stating that SmileDirect cost them business by falsely stating that SmileDirect's services were an equivalent substitute for theirs. *See Asurion, LLC v. SquareTrade, Inc.*, 407 F. Supp. 3d 744, 752 (M.D. Tenn. 2019) (Campbell, J.) (holding that a competitor had a cause of action under the TCPA based on a "misleading advertisement disparage[ing] its product by drawing a direct comparison with" the defendant's product). The defendants' argument that the orthodontist plaintiffs lack standing under the TCPA is, therefore, without merit, and their claims will not be dismissed.

### 3. Florida Deceptive and Unfair Trade Practices Act

The defendants argue that the orthodontist plaintiffs' claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") should be dismissed because the damages they have alleged are not damages of a type recoverable under the Act. FDUTPA allows a cause of action for declaratory or injunctive relief to be brought by "anyone aggrieved by a violation" of the Act. Fla. Stat. Ann. § 501.211(1). If a plaintiff seeks damages, however, the plaintiff must be a "a person who has suffered a loss as a result of" the relevant FDUTPA violation, and the plaintiff may recover only "actual damages, plus attorney's fees and court costs." Fla. Stat. Ann. § 501.211(2). The defendants argue that lost profits such as those allegedly suffered by the orthodontists are consequential damages, not actual damages, under Florida law. *See Rodriguez v. Recovery Performance & Marine, LLC*, 38 So. 3d 178, 180 (Fla. Dist. Ct. App. 2010) ("[U]nder FDUTPA, the term 'actual damages' does not include special or consequential damages."); *Paul Gottlieb & Co. v. Alps S. Corp.*, 985 So. 2d 1, 9 (Fla. Dist. Ct. App. 2007) (describing "lost profits" as "consequential damages"). The plaintiffs concede that the FDUTPA does not allow consequential damages. They argue, however, that it is a misstatement of Florida law to state that lost profits are categorically classified as consequential, rather than actual, damages.

A review of relevant cases confirms that, "[w]hile [Florida] case law often refers to lost profits as consequential damages, lost profits do not *always* constitute consequential damages as a matter of law. For example, '[l]ost profits are recoverable as general damages where they flow directly and immediately from the breach of a contract.'" *HCA Health Servs. of Fla., Inc. v. CyberKnife Ctr. of Treasure Coast, LLC*, 204 So. 3d 469, 471 n.2 (Fla. Dist. Ct. App. 2016) (quoting *Bird Lakes Dev. Corp. v. Meruelo*, 626 So. 2d 234, 238 (Fla. Dist. Ct. App. 1993)). The mere fact that lost profits are actual damages in some instances but not others, however, does not

provide much guidance in telling one situation from the other. Florida's state courts do not appear to have resolved the question of whether past lost profits are "actual damages" under the FDUTPA, and the U.S. district courts in Florida have disagreed on the issue from case to case. *Compare Glob. Tech Led, LLC v. Hilumz Int'l Corp.*, No. 2:15-CV-553-FTM-29CM, 2017 WL 588669, at *9 (M.D. Fla. Feb. 14, 2017) (holding that past lost profits are actual damages under the FDUTPA); *Factory Direct Tires Inc. v. Cooper Tire & Rubber Co.*, No. 3:11-CV-255-RV/EMT, 2011 WL 13117118, at *7 (N.D. Fla. Oct. 24, 2011) (same); *Tracfone Wireless, Inc. v. Access Telecom, Inc.*, 642 F. Supp. 2d 1354, 1365 (S.D. Fla. 2009) (same); *with Diversified Mgmt. Sols., Inc. v. Control Sys. Research, Inc.*, No. 15-81062-CIV, 2016 WL 4256916, at *6 (S.D. Fla. May 16, 2016) (holding that lost profits are not actual damages under the FDUTPA); *Five for Entm't S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1331 (S.D. Fla. 2012) (same). Last year, the U.S. District Court for the Middle District of California considered the history of the issue and concluded that "[t]he weight of Florida law supports" the conclusion that past lost profits are recoverable under the Act, although that analysis is far from conclusive. *Allergan USA, Inc. v. Prescribers Choice, Inc.*, 364 F. Supp. 3d 1089, 1114 (C.D. Cal. 2019).

As with Tennessee law, this court's duty when resolving an issue of Florida law is to make an "*Erie* guess"[6] regarding how the highest court in that state would resolve the issue. *In re Fair Fin. Co.*, 834 F.3d 651, 671 (6th Cir. 2016) (quoting *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013)). Given the mixed nature of the caselaw, the court's determination, in this case, truly is a guess—albeit, hopefully, an informed one. Neither party has identified Florida state precedents resolving or even providing much guidance on the issue, and none of the federal cases that have examined it offers much of a persuasive general analytical

---

[6] "*Erie* guess" refers to *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

framework for when lost profits are actual damages and when they are consequential damages—other than that, generally, it varies from one cause of action to another. Ultimately, the language of the FDUTPA and the balance of the caselaw lead this court to conclude that the more likely correct interpretation is that the FDUTPA does permit recovery of past lost profits caused by a violation of the Act. The FDUTPA itself provides that it shall be "construed liberally to promote" its purposes, Fla. Stat. Ann. § 501.202, and the Act's private cause of action, like the TCPA's, does appear to contemplate a broad range of potential plaintiffs. Indeed, the FDUTPA was explicitly amended to make clear that it allowed claims by parties other than individual consumers, which supports the inference that it must permit the kinds of damages that non-consumer plaintiffs are likely to suffer. *See Democratic Republic of the Congo v. Air Capital Grp., LLC*, 614 F. App'x 460, 468 (11th Cir. 2015) (discussing revisions to the FDUTPA).

Moreover, as the plaintiffs point out, even if the defendants are correct on this point, the correct remedy would not be dismissal. Dr. Kapit seeks both damages and injunctive relief, and the "actual damages" restriction applies only to claims for damages. Accordingly, his claim would continue regardless. The issue of what damages the FDUTPA allows will only become relevant when and if Dr. Kapit demonstrates a violation. At that point, there may, the court hopes, have been intervening guidance from the state's courts.

### 4. New York General Business Law §§ 349 and 350-A

Finally, the defendants argue that Dr. Ciccio's claim under Count X should be dismissed because he seeks a form of indirect damages not permitted by N.Y. Gen. Bus. Law §§ 349 and 350-A. The cases on which the defendants rely, however, involve wholly derivative injuries—that is, injuries sustained "solely as a result of injuries sustained by another party." *Spin Master Ltd. v. Bureau Veritas Consumer Prod. Servs., Inc.*, No. 08-CV-923, 2011 WL 1549456, at *4 (W.D.N.Y.

29

Mar. 7, 2011), *report and recommendation adopted*, No. 08-CV-923A, 2011 WL 1542038 (W.D.N.Y. Apr. 22, 2011). For example, the New York Court of Appeals has held that, where a tobacco company's marketing allegedly caused an insurance company's insured customers to become sick, the insurer could not itself recover under N.Y. Gen. Bus. Law § 349, since its injury was entirely derivative of theirs. *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 818 N.E.2d 1140, 1145 (N.Y. 2004).

The injuries that Dr. Ciccio has alleged, however, were not derivative of the injuries suffered by SmileDirect customers. If a potential patient chose SmileDirect over Dr. Ciccio, then Dr. Ciccio's loss of business occurred, regardless of how successful or unsuccessful the patient's SmileDirect treatment ultimately was. The injuries suffered by consumers may have been caused by the same allegedly illegal marketing that caused the orthodontists to lose business, but one injury was not created by the other. *See M.V.B. Collision, Inc. v. Allstate Ins. Co.*, 728 F. Supp. 2d 205, 217 (E.D.N.Y. 2010) (holding that, where the plaintiff company's harm was done directly by the defendant's bad act, it was not derivative of a separate, co-occurring harm to consumers). The defendants having advanced no other argument to dismiss Dr. Ciccio's New York statutory claim, the claim will not be dismissed.

## C. Motion to Strike

The court turns, finally, to the Motion to Strike. As an initial matter, the court's decision to permit Johnson and Nihogosian to rejoin the case eliminates the need to consider striking statements related only to consumer claims. Admittedly, the allegations related to a few of the state-specific claims are still immaterial to the case going forward, because there are no consumer plaintiffs from those states. But going back and excising a few state-specific allegations simply because the relevant plaintiffs were dismissed would be far outside the court's usual practice and

30

would not even serve the purposes of the defendants' motion. The defendants have made clear that their overriding concern is with protecting SmileDirect's reputation from what they characterize as an improper attempt to besmirch it through the judicial process. It cannot possibly matter very much, in that regard, whether there are allegations in the Complaint about, for example, SmileDirect engaging in bad acts *specifically in Colorado*. Tidying up the Complaint by removing allegations related to a few states is beyond the limited purpose of Rule 12(f). The court will, therefore, deny that aspect of the defendants' request.

There remain, therefore, two classes of statement that the defendants ask the court to strike: the miscellaneous statements identified in the defendants' Appendix A as immaterial, impertinent, and/or scandalous; and the "class allegations that on their face require such individualized inquiry as to render a class action improper."

The court has reviewed the allegations set out in Appendix A and concludes that, although the plaintiffs sometimes get close to the edge of permissible pleading, none of the statements warrants granting the motion to strike. The statements identified use dramatic language to cast the defendants' actions and motivations in an undeniably unflattering light. The same could be said, however, for a substantial percentage of the complaints that this court sees, particularly in fields, such as consumer protection, that involve defendants' allegedly profiting off of injuries to members of the general public. Most defendants take issue with some aspect of the allegations against them; nevertheless, "[m]otions to strike are viewed with disfavor and are not frequently granted." *Operating Eng'rs Local 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015) (citing *Lunsford v. United States*, 570 F.2d 221, 229 (8th Cir.1977); *Brown & Williamson*, 201 F.2d at 822). The reason for that is simple: such motions, more often than not, are simply "time wasters" that tie the court and the parties up in "purely cosmetic" matters that, if

31

anything, stand in the way of addressing the underlying allegations on the merits. *Neal v. City of Detroit*, No. 17-13170, 2018 WL 1399252, at *1 (E.D. Mich. Mar. 19, 2018) (quoting Wright & Miller, 5C Fed. Prac. & Proc. § 1382 (3d ed. 2004)).

As the defendants acknowledge, "immaterial," in the context of a motion to strike, refers only to allegations with "no possible relation to the controversy.'" *Clark*, 772 F. Supp. 2d at 850 (quoting *Brown & Williamson*, 201 F.2d at 822). Although most of the statements covered in Appendix A are not strictly necessary to pleading a cause of action, they are all relevant to the plaintiffs' overall narrative and theory of the case. For example, the defendants complain about the plaintiffs' mentioning of Better Business Bureau complaints against SmileDirect and the characterization of SmileDirect as "under siege." (Docket No. 71-1 at 1, 4.) At the heart of the plaintiffs' case, however, is the contention that SmileDirect is operating a business built around an ineffective product and a disregard for licensing and regulatory authorities. The need to conceal the alleged flaws and shortcuts underlying SmileDirect's business model in the face of increasing scrutiny is part of the broader account of the company's ongoing, allegedly unlawful operation. While the Rules of Civil Procedure do not require a plaintiff to tell a larger story with supporting details in order to state a claim, they do not forbid it. It is undeniably true that plaintiffs sometimes take this as an opportunity to editorialize. Anyone with even a rudimentary grasp of the judicial process, however, should know that the plaintiffs' allegations are, at this stage, untested and unproven. They do not have the imprimatur of the court or the endorsement of a jury. The defendants will have every opportunity to defend themselves and may find themselves, as many defendants do, vindicated—or at least victorious in litigation. That is not a sufficient ground for striking the allegations in the Complaint now.

The defendants' argument to strike class-related claims is similarly without merit. The Rules of Civil Procedure require the court to determine whether a class should be certified "[a]t an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1)(A). It is clear to the court that the time for making a decision about class certification in this case has not yet arisen. The defendants, however, attempt to force an unnecessary early battle over the issue in the form of their motion to strike. As with the other aspects of the motion to strike, this request is unnecessary.

The defendants rely in significant part on *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943 (6th Cir. 2011), in which the Sixth Circuit upheld a district court's decision to strike class allegations in a putative consumer protection class action related to a "healthcare discount program." *Id.* at 944. The Sixth Circuit, like the district court, focused on the putative class's inability to satisfy the predominance requirement of Rule 23(b)(3), which offered the only route for satisfying Rule 23(b).[7] The court observed that, "because each class member's claim would be governed by the law of the State in which he made the challenged purchase, . . . the differences between the consumer-protection laws of the many affected States would cast a long shadow over any common issues of fact plaintiffs might establish." *Id.* at 946.

However, the court left open the possibility that "a nationwide class covering claims governed by the laws of the various States could . . . overcome this problem by demonstrating considerable factual overlap." *Id.* at 947. The specific claims at issue in *Pilgrim*, though, had

---

[7] A class action will be certified only if, after rigorous analysis, the court is satisfied that the prerequisites of Fed. R. Civ. P. 23(a) have been met and the action falls within one of the categories under Fed. R. Civ. P. 23(b). *Bridging Cmties. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016). A party seeking to maintain a class action must be prepared to show that Rule 23(a)'s numerosity, commonality, typicality and adequacy of representation requirements have been met. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). In addition, the party must satisfy, through evidentiary proof, at least one of Rule 23(b)'s provisions. *Id.* at 34.

33

features that made them inherently susceptible to factual, not merely legal, variation on the basis of geography:

> A core part of the claim is that the program was worthless because the listed healthcare providers near the plaintiffs did not offer the promised discounts or because there were no listed providers near them in the first place. But to establish the point, the plaintiffs would need to make particularized showings in different parts of the country, particularly since the program apparently satisfied some consumers, as confirmed by the unchallenged reality that fifteen percent of those who signed up remained enrolled months after the suit was filed.

*Id.* at 948. Those factual issues, in addition to the fact that multiple states' laws were implicated, formed the basis for striking class allegations.

It is true that the plaintiffs in this case may ultimately struggle to establish that shared issues predominate over class members' claims across different jurisdictions. In addition to the fact that the plaintiffs rely on different state consumer protection statutes, their federal claims involve, among other things, allegedly false marketing comparing the SmileDirect Program to conventional dentistry, which could implicate individual states' licensure and scope-of-practice laws. It is not enough, however, for the defendants to simply point out that multiple states' laws will govern the claims. There must actually be some kind of identifiable discontinuity between the states' respective laws that would frustrate the possibility of a shared resolution of the claims. Many states' laws in areas such as consumer protection and professional licensure share significant similarities. The laws may not be identical, but the court cannot simply assume that they are too different to be applied side-by-side. That is especially true, given that this issue has been raised in the context of the rarely-appropriate tool of a motion to strike, rather than in response to a motion to certify, where the plaintiffs would bear the burden. Because the plaintiffs' prospects of class certification are not so dim as to render their allegations immaterial or impertinent within the

meaning of Rule 12(f), the court will not grant the motion to strike the class allegations across the board.[8]

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss the Plaintiff Orthodontists' Claims (Docket No. 68) and Motion to Strike Certain Allegations (Docket No. 70) will be denied, and the Motion to Rejoin Plaintiffs, or in the Alternative, to Intervene (Docket No. 85) will be granted, with the caveat that the court's earlier order requiring Nigohosian to submit her claims to the arbitration process remains in effect.

An appropriate Order will enter.

ALETA A. TRAUGER
United States District Judge

---

[8] The court acknowledges that the defendants have also identified some claim-specific reasons for striking class allegations. For example, the Tennessee Supreme Court has held that the TCPA does not permit an individual consumer plaintiff to bring a cause of action for damages on behalf of other individual consumers—a power reserved, by the Act, for the Tennessee Attorney General. *See Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008). The plaintiffs respond that they are permitted to bring TCPA class action claims because they have limited their class claims solely to requests for injunctive and declaratory relief. *See* Tenn. Code Ann. § 47-18-109(g) ("No class action lawsuit may be brought *to recover damages* for an unfair or deceptive act or practice declared to be unlawful by this part.") (emphasis added). Although the plaintiffs' position appears to be consistent with the current language, the court sees no reason to resolve the issue on a motion to strike.

35