IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **Dr. Joseph Ciccio**, *et al.*, | ) |
| Plaintiffs, | ) Civil No.: 3:19-cv-00845 |
| | ) |
| v. | ) Judge Aleta A. Trauger |
| | ) |
| **SmileDirectClub, LLC**, *et al.*, | ) Magistrate Judge Barbara D. Holmes |
| | ) |
| Defendants. | ) Special Master Samuel P. Funk |
| | ) |

**DEFENDANTS' RESPONSE TO PROVIDER PLAINTIFFS'
MOTION TO EXTEND DISCOVERY CUTOFF**

**I.   INTRODUCTION**

Defendants agree that the Court should revise the initial Case Management Order ("CMO"). Despite Defendants' best efforts to move this case expeditiously toward a merits-based resolution, completing discovery in the next two weeks is not possible because of Provider Plaintiffs' approach to this lawsuit, and to discovery in particular. But the one-year, all-purposes extension that Provider Plaintiffs seek is not warranted. There is a better way forward.

As explained below (and as the case's docket reflects), Provider Plaintiffs have made sure that these proceedings have been chaotic. The expiration of the initial CMO's discovery cutoff—and Provider Plaintiffs' simultaneous effort to "balloon the scope of the case" via their proposed Second Amended Complaint—creates an inflection point. Provider Plaintiffs' pending motions for leave to amend and to extend the deadlines in the CMO together offer the Court an opportunity to put this case—already pending for 21 months—back on track for an orderly, efficient, and fair resolution. Defendants respectfully request that the Court enter a new CMO that front-loads class-certification, so that the parties can properly prioritize their remaining discovery efforts. The reasons for this request, and a proposed new case-management schedule, follow.

## II. FACTUAL BACKGROUND

### A. After the pleadings closed, Provider Plaintiffs served 93 requests for production.

Plaintiffs filed their initial Complaint on September 24, 2019, alleging that SmileDirect competed unfairly by making certain marketing statements that Plaintiffs alleged were "false advertising." [Dkt. No. 1.] Plaintiffs exercised their right to amend and filed the First Amended Complaint ("FAC")—the operative complaint in this case—on November 15, 2019. [Dkt. No. 36.] Defendants moved to dismiss. [Dkt. No. 68.] The Court resolved those motions on June 2, 2020 [Dkt. No. 96], and entered the initial CMO on July 10, 2020. [Dkt. No. 116.]

When discovery commenced, Provider Plaintiffs immediately went on the attack. On July 6, 2020, they served 93 requests for production, not including subparts. [Dkt. No. 133, Ex. D.] Many of these requests had nothing to do with the marketing statements the FAC puts at issue, but instead were part of Provider Plaintiffs' ongoing effort to put SmileDirect's "entire business model" on trial. [*E.g.*, *id.* at RFPs 1-4 (seeking business plans, forecasts, reviews, and SWOT analyses); RFPs 67, 82–86 (seeing documents produced in other litigations, investigations, or proceedings); RFPs 10, 66–67, 70–71, 75 (seeking Federal and state regulatory correspondence); and RFPs 23–24, 26–28, 30, 32, 35, 38, 68 (seeking documents relating to provider agreements, policies, and procedures).] From the jump, Provider Plaintiffs thus disproved their assertion that "Defendants' concerns about delayed class certification proceedings and overly burdensome discovery are illusory." [Dkt. No. 104 at 9.]

### B. Provider Plaintiffs have executed a multistep plan to impede progress in discovery.

But that overbroad fusillade of document demands was only Step 1 in Provider Plaintiffs' offensive. Next, they implemented Step 2—the unusual step of demanding, just three days after serving their RFPs, that the parties meet and confer over those requests before Defendants'

- 2 -
Case 3:19-cv-00845   Document 221   Filed 07/02/21   Page 2 of 17 PageID #: 6930

responses were even due. [Ex. 1 (7/9/20 Payne Ltr.); Dkt. No. 133 at 25.] In the spirit of cooperation and good faith, Defendants indulged that odd request.

Step 3 in Provider Plaintiffs' plot to sow disarray was to deny Defendants sufficient time to respond to their discovery onslaught. When Defendants asked for an additional 30 days, Provider Plaintiffs refused to grant an extension before the pre-response meet-and-confer that they demanded. [*See* Ex. 2 (7/23/20 Payne email).] During that call, they offered only a week-long extension, and pledged that they would be amenable to further one-week extensions. But a week later, when Defendants requested one, Provider Plaintiffs refused further extensions. [*See* Ex. 3 (08/06/20 Payne email) (extending deadline only to Aug. 12, 2020).] Defendants met that rushed deadline and served their objections and responses on August 12, 2020. [Dkt. No. 133 at 6.]

Step 4 was to bombard Defendants and the Court with ginned-up discovery disputes. To date, Provider Plaintiffs have filed seven. [Dkt. Nos. 133, 136, 139, 140, 150, 155, & 159.] This step evidently was planned from the outset. During the initial meet-and-confer sessions—the ones that took place before Defendants' responses were due—Provider Plaintiffs mentioned over a dozen times that they planned to initiate discovery disputes. [Dkt. No. 133 at 25; Ex. 4 (8/5/20 Gartel Ltr.) at 7; Ex. 3 (8/6/20 Payne email) ("We intend to move to compel on issues where there is impasse").] No wonder, then, that they sent their first draft dispute statement on August 18, 2020, just six days after receiving Defendants' objections and responses. [Dkt. No. 133 at 6.]

Step 5 was—and still is—to keep "ballooning" issues, rather than resolve them. For example, when Defendants agree to provide Provider Plaintiffs with the discovery they have demanded, Provider Plaintiffs refuse to take yes for an answer and press forward with filing discovery disputes anyway. [*E.g.*, Dkt. Nos. 138 at 1–2; 139 at 12–13.] Even after the Court (with respect to some of their first 93 requests for production) reminded Provider Plaintiffs that

- 3 -
Case 3:19-cv-00845   Document 221   Filed 07/02/21   Page 3 of 17 PageID #: 6931

discovery "fishing expeditions" are improper [Dkt. No. 145 at 2], Provider Plaintiffs kept fishing, serving 54 more RFPs (not including subparts) in February. [Dkt. 205-7 (Pls.' 3d Set RFPs).]

The process of arriving at search terms—standard practice in federal e-discovery—presents perhaps the clearest example of Provider Plaintiffs' efforts to make the case about expensive and time-consuming discovery for the Defendants so as to extort a settlement and to impede progress by multiplying disputes rather than resolving them. Provider Plaintiffs offered an initial proposed set of 121 search terms and phrases just ten days after serving their 93 initial RFPs. [Ex. 5 (7/16/20 Payne Ltr.).] Provider Plaintiffs later expanded that list to almost 170 terms and phrases. [Ex. 6 (11/9/20 Fiorella Email).] That list included terms having nothing to do with Provider Plaintiffs' false-advertising claims, including terms aimed not at advertising, but instead at SmileDirect's entire business model, like "business model*," "business plan*," "swot*," and "strength* /10 weakness* /10 opportunit* /10 threat*." [*Id.* at Attachment A (hit report for Provider Plaintiffs' proposed terms).] The list also contained terms having nothing at all to do with the case:

| Examples of Provider Plaintiffs' Proposed Search Terms and String | |
|---|---|
| scam* | (avoid* OR escap* OR elud*) w/20 (scrutin* OR regulat* OR critic*) |
| (fool* OR trick* OR dece* OR sucker* OR lull*) w/20 (regulat* OR state* OR fed* OR agen* OR board* OR admin* OR public* OR customer*) | (unfair* OR decept*) w/20 (trad* OR practic* OR conduct* OR misconduct* OR compet*) |
| stupid* | moron* |
| fool* | idiot* |

(*Id.*)

Acting again in the spirit of cooperation, Defendants searched data collected from nine custodians whom Defendants believe are most likely to have documents relevant to the claims and defenses in this case,[1] and generated a hit report showing that Provider Plaintiffs' proposed search terms would yield over 2.1 million documents, increasing to 2.5 million documents when attachments and parents are added.

| Search Term | Total Document Hit # | Family Count |
|---|---|---|
| * * * * | | |
| Total Document Hits | 2,147,966 | 2518392 |

[Ex. 6 (11/9/20 Fiorella Email, at Attachment A) (indication added).] That total did not include all data that was being collected and would be much higher today. Defendants shared this information with Provider Plaintiffs and proposed an alternative set of search terms that would yield a more-reasonable total of 349,000 documents. [*Id.* at Attachment C.] Provider Plaintiffs refused to work toward a reasonable compromise, further impeding progress in discovery.

Beyond that, Provider Plaintiffs have magnified the number and scope of discovery issues through third-party practice, serving over two dozen third-party subpoenas to date. Many of the subpoenas are of questionable, if any, relevance. Some seek information about SmileDirect's business relationships that did not arise until well after the Complaint was filed, contravening the

---

[1] The custodians identified by Defendants are the highest ranking members of the SmileDirect's management, including: (a) the CEO and Chairman; (b) the COO and Director; (c) the Chief Global Brand Officer; (d) the Chief Legal Officer, Executive Vice President Business Affairs, Secretary, and Director; (e) the Chief Marketing Officer; (f) the Chief Clinical Officer; (g) the Global Head of Customer Experience; (h) the Chief Development Officer; and (i) a Co-Founder and member of the Board. In addition, Defendants have collected and are reviewing over 12 terabytes of data stored on SmileDirect's network drives, which include, among other things, the Company's advertisements during the period that the Court has found relevant to this case.

Court's instruction that post-Complaint discovery should be used "only for narrowly focused, pointed requests directed toward alleged specific ongoing conduct by Defendants." [Dkt. No. 145 at 4.] Provider Plaintiffs have yet to explain how inquiries into new business relationships could possibly be "narrowly focused, pointed requests [into] specific ongoing conduct."

These scorched-earth litigation tactics have increased defense costs substantially. Defendants have incurred costs for hundreds of hours spent defending themselves against unnecessary and counterproductive discovery disputes that Provider Plaintiffs insisted on filing. Provider Plaintiffs' overbroad e-discovery demands also impose considerable cost. Defendants are currently incurring approximately $250,000 per month for their vendor to search, preserve, host, and conduct a first-level review of ESI.

    **C.    Provider Plaintiffs' latest gambit to "balloon the scope of the case" will impose further cost and create further chaos.**

Provider Plaintiffs have recently asked the Court to allow them to "balloon the scope of the case" (as they described the effort to the Special Master) by adding 200 or more new defendants, including independent dentists around the country that use SmileDirect's telehealth platform to treat patients, SmileDirect's Chief Legal Officer, and others. Defendants' response to the motion for leave to amend [Dkt. No. 204] addresses the many reasons for denying that motion. Plainly, allowing Provider Plaintiffs to "balloon the scope of the case" would cause Defendants' already-unreasonable discovery expenditures to spiral beyond control—all the more so if Provider Plaintiffs are granted a full additional year to pursue discovery in the same way they have to date.

**III.    <u>LAW AND ARGUMENT</u>**

Provider Plaintiffs' request to amend the CMO presents an opportunity to impose order and reason on Provider Plaintiffs' chaotic case. As explained below, Defendants believe that, by

- 6 -
Case 3:19-cv-00845   Document 221   Filed 07/02/21   Page 6 of 17 PageID #: 6934

revising the CMO to front-load class certification, the Court can enhance efficiency and economy, and prevent further prejudice to Defendants.

> A. **Addressing class certification in the near future will preclude Provider Plaintiffs from continuing to use the putative class-action label to justify excessive, and excessively expensive, merits discovery.**

The broad function of our judicial system is to do justice. In specific cases—and especially in sprawling cases such as this one—that function is served by "bringing about a just resolution as speedily, inexpensively, and fairly as possible." Manual for Complex Litig. (Fourth) ("MCL") § 10.1. But that result is neither automatic nor foreordained. Instead, it results from "developing and monitoring an effective plan for the orderly conduct of pretrial and trial proceedings." *Id.* § 10.13.

The need for such a plan is especially acute in putative class actions such as this one. Exorbitant discovery costs and the *in terrorem* effect of potential class certification can both be used as weapons to try to coerce unjust settlements. Avoiding these injustices requires efficient proceedings guiding the parties toward a certification decision at the earliest practicable time.

> B. **Provider Plaintiffs' martial approach to discovery has impeded progress and undercut efficiency.**

As outlined above, Provider Plaintiffs have sought to make this a case about ever-expanding and irrelevant discovery, rather than a case about SmileDirect's advertising.[2] Rather than focus on evidence relevant to the proper resolution of their claims, they have served 148 requests for production to date (not counting subparts). Many are so expansive that they

---

[2] Provider Plaintiffs' recently filed reply brief regarding their motion for leave to amend offers further proof that their aim is to make the discovery tail wag the merits dog. Rather than focus on the specific marketing statements at issue, they now claim that they want to show "that SmileDirect's advertising was false because its business does not actually work the way it says it does." [Dkt. No. 219 at 3.] That capacious interpretation of their claims seems designed to authorize the unlimited "entire business model" discovery that Magistrate Judge Holmes rejected.

necessarily overlap with others. Many seek documents wholly unrelated to SmileDirect's advertising and irrelevant to any claim or defense. [Dkt. No. 196 at 10–15.]

Not only have Provider Plaintiffs propounded excessive and irrelevant discovery, they also have designed their discovery strategy to generate, and multiply, discovery disputes. Provider Plaintiffs revealed as much by stating that they were planning to file motions to compel before they'd even received Defendants' initial responses. And throughout discovery, they have followed through, filing seven discovery disputes to date, including disputes filed on issues on which the parties had not reached impasse. [*E.g.*, Dkt. No. 138.]

All the while, Provider Plaintiffs have refused to fulfill their own discovery obligations, opting instead to insist that discovery should be a one-way street. [*E.g.*, Dkt. No. 174-5 (02/12/2021 Franz Ltr.) (asserting that Provider Plaintiffs' discovery obligations are "limited"); Dkt. No. Doc. 139-18 (9/21/20 Payne Ltr.) (stating that Provider Plaintiffs "intend to abide by" unidentified "limitations" on their obligation to participate in discovery).] Even though they demand that SmileDirect metaphorically turn the company upside down and shake out every document ever created, Provider Plaintiffs refuse to provide SmileDirect with basic information relevant to fundamental issues, including the damages Provider Plaintiffs allege they have incurred. [Dkt. No. 174 at 4–6.]

Provider Plaintiffs' tactics have impeded progress in discovery. Insofar as Provider Plaintiffs complain that document productions were not complete by March, that is a problem of their own making. Not only did they blow up the scope of discovery beyond reason, they also undercut progress by refusing to negotiate—much less agree on—search terms. Instead, they demanded that Defendants run an overbroad set of search terms that would yield over 2.5 million documents from just nine custodians—all while demanding that Defendants add 15 more people

to the custodian list. [Ex. 7 (11/13/20 Payne Ltr.).] Even after Defendants offered a set of search terms that yielded a reasonable volume of documents, Provider Plaintiffs refused to negotiate.

More importantly, though, Provider Plaintiffs have stymied progress on resolving disputes over what Defendants will produce. In December, Defendants proposed a global resolution for disputes over which documents they would produce—an outcome that would be more efficient than haggling over individual RFP responses. [Ex. 8 (12/13/20 Norris Ltr.).] When the parties met and conferred, Defendants explained that they sought a global resolution so discovery could proceed. Rather than agree or formulate a counterproposal, Provider Plaintiffs insisted on addressing the RFPs one request at a time. Put simply, that is not the behavior of a party with an interest in solving problems so discovery could progress. It's the behavior of an obstructionist seeking to abuse the discovery process. Again, Provider Plaintiffs' motion complains about a problem that they have engineered.

### C. The Court should take this opportunity to remedy the problem and force Provider Plaintiffs back on track by decoupling class proceedings from merits proceedings.

Plainly, the current schedule will not work, so the CMO should be revised. Provider Plaintiffs' proposed one-year, all-purposes extension, however, will not fix the problems described above. At best, that approach merely kicks the can down the road for another year. At worst, it will improperly reward Provider Plaintiffs for their obstruction. Either way, a one-year extension will prejudice Defendants by subjecting them to another year of excessive discovery and its associated expense.

Instead, the Court should impose order on these proceedings by decoupling class proceedings from the merits phase of the case. Specifically, the Court should modify the CMO to set class-certification deadlines before discovery closes. To maximize economy and to ensure that merits discovery aligns with the open issues in the case, the Court should also stay discovery while

- 9 -
Case 3:19-cv-00845   Document 221   Filed 07/02/21   Page 9 of 17 PageID #: 6937

class certification remains pending and then convene the parties after a class-certification decision to determine the case's remaining discovery needs. Defendants propose the following schedule:

| Oct. 1, 2021 | Deadline for Provider Plaintiffs to file their class-certification brief and supporting expert reports; all discovery stayed except for class-certification expert discovery outlined below |
|---|---|
| Nov. 5, 2021 | Provider Plaintiffs must make their class-certification experts available for deposition before this date |
| Dec. 3, 2021 | Deadline for Defendants to file their class-certification opposition and supporting expert reports |
| Jan. 7, 2022 | Defendants must make their class-certification experts available for deposition before this date |
| Jan. 21, 2022 | Provider Plaintiffs must file their class-certification reply |

This schedule will require that the discovery period is extended for 2.5 months, through September 30, 2021. Additionally, after the Court rules on class certification, it would conduct a case-management conference to determine the remaining discovery needs and set a new schedule to accommodate those needs.

Courts have broad discretion to manage case schedules. *Asurion, LLC v. SquareTrade, Inc.*, No. 3:18-1306, 2019 WL 7421757, at *2 (M.D. Tenn. Oct. 15, 2019) (Holmes, M.J.) (staying discovery pending resolution of a partial motion for judgment on the pleadings and noting that "[d]istrict courts have broad discretion to manage the discovery process and control their dockets.") (citing *Marie v. Am. Red Cross*, 771 F.3d 344, 366 (6th Cir.2014)). In putative class-action cases, courts often bifurcate proceedings, placing a barrier between class proceedings and merits proceedings.[3] *E.g.*, *Ballard v. Kenan Advantage Grp., Inc.*, No. 5:20CV1042, 2020 WL

---

[3] Defendants acknowledge that the Court chose not to bifurcate as part of the initial CMO. But, like Defendants, the Court likely did not anticipate then that the case would follow the path it has to this point—with the Provider Plaintiffs demanding excessive discovery, filing serial discovery disputes, and, after 21 months, asking to "balloon" the scope of the case by adding 200 or more

4187815 (N.D. Ohio July 20, 2020); *Chenault v. Beiersdorf, Inc.*, No. 1:20-CV-174, 2020 WL 5016795 (S.D. Ohio Aug. 24, 2020); *In re Copper Tubing Litig.*, No. 04-2771 DV, 2006 WL 8434911 (W.D. Tenn. Oct. 3, 2006). To decide whether to bifurcate class and merits discovery, courts consider three factors:

- Expediency—that is, whether bifurcation will aid the court in making a timely decision on class certification;

- Economy—including whether bifurcating may enhance efficiency by enabling the court to tailor merits discovery to the case's needs after deciding class certification; and

- Enmeshment—the extent to which class issues and merits issues overlap.

*Ballard*, 2020 WL 4187815 at *1 (citing 3 Newberg on Class Actions § 7:17 (5th ed.)).

The first two factors strongly favor front-loading class proceedings here. The sooner the parties brief class certification, the sooner the Court can decide whether any class can be certified. And requiring the parties to focus their immediate efforts in discovery on class-certification issues will shorten the path to that decision. *Chenault*, 2020 WL 5016795, at *2. Further, front-loading class proceedings will enhance both judicial economy and the overall economy of the proceedings. If the Court ultimately denies class certification, as Defendants anticipate, Defendants will be able to avoid wide-ranging discovery into issues irrelevant to the case's merits—e.g., discovery into SmileDirect's business related to states other than those where the three Provider Plaintiffs practice. *E.g.*, *Smith v. Laws. Title Ins. Corp.*, No. 07-12124, 2009 WL 514210, at *3 (E.D. Mich. Mar. 2, 2009) (named plaintiff lacks standing to bring claims under laws of states in which he does not reside); *see also* Dkt. 95 at 34 (recognizing that Provider Plaintiffs' claims "could implicate

---

defendants and then pursuing free-range merits discovery for at least another year, all before having to make any showing as to whether this case even should proceed as a class action. Defendants respectfully submit that these developments warrant reconsidering the original decision not to bifurcate class-certification proceedings.

individual states' licensure and scope-of-practice laws"). And in the unlikely event that the Court certifies a class, the Court will be in a better position to define the contours of merits-only discovery after deciding whether a class can be certified, and if so, how that class is defined. *Chenault*, 2020 WL 5016795, at *2 ("defining any potential class may limit or focus discovery on the merits and prevent potentially unnecessary discovery costs").

The third factor is a closer call, but in light of Provider Plaintiffs' theory of the case, that factor also tilts in favor of dividing class and merits proceedings. Again, Provider Plaintiffs' theory is: *SmileDirect's advertisements made seven affirmative statements and one omission that each deceived some consumers. But for being deceived by that advertising, some of those consumers would have patronized Provider Plaintiffs for tooth-straightening services. Provider Plaintiffs therefore have suffered financial harm from that lost business.*[4]

That theory shows that class issues and merits issues are largely distinct. At the class-certification stage, the question is whether Provider Plaintiffs have proved that they meet Rule 23's prerequisites to class certification—that is, whether the named plaintiffs' claims and the claims of absent class members will rise or fall with common evidence, and whether other relevant factors warrant certification of a class with the named plaintiffs as its representatives. *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 521 (6th Cir. 2015) (at the class-certification stage, the "named plaintiffs must show that *they will be able* to prove injury through common evidence, not that they have in fact proved that common injury.") (emphasis in original); *see also* Dkt. No. 95 at 34 (noting that on a motion for class certification, Provider Plaintiffs bear the burden and recognizing that they "may ultimately struggle to establish" predominance). More specifically, to succeed on their

---

[4] Defendants previously identified this theory in their opposition to Provider Plaintiffs' motion for leave to amend. [Dkt. No. 204 at 1–2.] Provider Plaintiffs' reply did not dispute that recitation of their theory. [*See* Dkt. 219.]

motion for class certification, Provider Plaintiffs will need to show that the following questions (among others) can be resolved with common evidence:

- whether each putative class member's—that is, each American dentist and orthodontist's—base of patients and prospective patients was exposed to the same SmileDirect advertisements and marketing statements;

- whether each putative class member's base of patients and prospective patients interpreted those advertisements and marketing statements in the same way;

- whether each putative class member's base of patients and prospective patients relied on those advertisements and marketing statements in the same way; and

- whether each putative class member's base of patients and prospective patients would have made the same decision with respect to teeth-straightening services if not for being exposed to SmileDirect's advertisements and marketing statements.

By contrast, the merits stage will focus on questions of ultimate liability. There, the Provider Plaintiffs will need to prove (among other things) that each of the SmileDirect advertisements and marketing statements identified in the FAC was false, and that each of those statements actually caused prospective patients not to procure teeth-straightening services from their local dentist or orthodontist.

Thus, class questions and merits questions overlap only at a high level of generality. That is, they both touch upon questions of consumer behavior. But the specific questions at each stage differ. That slight conceptual overlap does not necessitate full-blown merits discovery before the parties can brief, and the Court can decide, class certification.

Defendants' proposal also avoids pitfalls that other courts have identified. Some courts have refused to bifurcate class and merits discovery, reasoning that enmeshment of class and merits issues threatens to spark additional disputes about whether particular discovery falls on the class side or the merits side. *E.g.*, *Lee v. Cincinnati Cap. Corp.*, No. 19-12133, 2020 WL 4040652, at *4 (E.D. Mich. July 17, 2020); *Burges v. BancorpSouth, Inc.*, No. 3:14-1564, 2015 WL 13628132, at *4 (M.D. Tenn. Oct. 26, 2015); *McCluskey v. Belford High Sch.*, No. 09-CV-14345, 2011 WL

13225278, at *3 (E.D. Mich. Mar. 10, 2011). Notwithstanding Provider Plaintiffs fondness for discovery disputes, that concern does not attach here. Defendants are not proposing an iron curtain separating class and merits discovery. Instead, they propose only that the Court modestly extend the discovery deadline and then address class certification before determining what, if any, additional merits discovery may be needed. That proposal will not serve as an absolute bar to further discovery, before class certification, into matters touching upon the merits. Instead, it will require the parties to prioritize the discovery necessary for the Court to determine at "an early practicable time" whether this case meets Rule 23's requirements. Fed. R. Civ. P. 23(c)(1).

Further, even courts that deny motions to fully bifurcate class and merits discovery frequently do what Defendants request here—schedule class-certification briefing well before merits discovery closes. For instance, in *Burgess*, the class-certification motion was due October 7, 2015, but discovery did not close until after that motion was filed and resolved. M.D. Tenn. Case No. No. 3:14-1564 at Dkt. Nos, 97, 158, and 166. Similarly, in *Obertman v. Electrolux Home Care Prod., Inc.*, the court declined a defendant's request to bifurcate class and merits discovery. No. 2:19-CV-02487-KJM-AC, 2020 WL 8834885, at *2 (E.D. Cal. June 17, 2020). But in August 2020, the court entered a scheduling order setting the class-certification deadline for November 18, 2020 and the close of discovery for February 25, 2021. E.D. Cal. No. 2:19-CV-02487-KJM-AC, Dkt. No. 27. *See also* Ex. 9 (*McCluskey* docket) (3/9/11 entry set discovery cutoff for 1/6/12; Dkt. No. 126 set class-certification deadline for 7/6/11).

Again, Defendants do not seek full bifurcation. Instead, they seek a revision to the CMO that will incentivize the parties to prioritize discovery necessary for class certification by scheduling class certification briefing before the close of all discovery. That schedule should

prevent the discovery free-for-all that has plagued progress in this case, and help guide the proceeding to an orderly efficient resolution on the merits.

## IV. CONCLUSION

The parties have been working under an initial CMO that does not differentiate between class and merits proceedings. The result has been enormous expense to Defendants, yet little progress.

All agree that the CMO needs to be revised. To focus proceedings and incentivize efficiency, the Court should reject Provider Plaintiffs' demand for a yearlong, all-purposes discovery extension enabling further discovery abuses by Provider Plaintiffs to extort a settlement. Instead, the Court should decouple class proceedings from merits proceedings, decide class certification at an early practicable time, and convene the parties after that decision to determine what necessary discovery remains.

Dated: July 2, 2021                    Respectfully submitted,

  /s/ *Michael D. Meuti*
John R. Jacobson (Tenn. BPR #14365)
D. Alexander Fardon (Tenn. BPR No. 13787)
Elizabeth O. Gonser (Tenn. BPR No. 26329)
**RILEY WARNOCK & JACOBSON, PLC**
1906 West End Avenue
Nashville, Tennessee  37203
Telephone: (615) 320-3700
Facsimile: (615) 320-3737
E-Mail: jjacobson@rwjplc.com
afardon@rwjplc.com
egonser@rwjplc.com

*-and-*

David Rammelt (admitted *pro hac vice*)
Nicholas J. Secco (admitted *pro hac vice*)
**BENESCH, FRIEDLANDER,**
    **COPLAN AND ARONOFF, LLP**
71 South Wacker Drive, Suite 1600
Chicago, Illinois  60606
Telephone: (312) 212-4949
Facsimile: (312) 767-9192
E-Mail: drammelt@beneschlaw.com
nsecco@beneschlaw.com

*-and-*

Michael D. Meuti (admitted *pro hac vice*)
Andrew G. Fiorella (admitted *pro hac vice*)
Mark K. Norris (admitted *pro hac vice*)
**BENESCH, FRIEDLANDER,**
    **COPLAN AND ARONOFF, LLP**
200 Public Square, Suite 2300
Cleveland, Ohio  44114
Telephone: (216) 363-4500
Facsimile: (216) 363-4588
E-Mail: mmeuti@beneschlaw.com
afiorella@beneschlaw.com
mnorris@beneschlaw.com

*Attorneys for the Defendants*

**CERTIFICATE OF SERVICE**

Michael D. Meuti, an attorney, hereby certifies that on July 2, 2021, he caused a true and correct copy of the foregoing document to be served via the Court's ECF Filing System on the following:

Edward M. Yarbrough
W. Justin Adams
Bone McAllester Norton PLLC
511 Union Street, Suite 1600
Nashville, TN 37219
eyarbrough@bonelaw.com
wadams@bonelaw.com

Robert K. Spotswood
Michael T. Sansbury
Joshua K. Payne
Morgan B. Franz
Spotswood Sansom & Sansbury LLC
One Federal Place
1819 Fifth Avenue North, Suite 1050
Birmingham, AL 35203
rks@spotswoodllc.com
msansbury@spotswoodllc.com
jpayne@spotswoodllc.com
mfranz@spotswoodllc.com

Richard Stone
Blackner, Stone & Assocs.
123 Australian Avenue
Palm Beach, FL 33480
rstoneesq@aol.com

/s/ Michael D. Meuti