# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **Dr. Joseph Ciccio,** *et al.*, | ) |
| | ) Civil No.: 3:19-cv-00845 |
| Plaintiffs, | ) |
| | ) Judge Aleta A. Trauger |
| v. | ) |
| | ) Magistrate Judge Barbara D. Holmes |
| **SmileDirectClub, LLC,** *et al.*, | ) |
| | ) Special Master Samuel P. Funk |
| Defendants. | ) |
| | ) |

### SUPPLEMENTAL BRIEF IN SUPPORT OF DEFENDANTS' POSITION IN THE FIFTH JOINT DISCOVERY DISPUTE STATEMENT [DKT. 176]

In response to the Special Master's June 27, 2021 e-mail directing the Parties to answer five questions identified by the Special Master as arising from the June 8, 2021 Fifth Joint Discovery Dispute Statement [Dkt. 176], SmileDirect[1] respectfully submits the following, in addition to the reasons provided in the Dispute Statement, in support of its requests:

## I.  INTRODUCTION

After more than seven months of Defendants' attempts to reach a resolution, including a lengthy meet-and-confer process, a compromise offer, a dozen letters and e-mails, and incurring legal fees of more than $25,000 for, among other things, having to research and brief the instant dispute, the Provider Plaintiffs last night proclaimed in their pleading that they would "accept" the offer made by SmileDirect months ago. Although the Provider Plaintiffs were well aware that SmileDirect was incurring significant legal fees, including fees incurred briefing the issues

---

[1] For the purposes of this Supplemental Brief only, "SmileDirect" refers to Defendants SmileDirectClub, LLC, David Katzman, Steven Katzman, Alexander Fenkell, Jeffrey Sulitzer, and Camelot Venture Group.

identified by the Special Master, they waited to sandbag SmileDirect by never once giving the slightest hint that they would now accept the compromise previously proposed by SmileDirect.

More specifically, for over seven months, SmileDirect tried to reach a compromise with the Provider Plaintiffs regarding third-party subpoenas that were served on SmileDirect's business partners, including DECA Dental, that were harassing and that violated the spirit, if not the letter, of Judge Holmes's limitation on post-complaint discovery. Following an April 13, 2021 meet-and-confer during which SmileDirect thought a fair compromise had been reached by the parties, subsequent e-mails dimmed this prospect when the Provider Plaintiffs unilaterally added terms that: (a) were never discussed during the meet-and-confer; and (b) signaled a retreat from the earlier-agreed terms. Repeated attempts to craft a compromise were made by SmileDirect, and all were rejected by the Provider Plaintiffs.

In addition to the wasted resources expended by SmileDirect, the Special Master has spent time and effort analyzing the briefing, asking questions (which the Provider Plaintiffs apparently refuse to answer), and setting oral argument. All the while, the subpoenas interfered with SmileDirect's business relationships, and the Provider Plaintiffs remained silent. Suddenly, and without answering the Special Master's questions or bothering to inform SmileDirect, the Provider Plaintiffs made their eleventh-hour pronouncement of "acceptance."

In spite of the Provider Plaintiffs' gamesmanship, SmileDirect's May 2021 offer still stands, as long as the Provider Plaintiffs agree: (a) not to serve additional third-party subpoenas on SmileDirect's business partners without agreement or an order from the Court or the Special Master; (b) that the Court's ruling on post-complaint discovery [Dkt. 147] applies with at least equal force to third-party discovery; and (c) to reimburse SmileDirect for the fees incurred with respect to this issue after SmileDirect's May compromise proposal to resolve the issue was

- 2 -
Case 3:19-cv-00845   Document 225   Filed 07/08/21   Page 2 of 16 PageID #: 7115

ignored. (SmileDirect will submit documentation of those expenses at the direction of the Special Master.)

To the extent that the Provider Plaintiffs do not agree to each of those provisions, SmileDirect asks the Court to quash, or grant a protective order against, the Provider Plaintiffs' subpoenas to DECA Dental Group and Smile Brands, Inc. The information sought by those subpoenas is not related to any claim or defense in the case. Instead, the subpoenas seek to circumvent the Court's limitations on both post-complaint and "business model" discovery, and seek to punish anyone who decides to work with SmileDirect. Moreover, as a direct result of the subpoenas, SmileDirect has suffered a "clearly defined and serious injury" in the form of business lost from DECA Dental's more than 80 offices.

SmileDirect summarizes its responses to the Special Master's questions as follows:

- **Answer to Question One**: SmileDirect has standing under Federal Rule of Civil Procedure 26(c) to seek a protective order against the Provider Plaintiffs' subpoenas to DECA Dental and Smile Brands. The substantial harm already caused to SmileDirect from DECA Dental's decision to "pause" its relationship with SmileDirect alone justifies the entry of a protective order.

- **Answer to Question Two**: Federal Rule of Evidence 407 would preclude the Provider Plaintiffs from introducing any evidence they receive from DECA Dental and Smile Brands to establish that there was "negligence [or] culpable conduct," even if the addition of dentists to SmileDirect's Partner Network represented a "change" to the business model (which it did not). Instead of the "change" asserted by the Provider Plaintiffs, the Partner Network simply offers a third option, along with (1) doctor prescribed at-home impression kits and (2) visits to a Smile Shop, for customers to begin their relationship with SmileDirect and the dentists and orthodontists who use its DSO services and telehealth platform to treat patients with clear aligner therapy. Nothing more. This is not a "change," but rather an additional offering that has zero relevance or bearing on the Provider Plaintiffs' false advertising claims.[2]

---

[2] As previously noted by SmileDirect in the Discovery Dispute Statement [Dkt. 176 at 11], the business relationship with DECA Dental and Smile Brands did not begin until many months after the Provider Plaintiffs filed their original Complaint.

- **Answer to Question Three**: Neither the payment made to DECA Dental nor the unrelated payment referenced in the New Jersey case is relevant to any issue in this case. To the extent that the Provider Plaintiffs are somehow able to establish relevance in the future, the information from the New Jersey case is available to them and comes from the four-year, pre-complaint period set by the Court. As a general matter, however, the Provider Plaintiffs are unlikely to be able to establish relevance because the payment to any of SmileDirect's affiliated doctors or members of the Partner Network (including DECA Dental and Smile Brands) has no bearing whatsoever in this case. Indeed, in the Provider Plaintiffs' discovery responses concerning the standard of care, nowhere do they mention the amounts paid for treatment or to the treating doctor as an element.[3]

- **Answer to Question Four**: As described above, there is no support for the proposition that the amount of the payment to a provider is relevant in any way to the applicable standards of care. In fact, an examination of the definitions of the standards of care in the states in which the Provider Plaintiffs practice and the Consumer Plaintiffs live (Tennessee, California, Colorado, Florida, Michigan, New York, Texas, Virginia, Washington, and Wisconsin) shows that fees received have nothing to do with those definitions. Provider Plaintiffs in the discovery response admit as much. Indeed, taken to its logical extreme, under Provider Plaintiffs' misguided theory, a dentist could never provide appropriate care to underserved communities on a discounted or *pro bono* or free-of-charge basis.

- **Answer to Question Five**: The post-complaint level of care provided by the dentists in the Partner Network, which is delivered in the same way as the care received through SmileDirect's other client options, is irrelevant to establishing anything about the level of care offered during the four-year, pre-complaint period set by the Court. As the Special Master observed in his question, "SmileDirect's level of care either was, or was not, sufficient at the time it made the statements at issue."

Those answers, along with arguments presented in Defendants' portions of the Dispute Statement, demonstrate that the Court should quash, or grant a Protective Order prohibiting, the Provider Plaintiffs' subpoenas to DECA Dental and Smile Brands.

---

[3] *See* Exhibit C to the Declaration of Andrew G. Fiorella ("Fiorella Decl."), which is the Provider Plaintiffs' October 23, 2020 Amended Response to Defendants Interrogatory No. 9, which does not list payment as an element of what the Provider Plaintiffs believe is the standard of care.

## II. ANSWERS AND ARGUMENT

### 1. Question One: SmileDirect Has Standing to Seek a Protective Order

The Special Master first directed the Parties to answer the question: "Does SmileDirect have standing to seek a protective order or do the subpoenaed parties need to do so?" (6/27/21 E-Mail from Special Master Funk.) The answer is "yes," SmileDirect has standing to seek a protective order against the Provider Plaintiffs' subpoenas to DECA Dental and Smile Brands, and the Provider Plaintiffs' arguments to the contrary are incorrect.

In the Dispute Statement, SmileDirect explained that it "seeks an order quashing both Subpoenas to DECA Dental and Smile Brands or for a similar protective order. . . ." [Dkt. 176 at 10.] Rule 26(c) allows "[a] party or any person from whom discovery is sought" to seek a protective order from the Court. FED. R. CIV. P. 26(c)(1). Although "a party may lack standing to file a motion to quash a subpoena to a third party," *United States v. Llanez-Garcia*, 735 F.3d 483, 498 (6th Cir. 2013), it is "unnecessary" to reach that determination here because "Rule 26(c) affords parties the ability to move for a protective order on a third party's behalf," *Diamond Resorts Int'l, Inc. v. Phillips*, No. 3:17-CV-01124, 2018 WL 4328257, at *2 (M.D. Tenn. July 16, 2018).[4] "A party can move for a protective order in regard to a subpoena issued to a non-party if it believes its own interests are jeopardized by discovery sought from a third party and has standing under Rule 26(c) to seek a protective order regarding subpoenas issued to non-parties which seek irrelevant information." *In re REMEC, Inc. Sec. Litig.*, No. CIV 04CV1948 JLS AJB, 2008 WL 2282647, at *1 (S.D. Cal. May 30, 2008).

---

[4] *See also Morrow v. Cmty. Health Sys. Inc.*, No. 3:16-01953, 2017 WL 2989374, at *2 (M.D. Tenn. Apr. 20, 2017) ("[i]n contrast to a motion to quash, a motion for protective order is available to 'a party.'"); *DASFortus Techs., LLC v. Precision Prod. Mfg. Co., Ltd (Hong Kong)*, No. 3-07-0866, 2011 WL 13244104, at *5 (M.D. Tenn. Jan. 25, 2011) ("A party may seek a protective order . . . . in accord with Rule 26(c) of the Federal Rules of Civil Procedure.").

Courts regularly grant protective orders to a party in response to third-party subpoenas that seek to annoy, embarrass, oppress, or unduly burden that party, including where the information sought by the subpoena is irrelevant. *See, e.g.*, *Hood v. Fiberweb, Inc.*, No. 3-10-0355, 2010 WL 4102219, at *2 (M.D. Tenn. Oct. 18, 2010) (granting, in part, a motion for a protective order and holding that "[p]ursuant to Rule 26(c), a party may seek a protective order to protect a party from annoyance, embarrassment, oppression, or undue burden and expense"); *Mayes v. City of Oak Park*, No. CIVA 05-CV-74386-DT, 2007 WL 187941, at *2 (E.D. Mich. Jan. 22, 2007) (granting a protective order against a third-party subpoena where the court "conclude[d] that the documents at issue in Plaintiff's Subpoena Request for Production of Documents [were] irrelevant").

"Good cause for the issuance of a protective order is established with 'specific facts showing clearly defined and serious injury resulting from the discovery sought and cannot rely on merely conclusory statements.'" *Morrow v. Cmty. Health Sys. Inc.*, No. 3:16-01953, 2017 WL 2989374, at *2 (M.D. Tenn. Apr. 20, 2017) (quoting *Nix v. Sword*, 11 F. App'x 498, 500 (6th Cir. 2001)) (internal quotation in *Nix* omitted). In other words, "[g]ood cause exists if 'specific prejudice or harm will result' from the absence of a protective order." *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 236 (6th Cir. 2016) (quoting *Father M. v. Various Tort Claimants (In re Roman Catholic Archbishop)*, 661 F.3d 417, 424 (9th Cir. 2011)). "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984).

SmileDirect has demonstrated the specific prejudice and harm that not only will result but that *has* already resulted from the issuance of the DECA Dental and Smile Brands subpoenas. DECA Dental, with its more than 80 offices, is "pausing" its participation in SmileDirect's Partner

- 6 -
Case 3:19-cv-00845   Document 225   Filed 07/08/21   Page 6 of 16 PageID #: 7119

Network until the subpoenas are resolved. Far from conjecture or conclusory statements, the harm to SmileDirect is unmistakable. Thus SmileDirect's "own interests" have already been "jeopardized" by the discovery sought from DECA Dental and Smile Brands, giving rise to SmileDirect's standing. *In re REMEC, Inc. Sec. Litig.*, 2008 WL 2282647, at *1. Moreover, in addition to seeking irrelevant information and harming SmileDirect's business unnecessarily, allowing the DECA and Smile Brands discovery to proceed potentially has the danger of being interpreted by the Provider Plaintiffs as an open door to seek further post-complaint discovery against *every* member of the Partner Network. And it is unlikely to stop there, since the Provider Plaintiffs have already informed SmileDirect that in their view Judge Holmes's ruling is not applicable to third parties. At the end of last year there were "1,000 dental practices in [SmileDirect's] Partner Network." (Fiorella Decl. Ex. A, 12/31/20 SmileDirect Annual Report on Form 10-K (excerpts) at 5.) Consequently, SmileDirect is entitled to a protective order.

### 2. Question Two: The Addition of an Option for a Customer to Visit a "Partner Network" Dentist is not a "Change" to the "Business Model"

The Special Master also directed the Parties to answer the question: "What is the effect, if any, [of] Federal Rule of Evidence 407 . . . on the establishment of Smile Brand brick and mortar shops providing new options to consumers?" (6/27/21 E-Mail from Special Master Funk.) Federal Rule of Evidence 407, addressing subsequent remedial measures, would preclude the Provider Plaintiffs from introducing any evidence they receive from DECA Dental and Smile Brands to establish that there was "negligence [or] culpable conduct," even if the addition of an option to visit a dentist represented a "change" to SmileDirect's business model (which it did not). But there is no reason to accept the Provider Plaintiffs' mischaracterizations.

Instead of a "change," the Partner Network (of which DECA Dental and Smile Brands are members) simply offers a third option, along with doctor-prescribed, at-home impression kits and

visits to a Smile Shop, for customers to begin their relationship with SmileDirect and seek treatment from the dentists and orthodontists who use SmileDirect's DSO services and telehealth platform to treat patients with clear aligner therapy. As a result, regardless of how their argument is construed, the Provider Plaintiffs' subpoenas are improper. Either Rule 407 renders the evidence they seek inadmissible or the facts of the post-complaint relationships with the Partner Network render the evidence completely irrelevant.

### a. There Has Been No Change to SmileDirect's "Business Model"

The Provider Plaintiffs cannot justify discovery into DECA Dental and Smile Brands by claiming a fictitious "change" to SmileDirect's "model." [*See* Dkt. 176 at 20.] The Provider Plaintiffs have ignored publicly available information about the Partner Network showing that there are no differences in care among the three ways that a person may approach SmileDirect. In other words, the Partner Program is not a replacement for, or improvement to, the other methods available for a SmileDirect client. The Partner Network dentists provide no "care" as it relates to SmileDirect. Instead, they function like a SmileShop. Thus, even if the subpoenas go forward, the Provider Plaintiffs will gain nothing.

In January 2020, Smile Direct "launched its direct-to-office offering, the SmileDirectClub Partner Network," which created "an additional path for consumers to begin invisible aligner treatment with SmileDirectClub and its telehealth platform." [Dkt. 176-5 at 1, Smile Brands Press Release.] As SmileDirect's CEO and Chairman, David Katzman, said during an August 2020 earnings call, "all we asked [the dentists] to do [is] take a scan or impression kit, and we would handle the rest." (Fiorella Decl. Ex. B, Q2 2020 SmileDirectClub Inc Earnings Call at 12.) Customers have three options: (1) "They can buy an impression kit and start from home;" (2) "They can go to one of our SmileShops;" or (3) "[T]hey can go to one of our partner locations." (*Id.*)

SmileDirect's press releases announcing the DECA Dental and Smile Brands agreements also make this point. In October 2020 (that is, more than a year after Provider Plaintiffs filed this lawsuit), SmileDirect announced that it "has partnered with Texas-based dental service organization DECA Dental and its more than 100 affiliated dental practices to give more consumers *the option* to begin a SmileDirectClub treatment journey in the dentist chair." [Dkt. 176-10, at 1, DECA Dental Press Release (emphasis added); Dkt. 176-5, at 1 Smile Brands Press Release ("The direct-to-office treatment model creates an additional path for consumers to begin invisible aligner treatment with SmileDirectClub and its telehealth platform.").)

In describing the Partner Network, SmileDirect's website explains that once the partner dentist takes a "quick 3D scan or impressions of [their] patient's teeth . . . SmileDirectClub takes it" from there "without distracting" the dentist from the care otherwise provided:



(https://smiledirectclub.com/partner-network/ (indication added).) Further, for the partner practices there are "[n]o lab fees, no case management, and no additional chair time or

appointments to schedule following initial consultation." (*Id.*) The determination of the customer's suitability for clear aligner therapy, as well as treatment plan and monitoring, are all performed in the same way as for those who choose at-home impressions or to visit the Smile Shops. That is, by the dentists and orthodontists who use SmileDirect's DSO services and telehealth platform to treat patients with clear aligner therapy when they deem them clinically viable for such remote treatment.

Moreover, no clear-aligner examination or other prequalification is performed by the partner dentist as the Provider Plaintiffs assert. [Dkt. 176 at 20.] All clinical decisions related to whether consumers will be treated with clear aligner therapy using the SmileDirect telehealth platform remain solely within the discretion of the dentists and orthodontists who have contracted SmileDirect for use of its DSO services and telehealth platform.

Separately, it is also important to note that neither DECA Dental nor Smile Brands (or any of the Partner Network practices) is an affiliate of, or in any way owned or controlled by, SmileDirect. Instead, "DECA [Dental] provides support for [their] practices by handling all operational aspects, allowing doctors to focus on what really matters: providing quality patient care." (*Available at* https://decadental.com/about-us/.) Similarly, "Smile Brands, Inc. is one of the largest providers of support services to dental groups in the United States." (*Available at* https://www.gryphon-inv.com/company-profile/smile-brands/.)

> **b.  Even Under the Provider Plaintiffs' Theory, Federal Rule of Evidence 407 Would Bar Any Evidence Derived From The Subpoenas**

The Provider Plaintiffs fare no better even when we accept their allegations (for argument only). If the Partner Network offered care that is somehow different from the other available SmileDirect options, those post-complaint "changes" would be inadmissible to establish what the Provider Plaintiffs want. As the Special Master's question foreshadows, Federal Rule of Evidence

407 provides that "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . negligence [or] culpable conduct." FED. R. EVID. 407. Proceeding with the subpoenas, therefore, is a futile effort.

The Court regularly excludes such evidence. *See, e.g.*, *Smith v. Pfizer Inc.*, No. 3:05-0444, 2010 WL 1963379, at *12 (M.D. Tenn. May 14, 2010) (Trauger, J.) (excluding evidence that "falls squarely within the protection of Rule 407"); *Sanders v. Correct Care Sols.*, LLC, No. 3:15-CV-01526, 2018 WL 2388551, at *3 (M.D. Tenn. May 25, 2018) ("If a party fully remedied a situation that was the subject matter of the litigation only to have that remedy utilized against them as an admission of wrongdoing the policy goal of voluntary remedies would be directly undermined which is entirely inconsistent with the Rule."); *Lawhorn v. Buy Buy Baby, Inc.*, No. 3:20-CV-00201, 2021 WL 1063075, at *2 (M.D. Tenn. Mar. 19, 2021) (finding a statement "inadmissible as a subsequent remedial measure"); *Cary v. Kroger Co.*, No. 1:09-0064, 2010 WL 3420351, at *1 n.2 (M.D. Tenn. Aug. 26, 2010) ("[T]he Court will not consider as admissible evidence the fact that Kroger subsequently painted the speed bump").

Moreover, the Sixth Circuit regularly affirms decisions excluding evidence under Rule 407. *See, e.g.*, *Siegel v. Dynamic Cooking Sys., Inc.*, 501 F. App'x 397, 405 (6th Cir. 2012) (finding no abuse of discretion to exclude evidence under Rule 407); *Nolan v. Memphis City Sch.*, 589 F.3d 257, 273 (6th Cir. 2009) (affirming the district court's exclusion of "testimony as evidence of subsequent remedial measures under Federal Rule of Evidence 407"); *Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 357 (6th Cir. 2006) ("The District Court properly excluded this subsequent remedial evidence under Fed.R.Evid. 407.")

In short, the Special Master's question highlights the folly of the Provider Plaintiffs' subpoenas. If they are right (and they are not) that the Partner Network represents a "change" to

SmileDirect's "business model," then the evidence they obtain will be excluded. If they are wrong (and they are), then the evidence they receive is completely irrelevant. Either way, the Provider Plaintiffs lose.

### 3. Question Three: Payments to DECA Dental or Smile Brands, or the Payment Information in the New Jersey Case, Adds Nothing to This Case

The Special Master next directed the Parties to answer the question: "What, if anything, does payment to Deca Dental get Provider Plaintiffs that they cannot derive from the publicly-available payment information from the New Jersey case?" (6/27/21 E-Mail from Special Master Funk.) The answer to this question, if Provider Plaintiffs had bothered to answer, is nothing. Moreover, neither the amount of payment disclosed in the New Jersey case nor any payment related to DECA Dental (or any member of the Partner Network) is relevant to any claim or defense in this case. It is important to note that SmileDirect does *not* pay any fees to the dentists in the Partner Network (like DECA Dental or Smile Brands); nor does it pay any fees to the affiliated doctors in SDC's network who use SmileDirect's DSO Services and telehealth platform.

As described in the answer to Question Four, payment is not an element in establishing or showing compliance with the standards of care applicable to the Plaintiffs' claims. To the extent that the Provider Plaintiffs are somehow able to establish the relevance of this information in the future, the information from the New Jersey case is already available to them and comes from the four-year, pre-complaint period set by the Court.

### 4. Question Four: The Applicable Standards of Care are Unaffected by the Amount of the Payment to a Provider

The Special Master directed the Parties to provide: "Support for or against the proposition that the amount of money paid to a provider is relevant to a particular level or standard of care being satisfied or not." (6/27/21 E-Mail from Special Master Funk.) The standards of care in the various jurisdictions covered by the Plaintiffs' allegations are unaffected by the amount of money

paid to a medical provider. In their discovery responses, the Provider Plaintiffs have refused to identify the sources or elements of the "standard of care." The precise standards of care that are applicable in this case will, of course, have to be established through expert testimony and may vary by state. Nevertheless, although there are important variations in the precise wording, the standards of care are somewhat similar to Tennessee's standard and well summarized in the Pattern Jury Instructions for the duty of a physician (which also applies to a dentist): "A physician not only must have that degree of learning and skill ordinarily possessed by other reputable physicians but also must use the care and skill ordinarily used in like cases." 8 TENN. PRAC. PATTERN JURY INSTR. T.P.I.-Civil 6.10, Duty of Physician (2020 ed.). That standard, as well as the ones from the other jurisdictions, is silent about payment.

The standards of care in each of the jurisdictions in which the Provider Plaintiffs practice and in which the Consumer Plaintiffs live make no reference to whether or how much of a fee was charged for the dental or medical service provided.

The Provider Plaintiffs have not and cannot come forward with any reason why fee levels or payment amounts have the slightest correlation to the standard of care. A dentist offering, for example, discounted or *pro bono* professional services to a patient is not relieved from complying with the standard of care and could not claim the lack of payment as a defense to a malpractice action. The Provider Plaintiffs' effort to equate payment amount with time spent on a patient with the standard of care finds no support in the law or in common sense.

### 5. Question Five: SmileDirect's Post-Complaint Affiliations Are Irrelevant

The Special Master directed the Parties to answer the question: "How is the level of care provided by Deca Dental relevant to the level of care provided by SmileDirect before the affiliation? Specifically, SmileDirect's level of care either was, or was not, sufficient at the time it made the statements at issue. Therefore, how could a subsequent affiliation prove or disprove

that issue?" (6/27/21 E-Mail from Special Master Funk.) The answer is that a subsequent affiliation has no relevance to the appropriate standard of care, let alone the standard of care that existed during the four-year pre-complaint period at issue in this case for the reasons stated in response to the Special Master's other questions. As the Special Master said, "SmileDirect's level of care either was, or was not, sufficient at the time it made the statements at issue." It was.

## III. CONCLUSION

SmileDirect is willing to keep its May 2021 offer to resolve this dispute open, as long as the Provider Plaintiffs agree: (a) not to serve additional third-party subpoenas on SmileDirect's business partners without agreement or an order from the Court; (b) that the Court's ruling on post-complaint discovery applies with at least equal force to third-party discovery; and (c) to reimburse SmileDirect for the fees incurred with respect to this issue after the May compromise proposal was ignored.

In the alternative, for the reasons stated by Defendants in the Joint Discovery Dispute Statement Regarding Provider Plaintiffs' Productions [Dkt. 174] and in this Supplemental Brief, the Court should enter an order quashing, or granting a protective order against, the Provider Plaintiffs' third-party subpoenas to DECA Dental and Smile Brands.

Dated: July 8, 2021                                    Respectfully submitted,

                                                       */s/ D. Alexander Fardon*
                                                       John R. Jacobson (Tenn. BPR #14365)
                                                       D. Alexander Fardon (Tenn. BPR No. 13787)
                                                       Elizabeth O. Gonser (Tenn. BPR No. 26329)
                                                       **RILEY WARNOCK & JACOBSON, PLC**
                                                       1906 West End Avenue
                                                       Nashville, Tennessee 37203
                                                       Telephone:   (615) 320-3700
                                                       Facsimile:   (615) 320-3737
                                                       E-Mail:      jjacobson@rwjplc.com
                                                                    afardon@rwjplc.com
                                                                    egonser@rwjplc.com

                                                       *-and-*

                                                       David Rammelt (admitted *pro hac vice*)
                                                       Nicholas J. Secco (admitted *pro hac vice*)
                                                       **BENESCH, FRIEDLANDER,**
                                                       **    COPLAN AND ARONOFF, LLP**
                                                       71 South Wacker Drive, Suite 1600
                                                       Chicago, Illinois 60606
                                                       Telephone:   (312) 212-4949
                                                       Facsimile:   (312) 767-9192
                                                       E-Mail:      drammelt@beneschlaw.com
                                                                    nsecco@beneschlaw.com

                                                       *-and-*

                                                       Michael D. Meuti (admitted *pro hac vice*)
                                                       Andrew G. Fiorella (admitted *pro hac vice*)
                                                       Mark K. Norris (admitted *pro hac vice*)
                                                       **BENESCH, FRIEDLANDER,**
                                                       **    COPLAN AND ARONOFF, LLP**
                                                       200 Public Square, Suite 2300
                                                       Cleveland, Ohio 44114
                                                       Telephone:   (216) 363-4500
                                                       Facsimile:   (216) 363-4588
                                                       E-Mail:      mmeuti@beneschlaw.com
                                                                    afiorella@beneschlaw.com
                                                                    mnorris@beneschlaw.com

                                                       *Attorneys for the Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served via the Court's ECF Filing System this 8th day of July, 2021 on:

Edward M. Yarbrough
W. Justin Adams
Bone McAllester Norton PLLC
511 Union Street, Suite 1600
Nashville, TN 37219
eyarbrough@bonelaw.com
wadams@bonelaw.com

Robert K. Spotswood
Michael T. Sansbury
Joshua K. Payne
Morgan B. Franz
Spotswood Sansom & Sansbury LLC
Financial Center
505 20th Street North, Suite 700
Birmingham, AL 35203
rks@spotswoodllc.com
msansbury@spotswoodllc.com
jpayne@spotswoodllc.com
mfranz@spotswoodllc.com

Richard Stone
Blackner, Stone & Assocs.
123 Australian Avenue
Palm Beach, FL 33480
rstoneesq@rstoneesq.com

And by email, with copy to counsel, on:

Samuel P. Funk
Sims Funk, PLC
3322 West End Avenue, Suite 200
Nashville, TN 37203
sfunk@simsfunk.com

                                            */s/ D. Alexander Fardon*