**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| DR. JOSEPH CICCIO; JOSEPH A. CICCIO, JR., D.D.S. AND PETER B. DEMAREST, D.M.D., PLLC; DR. ARTHUR KAPIT; ARTHUR L. KAPIT, D.D.S., M.SC.D., P.A.; DR. VISHNU RAJ; ALAMO RANCH ORTHODONTICS, PLLC; WHITNEY BLAINE; DAVID CAPABLANCA; EMILY GEBHARD; KRYSTAL PERKINS; ROMONIA SIMPSON; ANTHONY VASQUEZ; JESSICA VAUGHN; ZOE WILLIAMS; DANA JOHNSON; PENNY YOUNG-CARRASQUILLO; R.B., A MINOR, BY HER PARENTS AND NEXT FRIENDS SETH BROWN AND MELISSA BROWN; MIKE ALKEMA; DENA NIGOHOSIAN; VISAKA BHANDARI; GABRIELLA LOISEAU; ELIANA MOLINA; BLAIR LOFLAND; GABRIEL CAMPOS; KENNETH PHILLIPS; PAMELA FLOWERS; JANE LEE; VANCE ROODZANT; and LAUREL WILCOX, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No: 3:19-cv-00845 |
| v. | ) ) ) | Judge Trauger |
| SMILEDIRECTCLUB, INC.; SMILEDIRECTCLUB, LLC; SDC FINANCIAL, LLC; SMILE OF NEW JERSEY, P.A.; SMILE OF TENNESSEE, P.C.; DAVID KATZMAN; STEVEN KATZMAN; ALEXANDER FENKELL; JEFFREY SULITZER; and CAMELOT VENTURE GROUP, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

**CORRECTED SECOND AMENDED COMPLAINT FOR FALSE ADVERTISING,
FRAUD, NEGLIGENCE, AND UNFAIR AND DECEPTIVE TRADE PRACTICES**

Plaintiffs Dr. Joseph Ciccio, Joseph A. Ciccio, Jr., D.D.S. and Peter B. Demarest, D.M.D., PLLC, Dr. Arthur Kapit, Arthur L. Kapit, D.D.S., M.Sc.D., P.A., Dr. Vishnu Raj, and Alamo Ranch Orthodontics, PLLC, individually and on behalf of a class of dentists and/or the practice entities through which they provide dental services, and Whitney Blaine, David Capablanca, Emily Gebhard, Krystal Perkins, Romonia Simpson, Anthony Vasquez, Jessica Vaughn, Zoe Williams, Dana Johnson, Penny Young-Carrasquillo, R.B., Mike Alkema, Dena Nigohosian, Visaka Bhandari, Gabriella Loiseau, Eliana Molina, Blair Lofland, Garbriel Campos, Kenneth Phillips, Pamela Flowers, Jane Lee, Vance Roodzant, and Laurel Wilcox, individually and on behalf of a class of consumers, for their complaint as against defendants SmileDirectClub, Inc., SmileDirectClub, LLC, SDC Financial, LLC, (collectively "SmileDirect"), Smile of New Jersey, P.A. ("Smile of New Jersey"), Smile of Tennessee, P.C. ("Smile of Tennessee"), David Katzman, Steven Katzman, Alexander Fenkell, Jeffrey Sulitzer, and Camelot Venture Group ("Camelot"), do hereby allege as follows:

## INTRODUCTION

1. SmileDirect is a company under siege. It is currently subject to a barrage of litigation and customer complaints that challenge its business model and set forth substantiated allegations that SmileDirect is operating illegally in violation of provisions of the federal Food, Drug, and Cosmetic Act (the "FD&C Act").

2. More specifically, SmileDirect is currently subject to:

   a. At least 40 state claims filed by the relevant state affiliate of the American Dental Association ("ADA"), American Association of Orthodontists ("AAO"), or similar organizations alleging, in a substantiated fashion, that SmileDirect is illegally operating as a dentist without proper licensing in the subject state.

Indeed, a Federal District Court in Georgia recently found that SmileDirect was in fact illegally operating as a dentist in connection with its ordinary course practices. (*See* Exhibit A, attached hereto.)

b. A lengthy, detailed and substantiated Citizen Petition filed by the American Dental Association with the federal Food and Drug Administration ("FDA") alleging in a detailed and substantiated fashion that SmileDirect is in continuing violation of the FD&C Act because it is selling plastic aligners that it manufactures in Tennessee (a) without a valid prescription and (b) without having had such aligners approved pursuant to a 510(k) clearance procedure. (*See* Exhibit B, attached hereto.)

c. A complaint filed by the ADA with the Federal Trade Commission ("FTC") requesting that the FTC investigate numerous false and misleading claims made by SmileDirect to fraudulently entice customers to purchase its products and services. The ADA's detailed lengthy complaint alleges that SmileDirect has made false and misleading claims and engages in unfair and deceptive practices within the meaning of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. (*See* Exhibit C, attached hereto.)

d. Thousands of substantiated, serious customer complaints with respect to the efficacy of the SmileDirect aligner treatment and injuries suffered with respect thereto. Among these thousands of complaints are complaints that the product did not work, that the product came in a broken fashion, and that the product made consumers' teeth "worse" and, in certain instances, substantially worse:

- "Product made my teeth worse with spacing and gaps. Did not work as described and was led to believe it would get fixed ... After five months and four aligners and a cracked tooth and numerous attempts to talk to customers service to fix my issues all of which led nowhere."

- "Please don't do this to yourself - especially if you're just trying to save money ... A few months closer to the seventh month, my crown and implant - which was super expensive to get done - came off together. When I called them about this, they kept making me email people ... I am here months later with about the same smile as before, $1700 down the drain, and my crown and implant not intact."

3.      Rather than address and seek to remedy these substantiated complaints alleging illegal operation, false advertising, and violations of the FTCA and the FD&C Act, SmileDirect instead has taken the low road by (a) refusing to make refunds to customers who have had bona fide problems with the aligners and/or damage relating to their teeth and (b) bringing litigation against ADA or AAO state affiliates and their board members to deflect the claims contained in their state-filed complaints with respect to SmileDirect's illegal operation.

4.      Moreover, SmileDirect has engaged in a deliberate, intentional, and well-lawyered campaign to stifle any legitimate, publicly-stated concerns or criticisms of its product and/or business practices.

5.      Indeed, SmileDirect has retained numerous law firms in the United States and elsewhere, who on a regular and continuous basis have sent threatening, overbroad, and improper letters to dentists, orthodontists, and others who have expressed professional opinions with respect to the inadequacy of the SmileDirect treatment. Moreover, on information and belief,

SmileDirect has had its agents post false negative internet reviews of dentists who have questioned SmileDirect's results.

6.      These dentists, orthodontists, and other parties have received a barrage of "cease and desist" letters from SmileDirect's counsel threatening lawsuits and threatening the filing of ethical complaints with regulators against such professionals who have merely voiced legitimate, substantiated opinions regarding the clear inadequacy of the SmileDirect Program. (*See* Exhibit D, attached hereto.)

7.      SmileDirect's litigation offensive is purposeful. SmileDirect needed to deflect, defer and cover up legitimate criticism of its inadequate practices and illegal business model because SmileDirect was in the process of "going public".

8.      SmileDirect filed a prospectus pursuant to which it intended to raise more than $1 billion in the public equity markets and pursuant to which it valued itself at more than $8 billion ("Prospectus"). (Exhibit F, attached hereto.)

9.      The Prospectus fails to disclose to the public the numerous bona fide complaints with respect to SmileDirect's illegal practice of dentistry and defective business model.

10.      Moreover, the Prospectus contains numerous representations about SmileDirect's business that are inconsistent with other written representations made by SmileDirect in its advertising and extensive online marketing and thus show these marketing representations to be literally false.

11.      In September 2019, SmileDirect went public. As a result of public disclosure of its fraudulent business model and the extensive litigation in which it is involved, its stock is currently trading around 50% of its initial public value, representing a loss to investors of at least $4.5 billion.

12.     On November 13, 2019, SmileDirect held an earnings call for investors. (Exhibit G, attached hereto.) On that call, SmileDirect's CEO, David Katzman, said that SmileDirect's legal expenses were expected to double again in the fourth quarter of 2019, due, in part, to SmileDirect's "investment" in lobbying efforts in the United States. One of those efforts is to lobby "a handful" of states to relax the laws regarding teledentistry before SmileDirect faces challenges from regulators. Those lobbying efforts recently failed in California, which passed new teledentistry regulations to protect its consumers. SmileDirect called those consumer protections "anticompetitive" and complained that such protections would introduce "unnecessary hurdles and costs."

13.     In sum, despite having been found to be illegally operating as dentists, despite a business model that is destined to fail, and despite thousands of bona fide customer complaints, SmileDirect is waging a war against longstanding regulatory authorities and its own customers to prevent the pot from boiling over while it raises money in the public markets without proper disclosure as to its illegal, improper business practices and ineffective orthodontic treatment.

14.     Pursuant to Management Services Agreements with SmileDirect, Smile of New Jersey and Smile of Tennessee participated in the development and creation of the misrepresentations addressed herein. These agreements also required express approval of such marketing statements by Smile of New Jersey and Smile of Tennessee.

**THIS ACTION**

15.     In an effort to remedy the harm visited on dentists and consumers by SmileDirect's illegal and harmful business practices, Plaintiffs seek to represent two distinct classes. The first class consists of consumers nationwide who have been deceived and have received fraudulent and misleading written marketing material with respect to the SmileDirect

aligners and services. These parties seek to proceed under federal law and Tennessee law, which governs the relationship between them and SmileDirect, as well as certain other state laws. The second class consists of dentists and/or the practice entities through which they provide dental services in the United States who have been directly injured by SmileDirect's commercial advertising or promotion in interstate commerce that misrepresents the nature, characteristics, or qualities of it goods, services, and/or commercial activities in violation of the Lanham Act, 15 U.S.C. § 1125(a).

16.      As set forth in more detail below, SmileDirect has engaged in a well-funded marketing campaign in print, on television, and on the internet that has made literally false statements about its aligners and that has denigrated and falsely described its direct competition, traditional orthodontics. This campaign of falsity involved more than $100 million of marketing in 2018 and a 125-person, in-house ad agency that deliberately and falsely described the attributes of the SmileDirect aligners in an effort to obtain market share from the traditional orthodontic industry, whom the Defendants describe as their "competition" in the Prospectus. (*See* Exhibit F at 62.)

## PARTIES

### A. <u>Provider Plaintiffs</u>

17.      Plaintiff Dr. Joseph Ciccio is a licensed dentist practicing in New York. He provides traditional orthodontic services in accordance with the standard of care. His business has been reduced due to unfair competition from the Defendants. Specifically, SmileDirect has diverted potential patients from Dr. Ciccio's orthodontic practice through literally false and misleading advertisements and written representations that state, among other things, that

SmileDirect's course of treatment is as effective as traditional orthodontics and involves the same standard of care, as well as other false representations described herein.

18.     Plaintiff Joseph A. Ciccio, Jr., D.D.S. and Peter B. Demarest, D.M.D., PLLC is a professional limited liability company based in New York and is the entity through which Dr. Ciccio practices.

19.     Plaintiff Dr. Arthur Kapit is a licensed dentist practicing in Florida. He provides traditional orthodontic services in accordance with the standard of care. His business has been reduced due to unfair competition from the Defendants. Specifically, SmileDirect has diverted potential patients from Dr. Kapit's orthodontic practice through literally false and misleading advertisements and written representations that state, among other things, that SmileDirect's course of treatment is as effective as traditional orthodontics and involves the same standard of care, as well as other false representations described herein.

20.     Plaintiff Arthur L. Kapit, D.D.S., M.Sc.D., P.A. is a professional association based in Florida and is the entity through which Dr. Kapit practices.

21.     Plaintiff Dr. Vishnu Raj is a licensed dentist practicing in Texas. He provides traditional orthodontic services in accordance with the standard of care. His business has been reduced due to unfair competition from the Defendants. Specifically, SmileDirect has diverted potential patients from Dr. Raj's orthodontic practice through literally false and misleading advertisements and written representations that state, among other things, that SmileDirect's course of treatment is as effective as traditional orthodontics and involves the same standard of care, as well as other false representations described herein.

22.     Plaintiff Alamo Ranch Orthodontics, PLLC is a professional limited liability company based in Texas and is the entity through which Dr. Raj practices.

### B. **Consumer Plaintiffs**

#### i. **California**

23.     Plaintiff Whitney Blaine is a resident of California who purchased aligners from SmileDirect. Plaintiff Blaine chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Blaine's teeth alignment, and represented that her alignment would be corrected. However, SmileDirect's aligners, in fact, did not correct the alignment, made the alignment worse, and caused significant problems for Plaintiff Blaine's bite.

24.     Plaintiff David Capablanca is a resident of California who purchased aligners from SmileDirect. Plaintiff Capablanca chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Capablanca's teeth alignment, and represented that his alignment would be corrected. However, SmileDirect's aligners did not fit properly, did not correct his alignment, and caused extreme pain and bleeding.

25.     Plaintiff Emily Gebhard is a resident of California who purchased aligners from SmileDirect. Plaintiff Gebhard chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written

representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Gebhard's teeth alignment and represented that her alignment would be corrected. However, SmileDirect's aligners, in fact, worsened the alignment, and caused significant problems for Plaintiff Gebhard's bite.

26.     Plaintiff Krystal Perkins is a resident of California who purchased aligners from SmileDirect. Plaintiff Perkins chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Perkins' teeth alignment, and represented that her alignment would be corrected. However, SmileDirect's aligners caused one tooth to be permanently loose and Plaintiff Perkins now requires dental reconstruction.

27.     Plaintiff Romonia Simpson is a resident of California who purchased aligners from SmileDirect. Plaintiff Simpson chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Simpson's teeth alignment, and represented that her alignment would be corrected. However, SmileDirect's aligners, in fact, did not correct the

alignment but instead caused complications including crowding all along her bottom teeth and an overbite.

28.     Plaintiff Anthony Vasquez is a resident of California who purchased aligners from SmileDirect. Plaintiff Vasquez chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Vasquez's teeth alignment and snaggletooth, and represented that his alignment and snaggletooth would be corrected. However, SmileDirect's aligners, in fact, worsened the alignment and snaggletooth, and caused significant problems for Plaintiff Vasquez's bite.

29.     Plaintiff Jessica Vaughn is a resident of California who purchased aligners from SmileDirect. Plaintiff Vaughn chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Vaughn's teeth alignment, and represented that her alignment would be corrected. However, SmileDirect's aligners, in fact, worsened the alignment, and caused significant pain, a cracked tooth, and significant problems for Plaintiff Vaughn's bite.

**ii.     Colorado**

30.     Plaintiff Zoe Williams is a resident of Colorado who purchased aligners from SmileDirect. Plaintiff Williams chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Williams' teeth alignment, and represented that her alignment would be corrected. However, SmileDirect's aligners, in fact, did not correct the alignment and caused significant pain and discomfort.

### iii.     Florida

31.     Plaintiff Dana Johnson is a resident of Florida who purchased aligners from SmileDirect. Plaintiff Johnson chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Johnson's teeth alignment, and represented that his alignment would be corrected. However, SmileDirect's aligners, in fact, did not correct the alignment, in part because top aligners were never provided. SmileDirect admitted after developing the treatment plan that Plaintiff Johnson could not get the results it had represented to him, but it did not provide a refund to Plaintiff Johnson.

32.     Plaintiff Penny Young-Carrasquillo is a resident of Florida who purchased aligners from SmileDirect. Plaintiff Young-Carrasquillo chose to purchase aligners from

SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Young-Carrasquillo's teeth alignment, and represented that her alignment would be corrected. However, SmileDirect's aligners, in fact, did not correct the alignment and made the alignment worse.

33.     Plaintiff R.B., who is a minor and sues in this action by her parents and next friends Seth Brown and Melissa Brown, is a resident of Florida who purchased aligners from SmileDirect. Plaintiff R.B. chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff R.B.'s teeth alignment, and represented that her alignment would be corrected. However, SmileDirect's aligners, in fact, repeatedly broke and did not correct the alignment and also caused Plaintff R.B. pain and discomfort.

**iv.     Michigan**

34.     Plaintiff Mike Alkema is a resident of Michigan who purchased aligners from SmileDirect. Plaintiff Alkema chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as

other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, a gap in Plaintiff Alkema's front teeth and represented that the gap would be corrected. However, SmileDirect's aligners immediately caused Plaintiff Alkema pain and damaged his lower frenulum. In addition, multiple sets of the aligners cracked. After several months of treatment, the gap in Plaintiff Alkema's front teeth remained uncorrected.

35.     Plaintiff Dena Nigohosian is a resident of Michigan who purchased aligners from SmileDirect. Plaintiff Nigohosian chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Nigohosian's snaggletooth and represented that her snaggletooth would be corrected. However, SmileDirect's aligners, in fact, worsened the snaggletooth, did not correct its placement, and caused the snaggletooth to become loose and sensitive.

**v.     New York**

36.     Plaintiff Visaka Bhandari (formerly Visaka Serres) is a resident of New York who purchased aligners from SmileDirect. Plaintiff Bhandari chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Bhandari's teeth alignment and

represented that her alignment would be corrected. However, SmileDirect's aligners, in fact, did not fit or work as represented and caused significant problems for Plaintiff Bhandari's bite.

37.    Plaintiff Gabriella Loiseau is a resident of New York who purchased aligners from SmileDirect. Plaintiff Loiseau chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Loiseau's teeth alignment, and represented that her alignment would be corrected. However, SmileDirect's aligners, in fact, worsened the alignment, and caused significant problems for Plaintiff Loiseau's baby tooth, adult teeth, and bite.

38.    Plaintiff Eliana Molina is a resident of New York who purchased aligners from SmileDirect. Plaintiff Molina chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Molina's teeth alignment, and represented that her alignment would be corrected. However, SmileDirect's aligners caused her teeth to become extremely loose and Plaintiff Molina requires wires to stabilize her teeth and root restoration.

**vi.    Tennessee**

39.    Plaintiff Blair Lofland (formerly Blair Anton) is a resident of Tennessee who purchased aligners from SmileDirect. Plaintiff Lofland chose to purchase aligners from

SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Lofland's teeth alignment, and represented that his alignment would be corrected. However, SmileDirect's aligners, in fact, did not correct the alignment, and caused Plaintiff Lofland to lose a crown on his tooth and experience symptoms of irreversible pulpitis requiring root canal treatment. (*See* Exhibit H, attached hereto.)

### vii. Texas

40. Plaintiff Gabriel Campos is a resident of Texas who purchased aligners from SmileDirect. Plaintiff Campos chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Campos's teeth alignment, and represented that his alignment would be corrected. However, SmileDirect's aligners, in fact, worsened Plaintiff Campos's teeth, did not correct the alignment, and caused there to be a gap in Plaintiff Campos's bite such that he cannot bring his upper and lower teeth together in a normal bite.

41. Plaintiff Kenneth Phillips is a resident of Texas who purchased aligners from SmileDirect. Plaintiff Phillips chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written

representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Phillips' tooth gap and cross-bite, and represented that these issues would be corrected. In fact, SmileDirect's aligners did not perform as represented, leaving Plaintiff Phillips unable to chew or grind up food with his teeth.

42.    Plaintiff Pamela Flowers is a resident of Texas who purchased aligners from SmileDirect. Plaintiff Flowers chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Flower's teeth alignment, and represented that her alignment would be corrected. However, SmileDirect's aligners, in fact, did not correct the alignment and instead made a tooth become extremely painful and loose and altered her bite, resulting in another tooth breaking.

### viii.    Virginia

43.    Plaintiff Jane Lee is a resident of Virginia who purchased aligners from SmileDirect. Plaintiff Lee chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to

correct, among other things, Plaintiff Lee's teeth alignment and represented that her alignment would be corrected. However, SmileDirect's aligners did not correct Plaintiff Lee's alignment.

### ix. Washington

44.    Plaintiff Vance Roodzant is a resident of Washington who purchased aligners from SmileDirect. Plaintiff Roodzant chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Roodzant's teeth alignment and represented that his alignment would be corrected. However, SmileDirect's aligners, in fact, caused Plaintiff Roodzant's teeth to become very loose, and SmileDirect sent the wrong aligners to Plaintiff Roodzant, did not provide adequate customer service to Plaintiff Roodzant, and caused significant delays. The aligners did not perform as described.

### x. Wisconsin

45.    Plaintiff Laurel Wilcox is a resident of Wisconsin who purchased aligners from SmileDirect. Plaintiff Wilcox chose to purchase aligners from SmileDirect, rather than undergo traditional orthodontic treatment, in reliance on SmileDirect's advertisements and written representations, which stated, among other things, that SmileDirect's aligners were just as effective as traditional orthodontic treatment and involved the same standard of care, as well as other false representations described herein. SmileDirect developed a plan of treatment to correct, among other things, Plaintiff Wilcox's teeth alignment, and represented that her

alignment would be corrected. However, SmileDirect's aligners, in fact, did not correct the alignment and also caused complications including stress ulcers.

### C. **Defendants**

46. Defendant SmileDirectClub, Inc. is a public corporation organized under the laws of the state of Delaware with its principal place of business in Nashville, Tennessee. SmileDirectClub, Inc. on information and belief succeeded to all of the assets and liabilities of SDC Financial, LLC and SmileDirectClub, LLC. SmileDirect operates its business in and from Tennessee. SmileDirect manufactures its aligners in Tennessee and directs its marketing efforts from Tennessee.

47. Defendants SDC Financial, LLC and SmileDirectClub, LLC are the financial predecessors to SmileDirectClub, Inc. and engaged and operated the same business as SmileDirectClub, Inc. SmileDirectClub, Inc. has assumed all of the liabilities of these entities.

48. Defendant Smile of New Jersey, P.A. is a professional corporation based in Nashville, Tennessee. Since at least April 1, 2018, Smile of New Jersey is an entity through which SmileDirect has engaged the services of affiliated dentists. Pursuant to a Management Services Agreement ("MSA"), SmileDirect provides marketing services on behalf of and at the direction of Smile of New Jersey and its affiliated dentists, which SmileDirect has confirmed in other litigation. The MSA states that these marketing services are provided in consultation with Smile of New Jersey, and requires Smile of New Jersey to approve the content of the marketing materials. Smile of New Jersey also engaged in regular and continuous business operations in Tennessee, directly and/or through SmileDirect, including:

a. Establishment of bank accounts in Tennessee for affiliated dentists;

b.      Billing and collection from clients/patients whereby bills were sent from Tennessee and then paid into the Tennessee bank account;

c.      Joint marketing and advertising of the SmileDirect product and brand, and creation of such joint advertising in Tennessee, that included many outlets—internet, television, print and social media; and

d.      Producing and printing aligners manufactured on a regular and continuous basis in Tennessee pursuant to computer data stored and maintained in Tennessee, and shipping such aligners from Tennessee.

Accordingly, Smile of New Jersey has knowingly and actively participated in the fraudulent marketing scheme and anticompetitive conduct alleged herein, in and from Tennessee and this district.

49.      Defendant Smile of Tennessee, P.C. is a professional corporation based in Nashville, Tennessee. Since at least April 1, 2018, Smile of Tennessee is an entity through which SmileDirect has engaged the services of affiliated dentists. Pursuant to an MSA, SmileDirect provides marketing services on behalf of and at the direction of Smile of Tennessee and its affiliated dentists. The MSA states that these marketing services are provided in consultation with Smile of Tennessee, and requires Smile of Tennessee to approve the content of the marketing materials. Smile of Tennessee also engaged in regular and continuous business operations in Tennessee, directly and/or through SmileDirect, including:

a.      Establishment of bank accounts in Tennessee for affiliated dentists;

b.      Billing and collection from clients/patients whereby bills were sent from Tennessee and then paid into the Tennessee bank account;

c. Joint marketing and advertising of the SmileDirect product and brand, and creation of such joint advertising in Tennessee, that included many outlets—internet, television, print and social media; and

d. Producing and printing aligners manufactured on a regular and continuous basis in Tennessee pursuant to computer data stored and maintained in Tennessee, and shipping such aligners from Tennessee.

Accordingly, Smile of Tennessee has knowingly and actively participated in the fraudulent marketing scheme and anticompetitive conduct alleged herein, in and from Tennessee and this district.

50. Defendant David Katzman is an individual who is the chief executive officer and chairman of SmileDirect and through his stock ownership, stock voting agreement, and position as a director of Camelot Venture Group controls the business operations of SmileDirect. David Katzman, through Camelot, also controlled the services provided by Steven Katzman and Alexander Fenkell to SmileDirect pursuant to a contract between SmileDirect and Camelot that he negotiated.

51. Defendant Steven Katzman is the chief operating officer of SmileDirect and through his stock ownership, stock voting agreement, and position as a director of Camelot Venture Group controls the business operations of SmileDirect.

52. Defendant Alexander Fenkell is a co-founder and director of SmileDirect. Fenkell is the point person for SmileDirect's marketing efforts. As such, he has been directly involved in developing the misleading and false advertising campaign used by SmileDirect. Fenkell appeared on national television and publicly repeated several of the false and misleading marketing statements that he participated in creating. Specifically, Fenkell falsely stated that the FDA's

investigation of SmileDirect had been "shut down." He also falsely stated that all clinical decisions related to SmileDirect's services were made by U.S. doctors. He further falsely stated that SmileDirect customers have a one-on-one relationship with a U.S. doctor. As a creator and direct participant in SmileDirect's false and misleading marketing campaign, Fenkell has personal liability for his conduct. Fenkell was also at all relevant times acting as an employee of Camelot Venture Group, and his conduct was within the scope of that employment.

53.     Defendant Jeffery Sulitzer is a dentist licensed in California and the chief clinical officer of SmileDirect. He resides in Happy Valley, Oregon. He is the spokesperson for SmileDirect and owns or leases SmileDirect shops in California. Sultizer has misrepresented the attributes, quality, and effects of SmileDirect's aligners on multiple media platforms, including the following:

- that SmileDirect customers receive the same level of care from SmileDirect as from traditional orthodontists;

- that a U.S. doctor prescribes the aligners used by SmileDirect customers; and

- that a U.S. doctor checks in on each customer every 90 days.

Sulitzer is personally liable for each false and misleading statement that he made on behalf of SmileDirect.

54.     Defendant Camelot Venture Group ("Camelot") is a corporation with its principal place of business in Michigan. Camelot is owned and controlled by David Katzman and is, as described on its website, the largest shareholder of SmileDirect and the managing member of the limited liability company that controls SmileDirect. As such, Camelot—through its stock ownership, through its control as the managing member of SmileDirect, and through its ability to

appoint David Katzman and Steven Katzman as the operating officers of SmileDirect—controls SmileDirect and is directly liable for its actions and violations of state and federal law.

55.    The Katzman Defendants and Fenkell did not work directly for SmileDirect at all relevant times. Instead, they were employed by Camelot, which, pursuant to a management agreement with SmileDirect, appointed them as Named Executive Officers ("NEOs") of SmileDirect. Camelot also appointed Susan Greenspon Rammelt as general counsel of SmileDirect and directed day-to-day management of SmileDirect through other Camelot employees. As such, Camelot, along with the Katzmans, controlled the day-to-day operations of SmileDirect.

56.    David Katzman acknowledged, in the Prospectus, that he and the Camelot management team "work side by side with [SmileDirect] Team Members." (Exhibit F at 141.) Camelot was paid at least $150,000 per month for the direct management services it provided to SmileDirect.

57.    The Katzman Defendants have appeared on national television to discuss their control of SmileDirect's defense against the FTC and FDA complaints described above, demonstrating their intimate knowledge and control of SmileDirect's marketing and sales strategy, including the decision to market SmileDirect aligners without FDA approval. The Katzman Defendants and Camelot have positioned themselves as the decision makers for Smile Direct with respect to the issues alleged in this action.

58.    The actions of SmileDirect alleged in this complaint relate to high-level decisions about marketing and business organization that were made at the executive level by Camelot and the NEOs it appointed. Those decisions, upon information and belief, were authorized, approved, and directed by the Katzman Defendants and Fenkell, who were thus knowing participants in

each such decision and the harm resulting from each such decision. Each Defendant is thus liable, under Tennessee law, for his or its "own acts and conduct" causing the injuries and giving rise to the causes of action alleged herein.

59.     In addition, the Katzman Defendants and Fenkell were agents of Camelot. As agents of Camelot, the Katzman Defendants and Fenkell caused injury to Plaintiffs and class members. When causing that injury, the Katzman Defendants and Fenkell were acting on Camelot's business and within the scope of their employment with Camelot. Accordingly, Camelot has respondeat-superior liability for the conduct of the Katzman Defendants and Fenkell in connection with SmileDirect.

## JURISDICTION AND VENUE

60.     This court has subject matter jurisdiction under Section 39 of the Lanham Act, 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331 and 1338 and over the common-law and state-law claims pursuant to 28 U.S.C. §§ 1338 and 1367. This court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d) and 1453 because the number of proposed class members exceeds 100, the amount in controversy exceeds the sum or value of $5 million, exclusive of interests and costs, and Plaintiffs and other class members are citizens of a different state from Defendants.

61.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because SmileDirect maintained its principal place of business in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

62.     This court has personal jurisdiction over each defendant because each defendant, directly with its directors, officers, employees, representatives, and/or agents participated in acts or practices giving rise to the claims herein in this district.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

63.     SmileDirect was founded in or around 2014. Its initial management and capital were provided directly by Camelot, which remained its largest voting shareholder and the managing member of the LLC, controlling its day-to-day business operations through both management and stockholder control.

64.     David Katzman and Steven Katzman, both of whom own and control Camelot, provide their services, respectively, as chief executive officer and chief operating officer pursuant to contractual agreements with Camelot and not directly to SmileDirect. Stated differently, it is Camelot who selected David Katzman and Steven Katzman to be the chief executive officer and chief operating officer, respectively, of SmileDirect and who directly controls their services to SmileDirect and those of Fenkell.

65.     SmileDirect describes itself as a "med-tech platform for transforming smiles." It states that its business purpose is to disrupt the current orthodontic model. SmileDirect also describes itself as a "middle man, making virtual connections between patients and dentists." In fact, the description of its business contained in the Prospectus and in its uniform marketing makes clear that SmileDirect is operating in the field of dentistry/orthodontics in every state in the United States—illegally.

66.     SmileDirect describes a "member journey" that customers of SmileDirect engage in as follows: "Members start their journey by visiting our website, where they can learn about how <u>our</u> process works, read firsthand reviews from other members, and view before and after photos. . . . Members can then order their aligners remotely."

67.     The remote ordering of a SmileDirect-manufactured aligner occurs in steps. Unlike in traditional orthodontics, none of these steps are supervised by a licensed dentist.

Instead, a customer orders an "easy to use" "impression kit" online. This impression kit is mailed by SmileDirect to the customer and contains impression material, which must be mixed and fabricated by the customer. The impression material must be used within 30 minutes of its home fabrication by the customer. The customer then returns the completed impression in a shipping box so the impression can be employed by SmileDirect in connection with its manufacture of aligners for the customer. The impression material is used to create a digital picture of the customer's mouth that SmileDirect's "doctors" employ to draft a "treatment plan" that contains protocols for how the customer's teeth might move during treatment.

68.     A SmileDirect customer also completes his or her own dental history without the assistance of a licensed dentist. As a result, these histories are often incomplete or, because they ask about medical conditions using complex dental terms, incorrect.

69.     According to a report authored by Hindenburg Research, dentists unanimously agree that the treatment offered by SmileDirect does not measure up to orthodontic standards in several ways: "Throughout the course of our research, dentists and orthodontists were unanimous in telling us that SDC was missing the most vital parts of any orthodontic treatment, which include a comprehensive pre-screening and evaluation for complex legacy dental issues, professionally performed molds and/or scans, as well as continuing personalized care from a licensed professional." (Exhibit I, attached hereto, at 5.)

70.     SmileDirect's Prospectus makes clear that the treatment plan itself is prepared not by U.S. dentists, but by its staff of independent contractors in Costa Rica. (*See* Exhibit F at 68; *see also* Exhibit E, attached hereto.) Stated differently, almost all the work in connection with the so-called treatment plan is prepared by persons who are not licensed as dentists in the United

States. This work is accomplished in 24-48 hours "to help minimize patient dropout (i.e., changing their mind)." (Exhibit J, attached hereto, at 16.)

71.     SmileDirect states that a U.S. licensed dentist "approves" the treatment plan. In fact, to the extent that U.S. dentists are involved in the process, they are minimally involved. SmileDirect has acknowledged in its "ELP participation agreement for 2017" that, to the extent a U.S. dentist "participates" in approving the treatment program, they are only paid if they actually approve the program and then are paid only $50. This "sign off" takes "only a few minutes" and "can be done from anywhere." (*See* Exhibit J at 16.) Some SmileDirect dentists regularly approve as many as 100 treatment programs per day. (*See* Exhibit I at 2.)

72.     SmileDirect's own practices make clear that the development of the so-called "treatment program" for the aligners, which it manufactures itself, is in fact done in Costa Rica by unlicensed dentists and not by prescription of a U.S. dentist who has engaged in acceptable, legitimate review of the patient's orthodontic condition consistent with industry standards of patient care. SmileDirect's constant marketing claim that its aligners provide the same level of care as traditional orthodontics is false.

73.     Following a customer's payment of the fee for the aligners of approximately $1,900, SmileDirect itself manufactures the aligners in Tennessee on a 3-D printer. The aligners are then sent to the customer with instructions for their use.

74.     While SmileDirect states that the average treatment lasts approximately six months, many treatments last many months longer.

75.     SmileDirect states in its Prospectus that a treating doctor "monitor[s] the member's progress" (Exhibit F at 26) and that "at least every 90 days" a customer's photos are reviewed by a treating doctor, who may then "order any mid-course corrections or refinements"

(*id.* at 147). SmileDirect, via Defendant Sulitzer, has further claimed publicly that a treating doctor checks in on each patient every 90 days. All of these claims are false. In fact, SmileDirect customers do not even know the identity of the dentists who are involved in their case (to the extent that they are involved). SmileDirect refuses to disclose the addresses or contact information with respect to such dentists, and therefore no patient-doctor relationship is ever actually established. Many online complaints about SmileDirect relate to the fact that its customers could not reach the so-called "treating doctor."

76. The communications between SmileDirect and customers are in fact handled by unlicensed administrative personnel. Complaints filed on the Better Business Bureau website and elsewhere, involving thousands of customers, indicate that these administrative personnel regularly offer orthodontic and treatment advice through emails over the internet. The treating doctors who are assigned to monitor these customers' progress do not communicate directly with the customers and, in most cases, are not informed of the communications with customers or any advice that is given to them.

77. Thus, while SmileDirect states in its Prospectus that, in its business model, there is "seamless communication with the member over the course of treatment" (Exhibit F at 26), this is a falsehood. Similarly, SmileDirect's statement that "each member's treating doctor is available to answer clinical questions" (Exhibit F at 162) is also a falsehood, given that SmileDirect customers do not even know who the "treating doctor" is or how to contact such treating doctor. Their contact with SmileDirect is through unlicensed administrative personnel, who handle the communication and advice offered by SmileDirect in connection with their dangerous and faulty product.

78. SmileDirect acknowledges that it currently manufactures all of its aligners in Tennessee on a 3-D printer provided by Hewlett-Packard. At no time has SmileDirect sought approval from the FDA for the manufacture and distribution of these aligners, nor has it submitted an application to the FDA under so-called Rule 510(k) seeking approval for the manufacture and distribution of such aligners.

79. SmileDirect states that it has 700,000 customers and that its revenue this fiscal year will exceed $500 million. SmileDirect is currently operating at a substantial loss. In September 2019, it offered common shares in a public offering. Subsequent to the public offering, 98% of the voting shares—and day-to-day control of SmileDirect—remained with the Katzman Defendants and Camelot. The Defendants have acknowledged, in the Prospectus, that SmileDirect is a "controlled company" under their control. (Exhibit F at 180.)

## SMILEDIRECT'S NATIONAL MARKETING CAMPAIGN DESIGNED TO AFFECT CONSUMER CHOICE

80. For the past several years, Defendants have been involved in one of the nation's largest marketing campaigns, which seeks to promote SmileDirect's aligners and to denigrate traditional orthodontics using falsehoods (this joint marketing effort is referred to herein as SmileDirect's marketing or advertising).

81. SmileDirect's marketing strategy was developed, in part, by Gin Lane, a major advertising agency, with the express purpose of persuading customers to avoid traditional orthodontic services, such as those provided by the Provider Plaintiffs, and to instead use SmileDirect. Among other things, SmileDirect advertised that, by using SmileDirect, customers could forgo visits to a dentist's office.

82. SmileDirect has stated that it follows an omni-channel approach to marketing, using billboards (including in Times Square and the NYC Subway), Google, Facebook,

Instagram, and other social media platforms to promote its aligners. In addition, SmileDirect has purchased advertising time during televised national sporting events, such as college football games. MediaRadar, an advertising analytics firm, indicates that SmileDirect spent over $100 million in marketing in 2018 and employed more than "250 different media properties."

83.    SmileDirect's marketing effort is so large that it has developed a 125-person, in house ad-agency to saturate the marketplace with its marketing falsehoods.

84.    SmileDirect's omni-channel marketing campaign uses literal falsities and misleading statements, as described herein, and is designed to demean the traditional orthodontic industry, which SmileDirect describes, in its Prospectus, as "competition." (Exhibit F at 62.) Many of those false, misleading, and demeaning statements are contained in the dozens of online commercials compiled by iSpot.tv, including the following:

- Stating that "we can straighten your smile for 60% less than braces;"

- Stating that, "[i]f your aligners aren't a good fit for you, you get your money back;"

- Stating that "you shouldn't have to wear braces to get your smile;"

- Asking "why would anyone go to a dentist's office?;"

- Describing braces as including "embarrassing wires."

These false, misleading, and demeaning statements harm dentists practicing traditional orthodontics and mislead consumers who would otherwise purchase traditional orthodontic services.

## SMILEDIRECT'S UNIFORM MISREPRESENTATIONS AND FRAUDULENT MARKETING STATEMENTS

85.    The Defendants have disseminated numerous false and misleading statements to the purchasing public in an effort to advertise and promote the SmileDirect aligners as an

alternative to traditional orthodontic treatment. As a result of these false and misleading statements, potential consumers of traditional orthodontic services (such as the Consumer Plaintiffs), who would have otherwise sought treatment from providers of traditional orthodontic services (such as the Provider Plaintiffs), have instead purchased SmileDirect aligners.

86. The false and misleading statements that the Defendants have disseminated to the public over the period of time during which they have offered the SmileDirect aligners for sale are described in more detail below.[1]

### A. Claiming that SmileDirect customers receive the same level of orthodontic care as patients who engage traditional dentists

87. Defendant Sulitzer, the Chief Clinical Officer at SmileDirect, has stated that "[a]n individual who is requesting treatment by using SmileDirectClub's aligners is receiving the same level of care from a treating dentist-orthodontist as an individual visiting a traditional orthodontist or dentist for treatment." This statement is repeated online in a blog prepared and used for marketing by SmileDirect called "Grin Life." This statement is materially false, deceptive, and fraudulent.

88. It is beyond dispute that SmileDirect's business model provides a much lower level of care to customers than traditional orthodontics. In traditional orthodontics, licensed dentists physically examine their patients, take radiological images of their teeth and surrounding

---

[1] Given the extensive advertising campaign waged by the Defendants, it would be unreasonable to require the Plaintiffs to allege the exact day, hour, and place of SmileDirect's misleading advertisements: "Where the allegedly misleading advertising has occurred over a long period of time, it would be unreasonable and contrary to the Sixth Circuit's liberal construction of Rule 9(b) to require Plaintiff to identify the exact day, hour or place of every advertisement which made the allegedly misleading statements. This is especially true in this case where it is clear that Defendant is aware of the advertising campaigns referred to in Plaintiff's complaint, when those campaigns started, and how long they have run." *Fed. Exp. Corp. v. U.S. Postal Serv.*, 40 F. Supp. 2d 943, 952 (W.D. Tenn. 1999).

bone structure, establish a treatment plan, implement the plan, and review the progress of their patients and their devices in-office on a regular basis. But SmileDirect's entire business model is based on eliminating the direct patient-doctor contact on a regular and continuous basis that is employed in traditional orthodontics.

89.     In the Prospectus and in its other advertising, SmileDirect states that a treating doctor "monitor[s] the members' progress" and is able to have "seamless communication with the member over the course of treatment." (Exhibit F at 144.) Defendant Sulitzer has also publicly stated that a licensed doctor checks in on each SmileDirect customer every 90 days. These statements are false and misleading and anticompetitive.

90.     In fact, patients do not interact with "treating doctors," either in person, by telephone, or through the SmileDirect internet platform. No doctor is ever identified to the customer as being their treating doctor, and communications between customers and SmileDirect take place through administrative personnel not trained in orthodontics or dentistry. This internet-based administrative interaction is nothing like the seamless communication between a treating doctor and the patient advertised by SmileDirect or employed in traditional orthodontics. Indeed, the SmileDirect "patient" does not even know who the purported dentist is.

91.     SmileDirect does not provide a patient-doctor relationship and does not identify to customers any doctor who is acting as "their doctor or prescriber." Included among the thousands of complaints lodged against SmileDirect on the internet are those that indicate that patients were unable to reach any actual doctor to describe and discuss their complaints and injuries resulting from their use of SmileDirect aligners.

92.     Similarly, SmileDirect advertises that customers who use its aligners do not have to undergo a dental exam prior to treatment. This advertising is an acknowledgement that

SmileDirect's level of care is below the standard in orthodontics, where such an examination is required.

93.     It is beyond dispute that SmileDirect's version of "teledentistry" is not consistent with the applicable medical standard of care for traditional dentists. Its false marketing injures both consumers and competing dentists.

94.     Because SmileDirect does not use physical exams of customers to develop a treatment program or allow the treatment of its customers to be monitored by a licensed dentist, the level of care provided by SmileDirect is, in fact, of a lower quality than that received by a patient undergoing traditional orthodontic treatment. Specifically, SmileDirect is unable to anticipate or correct issues that would be revealed by an x-ray, such as bite misalignment, gum disease, or the existence of implants. Indeed, the failure to take x-rays caused one Plaintiff, Plaintiff Lofland, to undergo a root canal due to SmileDirect's aligners. (*See* Exhibit H.) Furthermore, SmileDirect is unable to adjust the course of treatment if a customer's teeth do not respond as anticipated to treatment.

**B.  Asserting that SmileDirect is employing teledentistry in accordance with industry standards**

95.     SmileDirect represents to customers, in its marketing materials and its consent and history document, which forms the contract between SmileDirect and the customers, that customers are being served by "teledentistry." This representation is made in an effort to convince customers that they are receiving actual, industry-standard dental care. In fact, SmileDirect does not employ teledentistry.

96.     The ADA has a policy with respect to teledentistry that establishes the industry standard:

The dentist is responsible for and retains the authority for ensuring the safety and quality of services provided to patients using teledentistry technologies and methods. Services delivered via teledentistry should be consistent with in-person services, and the delivery of services utilizing these modalities must abide by laws addressing privacy and security of a patient's dental and medical information.

SmileDirect plainly does not meet the industry standard for teledentistry in several respects.

97.     First, SmileDirect's services are not consistent with in-person services. SmileDirect's dentists do not physically examine customers' teeth so that, unlike with in-person services, SmileDirect dentists are unable to identify certain issues, such as gum disease, bite issues, or the existence of implants, that would be revealed with in-person services.

98.     Second, SmileDirect services are not consistent with in-person services in that SmileDirect customers are not required to provide their existing dental records. As a result, SmileDirect's dentists are not able to use a customer's dental history to inform the plan of treatment.

99.     Third, unlike with in-person services, SmileDirect's dentists do not actively prescribe the course of treatment for SmileDirect customers. Instead, SmileDirect dentists, at best, passively approve a course of treatment designed by unlicensed personnel.

100.     Fourth, unlike with in-person services, SmileDirect's dentists do not interact directly or even indirectly with customers. SmileDirect dentists never interact with the customers assigned to them. If a customer has an issue with SmileDirect's treatment, that customer is only able to speak with administrative personnel. Those administrative personnel are not overseen by the SmileDirect dentist assigned to the customer, and the SmileDirect dentist is not kept informed of the content of those communications. The SmileDirect administrative personnel are thus offering advice concerning orthodontics in an improper and illegal fashion on a regular basis.

101.    SmileDirect is aware that it does not follow the industry standard for teledentistry. It recently complained that California's teledentistry regulations were "anticompetitive" and imposed "unnecessary hurdles and costs." Furthermore, it is currently engaged in an effort to lobby "a handful" of states to pass new teledentistry legislation before SmileDirect faces challenges from regulators using existing regulations.

102.    Because SmileDirect's business does not meet or follow the industry standard for teledentistry, the characterization of its business as teledentistry is fraudulent and misleading.

## C. Advertising that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces"

103.    While SmileDirect advertises that its treatment is "three times faster than braces," this is, in fact, a falsehood.

104.    First, SmileDirect has no actual support for this statement. The time required for traditional orthodontics depends upon the level of care and the level of correction required. SmileDirect cannot show that it would achieve the same level of correction for a specified condition "three times faster than braces."

105.    Second, because SmileDirect provides a lower quality of orthodontic care than a traditional orthodontic provider, its results cannot match those achieved in traditional orthodontic care, regardless of time period.

106.    SmileDirect has thus deliberately misstated the efficacy of its product in comparison to traditional orthodontics in order to gain unfair competitive advantage against dentists and to gain market share,

## D. Engaging in deceptive practices and misrepresentations concerning SmileDirect's return policies

107.     When ordering an impression kit from SmileDirect, SmileDirect describes, in writing, "our smile guarantee." It states that "getting started is risk-free. If invisible aligners aren't a good fit for you, you'll get your money back." The Prospectus also describes this "Smile Guarantee, which provides members a refund or additional treatment, at no extra cost, if they are not entirely satisfied." (Exhibit F at 23.) In sum, the uniform disclosures made by SmileDirect appear to make clear that customers who are not satisfied can avail themselves of the "Smile Guarantee" and get a total refund. Similarly, SmileDirect's commercials state that, "if aligners are not a good fir for you, you get your money back" and describe SmileDirect's aligners as "risk free."

108.     This offer of a refund is fraudulent and deceptive because, in other disclosures, SmileDirect retracts its offer of a "smile guarantee" and limits or eliminates any refund possibility. Furthermore, SmileDirect does not offer a refund if the aligners are not a good fit, and its aligners are not, in fact, risk free.

109.     SmileDirect's standard form customer agreement contains a small-print, hidden waiver of any claim that might be asserted by a customer as against SmileDirect. Specifically, in a section of the agreement captioned "TELEHEALTH," buried in small print and appearing almost as a non sequitur in that paragraph, customers unknowingly represent that they "release SmileDirectClub from liability for any claim by me or any third party in connection with my participation or use of the invisible aligner treatment."

110.     This deliberately hidden provision, contained in a paragraph that does not address litigation waivers but "telehealth," appears to retract entirely the "smile guarantee"/refund policy stated by SmileDirect in its Prospectus and other documents.

111.     Although this waiver is plainly unenforceable under Tennessee and other state law—as providers of medical and related services cannot waive claims as against them for their own fraud and negligence—it is designed deceptively to prevent people from asserting any claim as against SmileDirect and availing themselves of the so-called "smile guarantee."

112.     Moreover, as demonstrated by the numerous online complaints regarding SmileDirect, SmileDirect does not in fact offer refunds when aligners are not a good fit. Indeed, Plaintiff Johnson did not receive his complete aligner set and also received no refund.

113.     SmileDirect's representations and counter-representations with respect to its refund policy are deceptive trade practices and fraudulent under applicable law.

**E.  Making misrepresentations and deceptive statements with respect to the ability of SmileDirect's aligners to address "bite issues"**

114.     SmileDirect engages in an extreme form of deception, misrepresentation, and fraudulent practice in connection with its representations concerning the ability of its aligners to address bite issues.

115.     In its advertising and emails to customers, SmileDirect states that it has helped "thousands of people with bite issues." (*See* Exhibit C at 5.) On its blog, "Grin Life," it specifically states "our aligners may also correct bite issues" and "our aligners are designed to not only help straighten smiles, but they can also correct bite issues." These statements are misleading and deceptive because SmileDirect knows that its aligners cannot correct bite issues but only worsen them.

116.     As a result of the Defendants' misrepresentations regarding the ability of SmileDirect's aligners to address bite issues, many customers with bite issues have purchased SmileDirect aligners believing that their bite issues can be corrected without traditional orthodontic care.

117.    In fact, SmileDirect aligners cannot correct bite issues and, in many cases, can create new bite issues or aggravate existing bite issues. As a result, SmileDirect has received many complaints from customers whose spacing issues have been addressed, at least in part, by the aligners but for whom the aligners have worsened their bite issue or created a bite issue.

118.    Despite uniform advertising that its product can correct bite issues, SmileDirect, at the same time, disclaims the ability of its product to correct bite issues in the fine print of its customer contract. Therein, it makes customers represent that they understand that the aligner will only address alignment and will not correct any existing bite issue.

119.    SmileDirect's practice in this regard is a traditional "bait and switch" and a fraudulent and deceptive practice under Tennessee and other states' laws. Its practice of making a bold unambiguous promise that the aligners can correct underbites, overbites, and crossbites and then employing small-print language in a consent and history document to repudiate that promise is the definition of a deceptive practice.

### F.  Misrepresenting the effect of SmileDirect's aligners upon customer heart rate and blood pressure.

120.    In its blog, Grin Life, SmileDirect, in a gross and deliberate fraudulent statement, states that use of its product will help reduce customer heart rate and blood pressure: "Here are 7 reasons investing in SmileDirectClub will pay dividends. . . . Your heart rate and blood pressure will decrease. . . ."

121.    Stated simply, SmileDirect has no basis for these statements whatsoever. They are untrue, false, misleading, and deceptive. They are also anticompetitive.

### G.  Making misrepresentations and deceptive statements with respect to customer satisfaction with SmileDirect aligners.

122.     SmileDirect is engaged in one of the largest nationwide campaigns for advertising ever with respect to a new consumer product, spending hundreds of millions of dollars a year advertising its product on television, on the internet, and in print. (*See supra* ¶¶ 73-77.)

123.     In its Prospectus and advertising material, SmileDirect consistently states that "our members are highly satisfied." (Exhibit F at 123.) The Defendants make these statements because they know that potential customers are likely to purchase SmileDirect aligners if they believe they will be "highly satisfied" with the results and because they know that customers rely on the opinions of other customers when making purchasing decisions.

124.     In fact, the Defendants' statements that SmileDirect customers are highly satisfied is false and deceptive.

125.     SmileDirect knows that it has received <u>thousands</u> of serious customer complaints with respect to the efficacy of its aligners and its business model. Indeed, the dissatisfaction of customers with the aligners is reflected by the fact that SmileDirect has received many low ratings on Yelp and the Better Business Bureau websites.

126.     By stating that its customers are highly satisfied and failing to acknowledge the thousands of complaints that it has received, SmileDirect is engaging in deceptive and misleading conduct. Among the thousands of complaints available on the internet are the following:

- "We had nightmare experience with this company. We get no resolution after several emails and phone calls there has to be someone else that we can speak to. Our money is getting stolen from us."

- "[In] the seventh month, my crowning implant - which was super expensive to get done came off together. When I called them about this, they kept making me email people. They are generally super hard to get in contact with."

- "This company is truly a mess!!! Hopefully, my teeth will eventually be straight ... with all their delays, more like one and a half years instead of six months."

- "Had I had the opportunity to do this over again, I would have coughed up the extra dough and done it the right way with Invisalign. The quality of the tray simply weren't up to par. I was convinced that they sent me the wrong trays in later months because I wasn't seeing any incremental movement or straightening."

- Customer describing impact upon use of aligners: "A gap in my top teeth is fixed but I still cannot bite down with my front teeth, i.e. I cannot bite into a sandwich or a piece of meat."

- "Product made my teeth worse with spacing and gaps, did not work as described and was led to believe it would get fixed. I paid the full amount upfront for my treatment where I was promised straight teeth from one of their smile shop employees. After five months and four broken aligners and a cracked tooth and numerous attempts to talk to the customer service to fix my issues, all of which led nowhere."

- "Product doesn't work, when brought to the attention of the company that it didn't work, the new aligners that were given were completely messed up. I'm eight months into my treatment and am very unhappy. They are made **horribly**. They

are loose and don't even move my teeth. I'm spending thousands of dollars on these things for no reason."

- "Half a year of aligners with Smile Direct, and my most prominent teeth were WORSE. My girlfriends experience was just as bad. Her aligners keep cracking."

127. In sum, SmileDirect has deliberately misrepresented the consumer reaction to its product. The consumer reaction has been substantially negative with thousands of customer complaints, which SmileDirect has not disclosed to the consuming public but instead misrepresented.

**H. Failing to inform consumers that SmileDirect's sale of its self-manufactured aligners violates the FD&C Act and involves the illegal practice of dentistry.**

128. On or about April 25, 2019, the American Dental Association filed a detailed 20-page Citizen Petition with the FDA outlining why SmileDirect's self-manufactured and self-distributed aligner practice violates the FD&C Act. The FDA is currently addressing these issues. On October 10, 2019, the ADA confirmed that "[a]ll substantive issues raised by the ADA's citizen petition remain fully before the FDA at this time." (*See* Exhibit K, attached hereto, at 1.)

129. On May 8, 2019, a federal district court in Georgia found that SmileDirect is illegally practicing dentistry in the state of Georgia. (*See* Exhibit A, attached hereto.)

130. At no time has SmileDirect informed consumers that it is in violation of the FD&C Act and illegally practicing dentistry.

131. Both of these nondisclosures are highly material and highly fraudulent because consumers would be reluctant to use SmileDirect's aligners in any capacity if they knew that they were being sold in violation of both federal and state law.

132.     SmileDirect's failure to make such disclosures has allowed it to keep its fraudulent schemes secret and to perpetuate its deceptive scheme upon doctors and consumers.

133.     Manufacturers and sellers of medical devices are prohibited from introducing or causing them to be introduced into interstate commerce if such device is misbranded. *See* FD&C Act § 301(a); FD&C Act § 301(b).

134.     The aligners manufactured by SmileDirect in its own facility are class two medical devices regulated by the FDA. These devices are subject to a "by prescription only" restriction that applies to other manufacturers of such aligners but that SmileDirect has effectively and illegally eluded.

135.     As shown herein, the aligner devices manufactured by SmileDirect are not provided by a prescription. Instead, the aligner program is developed by unlicensed medical personnel in Costa Rica, in connection with administrative staff in the United States, and then rubberstamped by SmileDirect's dentists, who receive only a $50 fee in connection with such process and, again, only if they approve the customer for treatment. Although these dentists are typically licensed in only one state, SmileDirect often allows them to approve treatment plans for customers located in states in which they are not licensed. This process does not comply with the requirements for an orthodontic prescription under applicable medical standards.

136.     As a manufacturer of its aligners, SmileDirect was legally obligated to seek FDA clearance for such product, likely pursuant to Rule 510(k). SmileDirect instead has decided to flout these legal requirements and is selling its product, which should be labeled and sold only by prescription, in an essentially over-the-counter fashion.

137. SmileDirect's failure to inform consumers that its product is being sold in violation of the very consumer laws that are designed to protect them is a fraudulent practice in and of itself.

138. As referenced above, on or about May 8, 2019, a federal district court in Georgia specifically refused to find that SmileDirect was not acting as a dentist after SmileDirect requested declaratory relief to that effect. In connection with denying declaratory relief to SmileDirect, the court made clear that SmileDirect's assertion that it was not acting as a dentist in the state of Georgia was baseless. This decision is likely to be followed by other courts in the near future.

139. The Georgia decision and its import have also not been disclosed to consumers by SmileDirect.

140. SmileDirect is deliberately hiding from consumers—for competitive and monetary advantage—the fact that it is illegally operating as an unlicensed dentist in connection with its core business. Disclosure of this legal fact would directly impact SmileDirect's business model and result in potential customers choosing to use traditional orthodontics rather than SmileDirect's aligners.

141. SmileDirect's attempt to profit at the expense of customers and at the expense of traditional orthodontics is negligent, fraudulent, deceptive, and a violation of the Lanham Act.

## CLASS ALLEGATIONS

### A. Class Definitions

142. Plaintiffs seek to represent two classes and eight subclasses in this case.

143. The first class defined herein is the class of all dental or orthodontic providers who provide traditional orthodontic services or goods or services similar to those that

SmileDirect purportedly offers, and/or the practice entities through which they provide such services. This class—the "Provider Class"—asserts claims for violations of the Lanham Act, the Tennessee Consumer Protection Act of 1977, and other unfair or deceptive acts or practices statutes of the respective states in which such providers reside, collectively.

144. Included in the first class are two subclasses. The "Florida Provider Subclass" is the class of all dental or orthodontic providers who provide traditional orthodontic services or goods or services similar to those that SmileDirect purportedly offers in the state of Florida, and/or the practice entities through which they provide such services. The "New York Provider Subclass" is the class of all dental or orthodontic providers who provide traditional orthodontic services or goods or services similar to those that SmileDirect purportedly offers in New York, and/or the practice entities through which they provide such services.

145. The second class defined herein is the class of all customers who have used or otherwise paid for the SmileDirect aligner program and product. This class—the "Consumer Class"—asserts claims for violations of the Magnusson-Moss Act, breach of warranty, fraud, and violations of the Tennessee Consumer Protection Act of 1977 and other unfair or deceptive acts or practices statutes of the respective states in which such consumers reside, collectively.

146. Included in the second class are eight subclasses. The "California Consumer Subclass" is the class of all consumers who have used or otherwise paid for the SmileDirect aligner program and product in California. The "Colorado Consumer Subclass" is the class of all consumers who have used or otherwise paid for the SmileDirect aligner program and product in Colorado. The "Florida Consumer Subclass" is the class of all consumers who have used or otherwise paid for the SmileDirect aligner program and product in Florida. The "Michigan Consumer Subclass" is the class of all consumers who have used or otherwise paid for the

SmileDirect aligner program and product in Michigan. The "New York Consumer Subclass" is the class of all consumers who have used or otherwise paid for the SmileDirect aligner program and product in New York. The "Virginia Consumer Subclass" is the class of all consumers who have used or otherwise paid for the SmileDirect aligner program and product in Virginia. The "Washington Consumer Subclass" is the class of all consumers who have used or otherwise paid for the SmileDirect aligner program and product in Washington. The "Wisconsin Consumer Subclass" is the class of all consumers who have used or otherwise paid for the SmileDirect aligner program and product in Wisconsin.

147. Excluded from all classes are the Defendants, any entity in which the Defendants have a controlling interest, and the respective officers, directors, legal representatives, employees, successors, subsidiaries, and assigns of such persons and entities. Also excluded from all classes are any individuals or entities who are party to the anti-class-action clause added to SmileDirect's Consent and History in September 2019.[2]

## B. Numerosity: Fed. R. Civ. P. 23(a)(1)

148. The members of the classes defined herein are so numerous and geographically dispersed that individual joiner of all class members is impracticable.

149. The Provider Class, based upon available records, includes at least 10,000 members.

---

[2] This anti-class-action clause was inserted into the Consent and History in September 2019 and reads as follows: "I further agree that any arbitration under this agreement will take place on an individual basis, that class arbitrations and class actions are not permitted, and that I am agreeing to give up the ability to participate in a class action." (*See* Exhibit L, attached hereto, at 7.) This clause definitively shows that class actions were allowed under the language of the Consent and History prior to September 2019.

150. The Consumer Class, based upon statements made by SmileDirect, includes hundreds of thousands of members.

151. The individuals' names and addresses for each class are already publicly available or available from the records of SmileDirect.

152. Class members may be notified of the pendency of this action by judicially-accepted and court-approved notice, directly or via publication.

**C. Commonality and Predominance: Fed. R. Civ. P. 23(a)(2) & 23(b)(3)**

153. This action involves common questions of law and fact that predominate over any questions affecting individual class members.

154. Plaintiffs' claims do not seek personal injury damages of any nature.

155. The Provider Class seeks only damages related to the profits earned by Defendants in connection with the sale of the SmileDirect aligners and/or the profits lost by such providers as a result of SmileDirect's misrepresentations and deceptive and anti-competitive acts and practices.

156. The Consumer Class seeks only damages resulting from the misrepresentations and fraudulent and deceptive practices related to the sale and marketing of the SmileDirect aligners in the form of monetary or injunctive relief.

157. The common questions of law and fact which predominate over questions affecting individual class members include without limitation:

    a. whether SmileDirect knew or should have known that its aligners were being mis-marketed and misrepresented in nationwide commerce;

b.  whether SmileDirect was violating federal law, including the FDC&A Act, in connection with its distribution of aligners that required FDA approval, but for which no FDA approval was received;

c.  whether SmileDirect has made deliberate misrepresentations with respect to the efficacy of its aligners and the purposes for which they may be used;

d.  whether SmileDirect has been illegally operating as a dentist in the various states in which it engages in commerce;

e.  whether SmileDirect's practice of offering refunds and then refusing to make refunds based upon a fine-print waiver (that is unenforceable under state law) is a deceptive practice; and

f.  whether SmileDirect's deception and fraudulent marketing violate 15 U.S.C §1125(a).

**D. Adequacy of representation, Fed. R. Civ. P. 23(a)(4)**

158.  Plaintiffs are adequate class representatives because their interests did not conflict with the interest of the other class members whom they seek to represent.

159.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, including consumer litigation and Lanham Act litigation, and Plaintiffs intend to prosecute this action vigorously.

160.  The classes' interests will be fairly and adequately represented by Plaintiffs.

**E. Declaratory and injunctive relief: Fed. R. Civ. P. 23(b)(2)**

161.  The prosecution of separate actions by individual class members in each class would create a risk of inconsistent or varying adjudication with respect to class members that might establish incompatible standards of conduct for Defendants.

162.     Such individual actions would create a risk of adjudications that would be dispositive of the interests of all class members and impair their interests.

163.     Defendants have acted and/or refused to act on grounds generally applicable to the class making final injunctive relief and declaratory relief appropriate.

**F. Superiority: Fed. R. Civ. P. 23(b)(3)**

164.     A class action is superior to any other available means for a fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this case.

165.     The damages or other financial detriment suffered by Plaintiffs and the other class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impossible for class members to individually seek redress for Defendants' unlawful conduct.

166.     Even if each class member could afford litigation, individualized litigation would create a potential for inconsistent and contradictory judgments and dramatically increase the delay and expense to all parties and the court system.

167.     By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, the common use of scale, and comprehensive supervision by a single court.

## INAPPLICABILITY OF ARBITRATION CLAUSE

168.     Contained in the fine print of the customer agreement executed by each customer of SmileDirect is an unenforceable arbitration cause. More importantly, the arbitration clause by its own terms does not apply to any claim over which any small claims court could exercise jurisdiction. Furthermore, the customer agreement does not contain any venue or forum-selection

clause with respect to non-arbitrable claims. Nor does it prohibit proceeding on a class-wide basis in any forum.

169.     Each of the Consumer Class members' claims could otherwise be adjudicated in the small claims court of Tennessee, i.e. the General Sessions Court, as those claims only seek monetary damages equal to what they paid to SmileDirect and what they paid to correct any problems caused by the use of SmileDirect's aligners, together with interest thereon, which, in all cases, is less than $25,000. Alternatively, each of the Consumer Class members' claims could be adjudicated in other small-claims courts, including those with jurisdictional limits in excess of $25,000.

## **COUNT ONE**

## **FALSE ADVERTISING UNDER THE LANHAM ACT, 15 U.S.C. § 1125(a)**

### **(On behalf of the Provider Class)**

170.     The Provider Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 22, 46 through 144, 147 thorough 149, 151 through 155, and 157 through 167 of this complaint, as though fully set forth herein.

171.     This claim arises under the Lanham Act, 15 U.S.C. § 1125(a).

172.     On the basis of the foregoing paragraphs and allegations, Defendants, in connection with goods or services in interstate commerce, have used a false and misleading description of fact and a false or misleading representation of fact, which, in commercial advertising or promotion misrepresents the nature, characteristics, and qualities of the goods and services sold and marketed by them and at their specific direction.

173.     Moreover, Defendants' intentional and deliberate withholding of material facts with respect to their illegal operation as dentists and their violation of the FD&C Act in

connection with the sale and marketing of their aligner trays also constitutes misrepresentation of the nature, characteristics, and qualities of their products and services.

174.    On the basis of the foregoing paragraphs, Defendants have, in connection with goods or services, used a false or misleading description of fact or a false or misleading representation of fact or an omission of material fact, which in commercial advertising or promotion, misrepresented the nature, characteristics, and/or qualities of their aligner trays and related services in interstate commerce.

175.    Defendants' statements and omissions have the tendency to deceive and have actually deceived customers purchasing or contemplating the purchase of their products and services.

176.    Defendants' deception was material and did influence the purchasing decisions of customers who would otherwise have used traditional orthodontic or dental services.

177.    Defendants' false and misleading statements and representations and material omissions were and are made in interstate commerce.

178.    Defendants' improper activities, as described above and including the material omissions as described above, were willful and deliberate and part of an intentional business plan to avoid discovery of their deception until SmileDirect became a public company and raised money in the public markets.

179.    As a result of Defendants' improper activities, the Provider Plaintiffs and the Provider Class have suffered and continue to suffer injury and damages, including but not limited to loss of sales and profits that they would have made but for the false and deceptive advertising and marketing made by Defendants.

180.   This injury will continue, unless Defendants are preliminarily and permanently enjoined by this court.

## COUNT TWO

## VIOLATION OF MAGNUSON-MOSS ACT, 15 U.S.C. §§ 2301, et seq.

### (On behalf of the Consumer Class)

181.   The Consumer Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 15, 19 through 135, 138 thorough 141, 143 through 147, and 149 through 162 of this complaint, as though fully set forth herein.

182.   The SmileDirect aligners are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

183.   The Consumer Plaintiffs and Consumer Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3), because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

184.   The Defendants are each a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

185.   Section 2310(d)(1) of Chapter 15 of the United States Code provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

186.   Defendants provided the Consumer Plaintiffs and Consumer Class Members with warranties in connection with the purchase of SmileDirect's aligners, each of which was a "written warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

187.    Defendants breached these written warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1).

188.    Any efforts to limit the written warranties in a manner that would exclude coverage of SmileDirect's aligners is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the aligners is null and void.

189.    Pursuant to 15 U.S.C. § 2310(e), the Consumer Plaintiffs are entitled to bring this class action and are not required to give Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of the Consumer Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

190.    The Consumer Plaintiffs' individual claims place into controversy an amount equal to or exceeding $25. The amount in controversy of this entire action, for all Class Members combined, exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. The Consumer Plaintiffs, individually and on behalf of the other Consumer Class Members, seek all warranty-based damages permitted by law, including diminution in value of their aligners, in an amount to be proven at trial, but not in excess of $25,000 per individual. In addition, pursuant to 15 U.S.C. § 2310(d)(2), the Consumer Plaintiffs and the other Consumer Class Members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by the Consumer Plaintiffs and the other Consumer Class Members in connection with the commencement and prosecution of this action.

191.    Further, the Consumer Plaintiffs and the Consumer Class Members are entitled to equitable relief under 15 U.S.C. § 2310(d)(1).

## COUNT THREE

## BREACH OF EXPRESS WARRANTY UNDER TENNESSEE LAW

### (On behalf of the Consumer Class)

192.    The Consumer Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 15, 19 through 135, 138 thorough 141, 143 through 147, and 149 through 162 of this complaint, as though fully set forth herein.

193.    By advertising that SmileDirect customers receive the same level of orthodontic care as patients who employ traditional dentists, Defendants expressly warranted to the Consumer Plaintiffs and Consumer Class Members that SmileDirect's aligners complied with the standards of care of the orthodontic profession.

194.    SmileDirect and its aligners did not provide the same level of orthodontic care as a traditional dentist. Indeed, they did not even meet the baseline standards of care of the orthodontic profession. Accordingly, SmileDirect breached this express warranty.

195.    Moreover, Defendants made the following express warranties regarding SmileDirect's aligners, uniformly and in writing, through its advertisements:

      a.   that, in developing and producing its aligners, SmileDirect is employing teledentistry in accordance with industry standards;

      b.   that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces;"

      c.   that SmileDirect's aligners were backed by a "smile guarantee" and were "risk free;"

      d.   that SmileDirect's aligners address "bite issues;"

      e.   that SmileDirect's aligners reduce customers' heart rate and blood pressure; and

f.   that customers are satisfied with SmileDirect aligners.

By advertising these claims, Defendants expressly warranted to purchasers of SmileDirect's aligners, pursuant to Tenn. Code. § 47-2-313, that those aligners would exhibit the characteristics and the combination of characteristics claimed. Such statements became the basis of the bargain for the Consumer Plaintiffs and Consumer Class Members because such statements are among the facts a reasonable consumer would consider material in the purchase of aligners for orthodontic treatment.

196.   In fact, SmileDirect's aligners did not comply with the standards of care of the orthodontic profession. As such, and for the reasons set forth herein, it was unlawful for SmileDirect to sell the aligners to the public.

197.   In addition, Defendants, through their advertising regarding SmileDirect, created an express warranty that SmileDirect's aligners produced certain orthodontic results, purportedly allowing consumers to make apples-to-apples comparisons with other types of orthodontic treatment.

198.   In fact, SmileDirect's aligners did not produce the claimed orthodontic results or otherwise exhibit the characteristics or the combination of characteristics claimed in its advertisements.

199.   As a result of the foregoing breaches of express warranty, the Consumer Plaintiffs and Consumer Class Members have been damaged in that they purchased aligners that were unlawfully sold in breach of such warranties, did not comply with applicable standards of care, did not perform as promised, and were less valuable than what was paid for them.

**COUNT FOUR**

**COMMON LAW FRAUD**

**(On behalf of the Consumer Class)**

200.    The Consumer Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 15, 19 through 135, 138 thorough 141, 143 through 147, and 149 through 162 of this complaint, as though fully set forth herein.

201.    Defendants intentionally made materially false and misleading uniform misrepresentations in writing regarding the qualities and applications of their aligners and related services.

202.    Defendants also intentionally omitted to state material information necessary for customers to properly evaluate the efficacy of the aligners and related services, including (1) that defendants were illegally operating as dentists in the United States and (2) that the sale of their product without FDA approval was in violation of federal law.

203.    The Consumer Plaintiffs and Consumer Class Members reasonably relied upon Defendants' false and misleading representations made in writing and are presumed to have relied upon the material omissions outlined herein.

204.    The Consumer Plaintiffs and Consumer Class Members did not know and had no reason to know that the products were misrepresented and that Defendants have failed to make material disclosures with respect to their illegal conduct and their violations of federal and state law in connection with the distribution of the aligners and related services.

205.    Defendants intended that the Consumer Plaintiffs and Consumer Class Members would rely upon the misrepresentations and omissions.

206.    The Consumer Plaintiffs and Consumer Class Members have been injured as a result of Defendants' fraudulent conduct.

207.     Defendant is liable to the Consumer Plaintiffs and Consumer Class Members for damages sustained as a result of Defendants' fraud.

## COUNT FIVE

**TENNESSEE CONSUMER PROTECTION ACT**

**(On behalf of Provider and Consumer Classes)**

208.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 167 of this complaint, as though fully set forth herein.

209.     Defendants advertised and sold "goods" or "services" in "trade" and "commerce," as meant by Tenn. Code § 47-18-103.

210.     Defendants, operating in Tennessee, engaged in unlawful, unfair, and deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of goods and services in violation of Tenn. Code Ann. § 47-18-104, including but not limited to the following:

a.   Causing likelihood of confusion or of misunderstanding as to the sponsorship, approval, or certification of goods or services, in violation of Tenn. Code Ann. §§ 47-18-104(b)(2),

b.   Causing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another, in violation of Tenn. Code Ann. §§ 47-18-104(b)(3);

c.   Representing that goods or services have sponsorship, approval, characteristics, uses, and benefits that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have, in violation of Tenn. Code Ann. §§ 47-18-104(b)(5);

d.  Representing that goods or services are of a particular standard, quality or grade, in violation of Tenn. Code Ann. §§ 47-18-104(b)(7);

e.  Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law, in violation of Tenn. Code Ann. § 47-18-104(b)(12);

f.  Representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve, in violation of Tenn. Code Ann. § 47-18-104(b)(19); and

g.  Using statements or illustrations in any advertisement which create a false impression of the grade, quality, quantity, make, value, age, size, color, usability or origin of the goods or services offered, or which may otherwise misrepresent the goods or services in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised goods or services to other goods or services, in violation of Tenn. Code Ann. § 47-18-104(b)(21).

211.    The above unlawful, unfair, and deceptive acts and practices by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Class Members that they could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

212.    Defendants knew or should have known that SmileDirect's business practices were unlawful, unfair, and deceptive. Defendants' actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and Class Members.

213.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and Class Members suffered an ascertainable loss of money or property, real or personal, as described above, including, but not limited to, for the Consumer Class, their loss of money paid to SmileDirect and, for the Provider Class, loss of business revenue.

214.     Plaintiffs and Class Members seek declaratory relief, injunctive relief, and attorneys' fees and costs under Tenn. Code Ann. § 47-18-109.

215.     Plaintiffs seek individual relief under Tenn. Code Ann. § 47-18-109, including, but not limited to, declaratory relief, injunctive relief, actual damages, treble damages for each willful or knowing violation, and attorneys' fees and costs.

## COUNT SIX

## CALIFORNIA UNFAIR COMPETITION LAW

### (On behalf of California Consumer Subclass)

216.     Plaintiffs Blaine, Capablanca, Gebhard, Perkins, Simpson, Vasquez, and Vaughn repeat and re-alleges the allegations set forth in paragraphs 1 through 15, 19 through 25, 42 through 135, 138 thorough 141, 143 through 147, and 149 through 162 of this complaint as though fully set forth herein.

217.     Defendants, operating in California, with the intent of disposing personal property or to perform services, made untrue or misleading statements about those property or services which they knew, or by the exercise of reasonable care should have known, were untrue or misleading, in violation of Cal. Bus. & Prof. Code § 17500. Similarly, Defendants made false or misleading advertising claims that (1) purported to be based on factual, objective, or clinical evidence, (2) compared the product's effectiveness or safety to that of other products, or (3) purported to be based on any fact in violation of Cal. Bus. & Prof. Code § 17508. Further,

Defendants misrepresented the character of their business in violation of Cal. Bus. & Prof. Code § 17505 and failed to properly display accurate information about SmileDirect's return policies in violation of Cal. Bus. & Prof. Code § 17358. Defendant's unlawful actions include but are not limited to the following:

a. Claiming that SmileDirect customers receive the same level of orthodontic care as patients who employ traditional dentists;

b. Asserting that SmileDirect is employing teledentistry in accordance with industry standards;

c. Advertising that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces;"

d. Making misrepresentations and deceptive statements concerning SmileDirect's return policies;

e. Making misrepresentations and deceptive statements concerning the ability of SmileDirect's aligners to address "bite issues;"

f. Making misrepresentations and deceptive statements concerning the effect of SmileDirect's aligners upon consumer heart rate and blood pressure;

g. Making misrepresentations and deceptive statements concerning consumer satisfaction with SmileDirect aligners; and

h. Failing to inform consumers that SmileDirect's sale of its self-manufactured aligners violates the FD&C Act.

218. As a direct and proximate result of these practices, Plaintiffs Blaine, Capablanca, Gebhard, Perkins, Simpson, Vasquez, and Vaughn, as well as the California Consumer Subclass

Members, suffered injuries to legally protected interests, as described above, including but not limited to their loss of money paid to SmileDirect.

219.   The above unfair and deceptive practices and acts by SmileDirect were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs Blaine, Capablanca, Gebhard, Perkins, Simpson, Vasquez, and Vaughn, and the California Consumer Subclass Members that they could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition. These acts were within the penumbra of common law, statutory, or other established concepts of unfairness.

220.   Defendants knew or should have known that SmileDirect's practices were unfair and deceptive. Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs Blaine, Capablanca, Gebhard, Perkins, Simpson, Vasquez, and Vaughn, and the California Consumer Subclass Members.

221.   Plaintiffs Blaine, Capablanca, Gebhard, Perkins, Simpson, Vasquez, and Vaughn, and the California Consumer Subclass Members seek injunctive relief to enjoin Defendants from continuing SmileDirect's unfair and deceptive acts; monetary relief against Defendants measured as the actual damages in an amount to be determined at trial for Plaintiffs Blaine, Capablanca, Gebhard, Perkins, Simpson, Vasquez, and Vaughn, and the California Consumer Subclass Members; reasonable attorneys' fees and costs; and any other just and proper relief available under Cal. Bus. & Prof. Code § 17500 *et seq.*

## COUNT SEVEN

## COLORADO CONSUMER PROTECTION ACT

### (On behalf of the Colorado Consumer Subclass)

222.     Plaintiff Williams repeats and re-alleges the allegations set forth in paragraphs 1 through 15, 26, 42 through 135, 138 thorough 141, 143 through 147, and 149 through 162 of this complaint as though fully set forth herein.

223.     Defendants, operating in Colorado, engaged in unfair, unconscionable, and deceptive methods, acts, and practices in the course of its business, including knowingly or recklessly making false representations as to the source, sponsorship, approval, or certification of goods, services, or property; knowingly or recklessly making a false representation as to the characteristics, uses, benefits, or qualities of goods or services; advertising goods or services with intent not to sell them as advertised; advertising or otherwise representing that goods or services are guaranteed without clearly and conspicuously disclosing the nature and extent of the guarantee; failing to disclose material information concerning good or services which was known at the time of an advertisement or sale where such information was intended to induce the consumer to enter into a transaction; and refusing or failing to obtain all governmental licenses or permits required to perform the services or to sell the goods or services in violation of C.R.S.A. § 6-1-105(b), (e), (i), (r), (u), and (z). This unlawful conduct includes but is not limited to the following:

      a.  Claiming that SmileDirect customers receive the same level of orthodontic care as patients who employ traditional dentists;

      b.  Asserting that SmileDirect is employing teledentistry in accordance with industry standards;

c. Advertising that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces;"

d. Making misrepresentations and deceptive statements concerning SmileDirect's return policies;

e. Making misrepresentations and deceptive statements concerning the ability of SmileDirect's aligners to address "bite issues;"

f. Making misrepresentations and deceptive statements concerning the effect of SmileDirect's aligners upon consumer heart rate and blood pressure;

g. Making misrepresentations and deceptive statements concerning consumer satisfaction with SmileDirect aligners; and

h. Failing to inform consumers that SmileDirect's sale of its self-manufactured aligners violates the FD&C Act.

224. As a direct and proximate result of these practices, Plaintiff Williams and Colorado Consumer Subclass Members suffered injuries to legally protected interests, as described above, including but not limited to their loss of money paid to SmileDirect.

225. The above unfair and deceptive practices and acts by SmileDirect were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff Williams and Colorado Consumer Subclass Members that they could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition. These acts were within the penumbra of common law, statutory, or other established concepts of unfairness.

226. Defendants knew or should have known that SmileDirect's practices were unfair and deceptive. Defendants' actions in engaging in the above-named unfair practices and

deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Williams and Colorado Consumer Subclass Members.

227.    Plaintiff Williams and Colorado Consumer Subclass Members seek injunctive relief to enjoin Defendants from continuing SmileDirect's unfair and deceptive acts; monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, (b) statutory damages in the amount of $500 for Plaintiff Williams and Colorado Consumer Subclass Members, and (c) three times the amount of actual damages sustained, if it is established by clear and convincing evidence that Defendants engaged in bad faith conduct; reasonable attorneys' fees and costs; and any other just and proper relief available under C.R.S.A. § 6-1-113.

## COUNT EIGHT

### FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT

#### (On behalf of the Florida Consumer & Provider Subclasses)

228.    Plaintiffs Dr. Kapit, Arthur L. Kapit, D.D.S., M.Sc.D., P.A., Johnson, Young-Carrasquillo, and R.B. repeat and re-allege the allegations set forth in paragraphs 1 through 16, 19 through 20, 31 through 33, and 46 through 167 of this complaint as though fully set forth herein.

229.    Defendants, operating in Florida, engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, in violation of Fla. Stat. § 501.204(1). This includes but is not limited to the following:

   a. Claiming that SmileDirect customers receive the same level of orthodontic care as patients who employ traditional dentists;

b. Asserting that SmileDirect is employing teledentistry in accordance with industry standards;

c. Advertising that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces;"

d. Making misrepresentations and deceptive statements concerning SmileDirect's return policies;

e. Making misrepresentations and deceptive statements concerning the ability of SmileDirect's aligners to address "bite issues;"

f. Making misrepresentations and deceptive statements concerning the effect of SmileDirect's aligners upon consumer heart rate and blood pressure;

g. Making misrepresentations and deceptive statements concerning consumer satisfaction with SmileDirect aligners; and

h. Failing to inform consumers that SmileDirect's sale of its self-manufactured aligners violates the FD&C Act.

230. As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and Class Members suffered an ascertainable loss of money or property, real or personal, as described above, including, but not limited to, for the Consumer Class, their loss of money paid to SmileDirect and, for the Provider Class, loss of business revenue.

231. The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that outweighed any benefits to consumers or to competition.

232. Defendants knew or should have known that SmileDirect's business practices were unlawful, unfair, and deceptive. Defendants' actions in engaging in the above-named

deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs Dr. Kapit and Arthur L. Kapit, D.D.S., M.Sc.D., P.A., Florida Provider Subclass Members, Plaintiffs Johnson, Young-Carrasquillo, and R.B., and Florida Consumer Subclass Members.

233.    Plaintiffs Dr. Kapit and Arthur L. Kapit, D.D.S., M.Sc.D., P.A. and Florida Provider Subclass Members as well as Plaintiffs Johnson, Young-Carrasquillo, and R.B. and Florida Consumer Subclass Members seek actual damages under Fla. Stat. § 501.211(2), and attorneys' fees under Fla. Stat. § 501.2105(1), to be proven at trial.

234.    Plaintiffs Dr. Kapit and Arthur L. Kapit, D.D.S., M.Sc.D., P.A. and Florida Provider Subclass Members as well as Plaintiffs Johnson, Young-Carrasquillo, and R.B. and Florida Consumer Subclass Members also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, and any other just and proper relief available under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.*

**COUNT NINE**

**MICHIGAN CONSUMER PROTECTION ACT**

**(On behalf of Michigan Consumer Subclass)**

235.    Plaintiffs Alkema and Nigohosian repeats and re-alleges the allegations set forth in paragraphs 1 through 15, 30 through 31, 42 through 135, 138 thorough 141, 143 through 147, and 149 through 162 of this complaint as though fully set forth herein.

236.    Defendants, operating in Michigan, engaged in unfair, unconscionable, and deceptive methods, acts, and practices in the conduct of trade and commerce, including causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of their goods or services; representing that their goods and services had approval,

characteristics, uses, and benefits that they did not; causing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; entering into a consumer transaction in which the consumer waives or purports to waive a right, benefit, or immunity provided by law, unless the waiver is clearly stated and the consumer has specifically consented to it; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner, in violation of Mich. Comp. Laws Ann. § 445.903(1). This includes but is not limited to the following:

a.  Claiming that SmileDirect customers receive the same level of orthodontic care as patients who employ traditional dentists;

b.  Asserting that SmileDirect is employing teledentistry in accordance with industry standards;

c.  Advertising that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces;"

d.  Making misrepresentations and deceptive statements concerning SmileDirect's return policies;

e.  Making misrepresentations and deceptive statements concerning the ability of SmileDirect's aligners to address "bite issues;"

f.  Making misrepresentations and deceptive statements concerning the effect of SmileDirect's aligners upon consumer heart rate and blood pressure;

g.  Making misrepresentations and deceptive statements concerning consumer satisfaction with SmileDirect aligners; and

h.  Failing to inform consumers that SmileDirect's sale of its self-manufactured aligners violates the FD&C Act.

237.  As a direct and proximate result of these practices, Plaintiffs Alkema and Nigohosian and Michigan Consumer Subclass Members suffered injuries to legally protected interests, as described above, including but not limited to their loss of money paid to SmileDirect.

238.  The above unfair and deceptive practices and acts by SmileDirect were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs Alkema and Nigohosian and Michigan Consumer Subclass Members that they could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition. These acts were within the penumbra of common law, statutory, or other established concepts of unfairness.

239.  Defendants knew or should have known that SmileDirect's practices were unfair and deceptive. Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs Alkema and Nigohosian and Michigan Consumer Subclass Members.

240.  Plaintiffs Alkema and Nigohosian and Michigan Consumer Subclass Members seek injunctive relief to enjoin Defendants from continuing SmileDirect's unfair and deceptive acts; monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiffs

Alkema and Nigohosian and Michigan Consumer Subclass Members; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws Ann. § 445.911.

## COUNT TEN

### NEW YORK GENERAL BUSINESS LAW § 349 & 350-a

### (On behalf of the New York Consumer & Provider Subclasses)

241. Plaintiffs Dr. Ciccio, Joseph A. Ciccio, Jr., D.D.S. and Peter B. Demarest, D.M.D., PLLC, Bhandari, Loiseau, and Molina repeat and re-allege the allegations set forth in paragraphs 1 through 18, 36 through 38, and 46 through 167 of this complaint as though fully set forth herein.

242. Defendants, operating in New York, engaged in deceptive, unfair, and unlawful trade acts or practices and false advertising in the conduct of trade or commerce and furnishing of services, in violation of N.Y. Gen. Bus. Law §§ 349(a) & 350-a, including but not limited to the following:

    a. Claiming that SmileDirect customers receive the same level of orthodontic care as patients who employ traditional dentists;

    b. Asserting that SmileDirect is employing teledentistry in accordance with industry standards;

    c. Advertising that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces;"

    d. Making misrepresentations and deceptive statements concerning SmileDirect's return policies;

    e. Making misrepresentations and deceptive statements concerning the ability of SmileDirect's aligners to address "bite issues;"

f.   Making misrepresentations and deceptive statements concerning the effect of SmileDirect's aligners upon consumer heart rate and blood pressure;

g.   Making misrepresentations and deceptive statements concerning consumer satisfaction with SmileDirect aligners; and

h.   Failing to inform consumers that SmileDirect's sale of its self-manufactured aligners violates the FD&C Act.

243.   As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs and Subclass Members suffered an ascertainable loss of money or property, real or personal, as described above, including, but not limited to, for the Consumer Class, their loss of money paid to SmileDirect and, for the Provider Class, loss of business revenue.

244.   The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs Dr. Ciccio, Joseph A. Ciccio, Jr., D.M.D. and Peter B. Demarest, D.M.D., PLLC and New York Provider Subclass Members as well as Plaintiffs Bhandari, Loiseau, and Molina and the New York Consumer Subclass Members that they could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

245.   Defendants knew or should have known that SmileDirect's business practices were unlawful, unfair, and deceptive, and that its advertising was misleading in material respects. Defendants' actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs Dr. Ciccio, Joseph A. Ciccio, Jr., D.M.D. and Peter B. Demarest, D.M.D., PLLC and New York Provider Subclass Members as well as Plaintiffs Bhandari, Loiseau, and Molina and the New York Consumer Subclass Members.

246. Plaintiffs Dr. Ciccio, Joseph A. Ciccio, Jr., D.D.S. and Peter B. Demarest, D.M.D., PLLC and New York Provider Subclass Members as well as Plaintiffs Bhandari, Loiseau, and Molina and the New York Consumer Subclass Members seek relief under N.Y. Gen. Bus. Law §§ 349(h) and 350-e(3), including, but not limited to, actual damages, treble damages, statutory damages, injunctive relief, and/or attorney's fees and costs.

<u>**COUNT ELEVEN**</u>

**VIRGINIA CONSUMER PROTECTION ACT**

**(On behalf of the Virginia Consumer Subclass)**

247. Plaintiff Lee repeats and re-alleges the allegations set forth in paragraphs 1 through 15, 39, 42 through 135, 138 thorough 141, 143 through 147, and 149 through 162 of this complaint as though fully set forth herein.

248. Defendants, operating in Virginia, engaged in unfair, unconscionable, and deceptive methods, acts, and practices in connection with a consumer transaction, including misrepresenting goods or services as those of another; misrepresenting the source, sponsorship, approval, or certification of goods or services; misrepresenting that goods or services were of a particular standard, quality, grade, style, or model; using other deception, fraud, false pretense, false promise, or misrepresentation; and failing to disclose all conditions, charges, or fees relating to the return of goods for refund, exchange, or credit in violation of VA Code Ann. § 59.1-200(1), (2), (6), (14), & (16)(a). This unlawful conduct includes but is not limited to the following:

a. Claiming that SmileDirect customers receive the same level of orthodontic care as patients who employ traditional dentists;

b. Asserting that SmileDirect is employing teledentistry in accordance with industry standards;

c. Advertising that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces;"

d. Making misrepresentations and deceptive statements concerning SmileDirect's return policies;

e. Making misrepresentations and deceptive statements concerning the ability of SmileDirect's aligners to address "bite issues;"

f. Making misrepresentations and deceptive statements concerning the effect of SmileDirect's aligners upon consumer heart rate and blood pressure;

g. Making misrepresentations and deceptive statements concerning consumer satisfaction with SmileDirect aligners; and

h. Failing to inform consumers that SmileDirect's sale of its self-manufactured aligners violates the FD&C Act.

249. As a direct and proximate result of these practices, Plaintiff Lee and Virginia Consumer Subclass Members suffered injuries to legally protected interests, as described above, including but not limited to their loss of money paid to SmileDirect.

250. The above unfair and deceptive practices and acts by SmileDirect were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff Lee and Virginia Consumer Subclass Members that they could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition. These acts were within the penumbra of common law, statutory, or other established concepts of unfairness.

251. Defendants knew or should have known that SmileDirect's practices were unfair and deceptive. Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Lee and Virginia Consumer Subclass Members.

252. Plaintiff Lee and Virginia Consumer Subclass Members seek injunctive relief to enjoin Defendants from continuing SmileDirect's unfair and deceptive acts; monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for Plaintiff Lee and Virginia Consumer Subclass Members; reasonable attorneys' fees and costs; and any other just and proper relief available under VA Code Ann. § 59.1-204(A)-(B).

## COUNT TWELVE

### WASHINGTON CONSUMER PROTECTION ACT

### (On behalf of the Washington Consumer Subclass)

253. Plaintiff Roodzant repeats and re-alleges the allegations set forth in paragraphs 1 through 15, 40, 42 through 135, 138 thorough 141, 143 through 147, and 149 through 162 of this complaint as though fully set forth herein.

254. Defendants, operating in Washington, engaged in unfair or deceptive acts or practices in the conduct of trade and commerce, in violation of Wash. Rev. Code Ann. § 19.86.020. This includes but is not limited to the following:

    a. Claiming that SmileDirect customers receive the same level of orthodontic care as patients who employ traditional dentists;

    b. Asserting that SmileDirect is employing teledentistry in accordance with industry standards;

c. Advertising that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces;"

d. Making misrepresentations and deceptive statements concerning SmileDirect's return policies;

e. Making misrepresentations and deceptive statements concerning the ability of SmileDirect's aligners to address "bite issues;"

f. Making misrepresentations and deceptive statements concerning the effect of SmileDirect's aligners upon consumer heart rate and blood pressure;

g. Making misrepresentations and deceptive statements concerning consumer satisfaction with SmileDirect aligners; and

h. Failing to inform consumers that SmileDirect's sale of its self-manufactured aligners violates the FD&C Act.

255. As a direct and proximate result of Defendants' practices, Plaintiff Roodzant and Washington Consumer Subclass Members suffered the injury and/or damages described herein.

256. The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff Roodzant and Washington Consumer Subclass Members that they could not reasonably avoid. This substantial injury outweighed any benefits to consumers.

257. Defendants knew or should have known that SmileDirect's business practices were unlawful, unfair, and deceptive. Defendants' actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Roodzant and Washington Consumer Subclass Members.

258. Plaintiff Roodzant and Washington Subclass Members seek relief under Wash. Rev. Code Ann. § 19.86.090, including, but not limited to, actual damages, treble damages, injunctive relief, and attorneys' fees and costs.

## COUNT THIRTEEN

### WISCONSIN DECEPTIVE TRADE PRACTICES ACT

### (On behalf of the Wisconsin Consumer Subclass)

259. Plaintiff Wilcox repeats and re-alleges the allegations set forth in paragraphs 1 through 15, 41 through 135, 138 thorough 141, 143 through 147, and 149 through 162 of this complaint as though fully set forth herein.

260. Defendants, operating in Wisconsin, engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, in violation of W.S.A. 100.18. This includes but is not limited to the following:

    a.    Claiming that SmileDirect customers receive the same level of orthodontic care as patients who employ traditional dentists;

    b.    Asserting that SmileDirect is employing teledentistry in accordance with industry standards;

    c.    Advertising that the orthodontic result provided by SmileDirect's aligners is "three times faster than braces;"

    d.    Making misrepresentations and deceptive statements concerning SmileDirect's return policies;

    e.    Making misrepresentations and deceptive statements concerning the ability of SmileDirect's aligners to address "bite issues;"

f.   Making misrepresentations and deceptive statements concerning the effect of SmileDirect's aligners upon consumer heart rate and blood pressure;

g.   Making misrepresentations and deceptive statements concerning consumer satisfaction with SmileDirect aligners; and

h.   Failing to inform consumers that SmileDirect's sale of its self-manufactured aligners violates the FD&C Act.

261.   As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Wilcox and Members of the Wisconsin Consumer Class suffered an ascertainable loss of money or property, real or personal, as described above, including, but not limited to, their loss of money paid to SmileDirect.

262.   The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that outweighed any benefits to consumers or to competition.

263.   Defendants knew or should have known that SmileDirect's business practices were unlawful, unfair, and deceptive. Defendants' actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Wilcox and Wisconsin Consumer Subclass Members.

264.   Plaintiff Wilcox and Wisconsin Consumer Subclass Members seek actual damages and attorneys' fees and costs under W.S.A. 100.18(11)(b), to be proven at trial.

265.   Plaintiff Wilcox and Wisconsin Consumer Subclass Members also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, and any other just and proper relief available under the Wisconsin Deceptive Trade Practices Act, W.S.A. §§ 100.18 et seq.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class Members, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.     That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' attorneys as Class Counsel;

B.     That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.     That the Court award Plaintiffs and the other Class Members compensatory, consequential, and general damages in an amount to be determined at trial;

D.     That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

E.     That the Court award statutory damages, and punitive or exemplary damages, to the extent permitted by law;

F.     That the unlawful acts alleged in this Complaint be adjudged and decreed to be unfair and deceptive business acts and practices in violation of California, Colorado, Florida, Michigan, New York, Tennessee, Virginia, Washington, and Wisconsin consumer protection and competition laws;

G.     That Camelot be held liable under the doctrine of respondeat superior for the conduct of David Katzman, Steven Katzman, and Alexander Fenkell;

H.     That Plaintiffs be granted the declaratory relief sought herein;

I.      That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, including fees and expenses;

J.      That the Court award pre- and post-judgment interest at the maximum legal rate; and

K.      That the Court grant all such other relief as it deems just and proper.

DATED: August 20, 2021.

Respectfully submitted,

s/Edward M. Yarbrough
Edward M. Yarbrough, TNBPR#004097
W. Justin Adams, TNBPR#022433
BONE MCALLESTER NORTON PLLC
511 Union Street, Suite 1000
Nashville, Tennessee 37219
TEL: (615) 238-6390
FAX: (615) 687-6990
eyarbrough@bonelaw.com
wjadams@bonelaw.com

Robert K. Spotswood, Alabama Bar # ASB-7015-P76R
Michael T. Sansbury, Alabama Bar # ASB-6473-A53S
Joshua K. Payne, Alabama Bar # ASB-1041-A55P
Morgan Franz, Alabama Bar # ASB-0488-S13E
SPOTSWOOD SANSOM & SANSBURY LLC
Financial Center
505 20th Street North
Suite 700
Birmingham, Alabama 35203
TEL: (205) 986-3620
FAX: (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
jpayne@spotswoodllc.com
mfranz@spotswoodllc.com

Richard Stone, U.S. Dist. Ct. S.D.N.Y. Bar # RS5324
BLACKNER, STONE & ASSOCS.
123 Australian Avenue
Palm Beach, Florida 33480
TEL: 561-804-9569

rstoneesq@rstoneesq.com

*Attorneys for the Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that a true and correct copy of the foregoing document was served via the Court's ECF Filing System on August 20, 2021, as follows:

John R. Jacobson
Alex Fardon
Elizabeth O. Gonser
Riley Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
jjacobson@rwjplc.com
afardon@rwjplc.com
egonser@rwjplc.com

David Rammelt
Nicholas J. Secco
Hannah Stowe
Benesch, Friedlander, Coplan and Aronoff, LLP
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
drammelt@beneschlaw.com
nsecco@beneschlaw.com
hstowe@beneschlaw.com

Michael D. Meuti
Andrew G. Fiorella
Mark K. Norris
Benesch, Friedlander, Coplan and Aronoff, LLP
200 Public Square, Suite 2300
Cleveland, OH 44114
mmeuti@beneschlaw.com
afiorella@beneschlaw.com
mnorris@beneschlaw.com

*Attorneys for the Defendants*

                              s/ Edward M. Yarbrough