**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| DR. JOSEPH CICCIO, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil No. 3:19-cv-00845 |
| v. | ) | |
| | ) | Judge Trauger |
| SMILEDIRECTCLUB, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PROVIDER PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION
FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.    FACTS RELATED TO THE AT-ISSUE STATEMENTS AND OMISSIONS. .................. 3

    A.   Defendants' knowingly false statements about customer satisfaction with SmileDirect aligners. ................................................................................................ 3

    B.   Defendants' failure to inform customers that SmileDirect aligners did not have the required 510(k) clearance from the FDA, despite repeated applications............................ 5

    C.   Defendants' knowingly false statements that SmileDirect customers receive the same level of care as an individual visiting a traditional orthodontist or dentist for treatment. ... 8

    D.   Defendants' knowingly false statements that SmileDirect's aligner treatment is "3x faster than braces" or is completed "3x sooner than braces.".................................... 13

    E.   Defendants' misrepresentations regarding the ability of SmileDirect's aligner treatment to address bite issues. ................................................................................ 15

III.   THE PROPOSED CLASSES ............................................................................. 17

IV.   LEGAL STANDARDS FOR CLASS CERTIFICATION ............................................. 17

V.    ARGUMENT ................................................................................................. 19

    A.   The Proposed Classes Are Ascertainable Because They Are Objectively Defined....... 19

    B.   Plaintiffs Satisfy Rule 23(a). ............................................................................ 20

        1.   The Proposed Classes are Sufficiently Numerous. .......................................... 20

        2.   There are Common Questions of Law and Fact.............................................. 21

        3.   The Class Representatives' Claims are Typical of the Class Claims........................ 23

        4.   The Named Plaintiffs Will Adequately Represent the Class. ............................... 23

    C.   Class Certification is Appropriate Under Rule 23(b)(2)............................................ 27

    D.   Class Certification is Also Appropriate Under Rule 23(b)(3)....................................... 28

        1.   Questions of Law and Fact Predominate..................................................... 28

           a)   Lanham Act Claim..................................................................... 29

              (1)   Plaintiffs will prove false or misleading advertising statements....................... 30

(2)    Plaintiffs will prove deception or tendency to deceive consumers. .................... 31

(3)    Plaintiffs will prove that Defendants' statements were material......................... 34

(4)    Plaintiffs will prove introduction in interstate commerce. .................................. 35

(5)    Plaintiffs will prove causation and damages. ...................................................... 35

b)   Florida Deceptive and Unfair Trade Practices Act (FDUTPA) and New York General Business Law §§ 349 and 350 claims.......................................................... 37

2.   A Class Action is Superior to Other Available Methods. ............................................. 38

E.    Alternatively, The Common Issues of Liability Should Be Certified Under Rule 23(c)(4). 40

VI.   CONCLUSION............................................................................................................. 40

**TABLE OF AUTHORITIES**

**Cases**

*Ackerman v. Coca-Cola Co.*, No. 09 CV 395(DLI)(RML), 2013 WL 7044866 (E.D.N.Y. July 18, 2023) ................................................................................................................................. 38

*Act, Inc. v. Worldwide Interactive Network*, No. 3:18-CV-186, 2020 WL 4195269 (E.D. Tenn. July 21, 2020) ................................................................................................................... 33

*Advanced Dermatology v. Plaza Rsch. Corp.*, No. 5:20-CV-2826, 2021 WL 5589281 (N.D. Ohio Nov. 30, 2021) ................................................................................................................ 24

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999) ......................................................................... 30

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................................................. 18

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013) ...................................... 18, 28

*Ashley Furniture Indus., Inc. v. Am. Signature, Inc.*, No. 2:11-CV-427, 2015 WL 12999664 (S.D. Ohio Mar. 12, 2015) ................................................................................................... 34

*Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565 (6th Cir. 2004) ................................................ 20

*Balance Dynamics Corp. v. Schmitt Indus., Inc.,* 204 F.3d 683 (6th Cir. 2000) ............. 32, 35, 37

*Carriuolo v. Gen. Motors Co.*, 823 F.3d 977 (11th Cir. 2016) .................................................... 37

*Cassell v. Vanderbilt Univ.*, No. 3:16-cv-2086, 2018 WL 5264640 (M.D. Tenn. Oct. 23, 2018) 24

*Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623 (N.D. Cal. 2019) .................... 30

*Cole v. City of Memphis*, 839 F.3d 530 (6th Cir. 2016) ............................................................... 18

*Coleman v. Gen. Motors Acceptance Corp.*, 220 F.R.D. 64 (M.D. Tenn. 2004) ........................ 28

*Dash v. Seagate Tech. (U.S.) Holdings, Inc.*, 27 F. Supp. 3d 357 (E.D.N.Y. 2014) ................... 38

*Delahunt v. Cytodyne Techs.*, 241 F. Supp. 2d 827 (S.D. Ohio 2003) ........................................ 18

*DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188 (10th Cir. 2010) ............................................. 35

*EPAC Techs., Inc. v. Thomas Nelson, Inc.*, No. 3:12-CV-00463, 2018 WL 3322305, at *3 (M.D. Tenn. May 14, 2018) ........................................................................................................... 9

*Fed. Exp. Corp. v. U.S. Postal Serv.*, 40 F. Supp. 2d 943 (W.D. Tenn. 1999) ........................... 34

iii

*Fla. Emergency Phys. Kang & Assocs., M.D., Inc. v. United Healthcare of Fla., Inc.*, 526 F. Supp. 3d 1282 (S.D. Fla. 2021) ............................................................................. 37

*Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402 (6th Cir. 2012) ................................ 27

*Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785 (6th Cir. 2015) ........................................ 30

*Haas Door Co. v. Haas Garage Door Co.*, No. 3:13 CV 2507, 2016 WL 1047242 (N.D. Ohio Mar. 16, 2016) ............................................................................................. 32, 34

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ............................................. 23

*Hicks v. State Farm Fire & Cas. Co.,* 965 F.3d 452 (6th Cir. 2020) ......................... 29, 39

*Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cnty., Tennesse v. Momenta Pharm., Inc.*, 333 F.R.D. 390 (M.D. Tenn. 2019) ............................................................... 35

*In re Am. Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996) ................................................ 21

*In re Checking Acc't Overdraft Litig.*, 307 F.R.D. 630 (S.D. Fla. 2015) ........................ 22

*In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919 (C.D. Cal. 2015) .................................. 35

*In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013) ......................................... 26

In *re Heartland Pymt. Sys., Inc. Customer Datta Breach Lit.*, 851 F. Supp. 2d 1040 (S.D. Tex. 2012) ........................................................................................................... 24

*In re Scotts EZ Seed Litig.*, 304 F.R.D. 397 (S.D.N.Y. 2015) ....................................... 38

*In re Suboxone Antitrust Litigation*, 967 F.3d 264 (3d Cir. 2020) ................................. 24

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013) 28, 29

*In re Workers' Comp.,* 130 F.R.D. 99 (D. Minn. 1990) ................................................. 18

*Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723 (6th Cir. 2012) .................. 30, 32

*Kennedy v. United Healthcare of Ohio, Inc.*, 206 F.R.D. 191 (S.D. Ohio 2002) ........... 26

*Kensu v. Mich. Dep't of Corr.*, No. 18-CV-10175, 2020 WL 1698662 (E.D. Mich. Apr. 8, 2020) ......................................................................................................................... 19

*Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919 (7th Cir. 2016) ............................... 35

*Kutzman v. Derrel's Mini Storage, Inc.*, No. 1:18-cv-00755-AWI-JLT, 2020 WL 406768 (E.D. Cal. Jan. 24, 2020) ................................................................................. 29

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 138 (2014) .............. 13, 17

*Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447 (5th Cir. 2001) ...................... 8

*Louisiana-Pac. Corp. v. James Hardie Bldg. Prod., Inc.,* 335 F. Supp. 3d 1002 (M.D. Tenn. 2018) ................................................................................................................................ 33, 34

*Lyngaas v. Ag*, 992 F.3d 412 (6th Cir. 2021) ............................................................................ 19

*Mahindra & Mahindra Ltd. v. FCA US LLC*, No. 18-CV-12645, 2021 WL 323253 (E.D. Mich. Feb. 1, 2021) .......................................................................................................................... 34

*Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405 (6th Cir. 2018) ................................ 40

*Medison Am., Inc. v. Preferred Med. Sys., LLC*, 548 F. Supp. 2d 567 (W.D. Tenn. 2007) ......... 34

*Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247 (2d Cir. 2014) ............................................... 33

*Midlothian Lab'ys, L.L.C. v. Pamlab, L.L.C.*, 509 F. Supp. 2d 1065 (M.D. Ala.) ...................... 34

*New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287 (S.D.N.Y. 2015) ..................... 38

*Pansiera v. Home City Ice Co.*, 341 F.R.D. 223 (S.D. Ohio 2022) ............................................. 28

*Pegasystems, Inc. v. Appian Corp.*, 424 F. Supp. 3d 214 (D. Mass. 2019) ................................ 31

*Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869 (5th Cir. 2019) ................... 36

*Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015) ................................. 19, 20, 22, 23

*Roach v. T.L. Cannon Corp.*, 778 F.3d 401 (2d Cir. 2015) ........................................................ 35

*Rogers v. T.J. Samson Cmty. Hosp.*, 276 F.3d 228, 232 (6th Cir. 2002) ....................................... 9

*Senter v. Gen. Motors Corp.,* 532 F.2d 511 (6th Cir. 1976) ........................................................ 24

*Serv. Jewelry Repair, Inc. v. Cumulus Broad., LLC*, 145 F. Supp. 3d 737 (M.D. Tenn. 2015) ... 30

*Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105 (9th Cir. 2012) ......................................... 33

*Snead v. CoreCivic of Tenn., LLC*, No. 3:17-CV-0949, 2018 WL 3157283 (M.D. Tenn. June 27, 2018) ...................................................................................................................................... 21, 23

*Stanich v. Travelers Indem. Co.*, 259 F.R.D. 294(N.D. Ohio 2009)....................................... 24, 26

*System Fed'n No. 91, Ry. Emp. Dept. v. Reed*, 180 F.2d 991(6th Cir. 1950) .............................. 18

*Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466 (C.D. Cal. 2012) ..................................... 39

v

*TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820 (9th Cir. 2011) ...................................... 8, 36

*Tymar Distrib. LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275 (S.D. Fla. 2021) ........... 38

*Unger v. Amedisys, Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) ......................................... 24

*W. Loop Chiropractic & Sports Inj. Ctr., Ltd. v. N. Am. Bancard, LLC*, No. 16 C 5856, 2018 WL 4762333 (N.D. Ill. May 16, 2018) ............................................................ 20

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................. 21, 22, 23, 28

*Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998) ................................................ 28

*Watkins Inc. v. McCormick & Co., Inc.*, 574 F. Supp. 3d 644 (D. Minn. 2021) ......................... 36

*Wysong Corp. v. APN, Inc. (17-1975)*, 889 F.3d 267 (6th Cir. 2018) ............................. 30, 33, 34

*Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532 (6th Cir. 2012) ................................. 18, 19, 40

**Statutes**

15 U.S.C. § 1116 ....................................................................... 27

15 U.S.C. § 1117 ....................................................................... 36

15 U.S.C. § 1125 ....................................................................... 30

Fed. R. Civ. P. 23 ................................................................. passim

Fla. Stat. § 501.211 ............................................................... 27, 38

Rule 30 ............................................................................... 25

Tenn. Code Ann. § 47-18-109 ............................................................ 27

vi

# TABLE OF EXHIBITS

1. Sulitzer Marketing Email .................................................................................................. 1

2. SmileDirect 2021 Customer Tracker ................................................................... 2, 3, 14

3. 2017 Decision Analyst Customer Survey Report ......................................................... 3

4. July 2018 SmileDirect Email ....................................................................................... 4

5. SmileDirect Website ..................................................................................................... 4

6. SmileGuide Cover Email and Script ............................................................................ 4

7. Spreadsheet Showing Nationwide Reach ............................................................... 4, 13

8. SmileDirect FDA Regulatory Status Memo ............................................................... 5

9. SmileDirect Cover Email to First 510(k) Application ................................................ 5

10. Dec. 8, 2017 FDA Correspondence ........................................................................... 6

11. May 26, 2018 FDA Correspondence .......................................................................... 6

12. TPRG Correspondence .......................................................................................... 6, 14

13. Difficult Press Questions ........................................................................................... 7

14. Public Relations Plan Email ........................................................................................ 7

15. Excerpts from Customer Chat Transcripts .................................................................. 7

16. Expert Report of Dr. Jonathan D. Hibbard ....................................................... passim

17. Hibbard Deposition Transcript ................................................................................... 8

18. Hibbard Response to Dr. Berger Report .................................................................... 8

19. SmileDirect April 2018 Blog Post .............................................................................. 9

20. "Same Level of Care" Blogs and Emails .................................................................... 9

21. NAD Case Report .................................................................................................. 9, 13

22. T. Felixbrod Declaration ....................................................................................... 9, 15

23. AAO Position Paper .......................................................................................... 10, 11

24. Dr. Markarian Dec. from the ADA's Citizen Petition to the FDA ................................... 10, 11

25. Dr. Ciccio Deposition Transcript ............................................................... 10, 11, 16

26. Dr. Kapit Deposition Transcript ............................................................... 10, 11, 16

27. Dr. Raj Deposition Transcript.................................................................. 10, 11, 16

28. Hudson Jan. 2014 Email ........................................................................ 10

29. Additional Customer Chat Transcripts ....................................................... 10

30. Deposition of Dr. Tom Shannon................................................................ 10, 12

31. SmileDirect Treatment Record ................................................................ 11

32. SmileDirect Notes from August 11, 2017 Meeting with the FDA ........................ 11

33. JPM Analyst Meeting Notes .................................................................... 11

34. JPM SmileDirect Headquarters Meeting Notes ............................................. 11

35. Defendants' Supp. Responses and Objections to Plaintiffs' First Set of Interrogatories... 13, 14

36. Report of NARB Panel # 272 .................................................................. 14

37. SmileDirect Email, Data on Customers with Negative Reviews .......................... 13, 14

38. SmileDirect Data on Customers with Negative Reviews ................................... 13, 14

39. NAD Case Report # 6946RO................................................................... 14

40. Smile Assessment .............................................................................. 15

41. SmileDirect Website - Bite Landing Page .................................................. 15

42. SmileDirect Customer Bite Issues Email................................................... 15

43. Other SmileDirect Bite Advertisements .................................................... 15

44. Customer Reviews and Transcripts Related to Bite Issues............................... 15

45. Customer Email to Dr. Ciccio Confusing SmileDirect and Invisalign.................. 16

46. Fortune Business Insights ("FBI") Industry Report........................................ 21

47. Expert Report of Dr. Lorin M. Hitt.......................................................... 21

48. Dr. Ciccio Declaration ........................................................................ 25

49. Dr. Kapit Declaration ...................................................................................................... 25

50. Dr. Raj Declaration ........................................................................................................ 25

51. Spencer Fane LLP Declaration ....................................................................................... 27

52. Spotswood Sansom & Sansbury LLC Declaration .......................................................... 27

53. Law Offices of Richard L. Stone, PLLC Declaration ...................................................... 27

54. Dec. 8, 2021 Hearing with Special Master Transcript ..................................................... 32

55. Expert Report of Dr. Russell W. Mangum III ............................................................ 36, 37

56. Sulitzer Accusation ......................................................................................................... 12

57. Sulitzer Probation Order ................................................................................................. 12

58. Dowling Surrender Order ................................................................................................ 12

59. Moore Surrender Order ................................................................................................... 12

60. Align Opposition to SmileDirect Motion to Dismiss ....................................................... 11

61. Selwyn Singer Deposition Transcript ............................................................................. 25

62. Dr. Kapit Email to Singer ............................................................................................... 25

# I. __INTRODUCTION__

SmileDirect manufactures and distributes teeth aligners and is in direct competition with orthodontists and dentists who prescribe aligners and braces. As described in its Initial Public Offering Prospectus, SmileDirect maintains that it has "disrupted the traditional orthodontic model," which it defines to include "both metal braces and clear aligner treatment administered through in-office doctor visits." *See* Doc. 246-6 at 22.[1] SmileDirect represents 95% of the at-home invisible aligner market. *See* **Ex. 1** (Sulitzer Marketing Email).

In this action, Provider Plaintiffs claim that Defendants willfully and intentionally, through a multimillion-dollar marketing and advertising campaign, made false and misleading statements and omissions that inflicted financial and reputational harm on orthodontists and dentists who provide braces and clear-aligner treatment administered through in-office visits. Those false and misleading statements and omissions include:

- Misrepresenting the level of customer satisfaction with SmileDirect aligners, including making false statements about the specific number of customers that are satisfied and omitting that based on SmileDirect's own data, fewer than ██ of SmileDirect customers are satisfied;

- Failing to inform customers that SmileDirect aligners did not have the required 510(k) clearance from the U.S. Food and Drug Administration;

- Misrepresenting that SmileDirect customers receive the same level of care as an individual visiting a traditional orthodontist or dentist for treatment;

- Misrepresenting that the orthodontic result from SmileDirect's aligner treatment is "3x faster than braces" or is completed "3x sooner than braces"; and

- Misrepresenting the ability of SmileDirect's aligner treatment to address bite issues, including that SmileDirect has helped thousands of people with bite issues.

*See* Doc. 246 at 31-33, 35, 37-38, 39-43.[2]

---

[1] SmileDirect has also sued orthodontists and dentists that prescribe aligners and braces, asserting they were direct competitors under the Lanham Act. *See* Doc. 174-8 (SmileDirect v. Jacqueline I. Fulop, D.M.D., P.C., et al.); Doc. 174-9 (SmileDirect v. Diamond Braces, et al.).

[2] Additional statements and omissions may be pursued on behalf of the consumer class.

Defendants' own actions and customer data prove their marketing was pervasive and effective. Defendants spent enormous sums on advertising, despite incurring significant net losses during the same period. *See, e.g.*, SmileDirect 2020 10-K at 55, available at https://investors.smiledirectclub.com/static-files/13142eee-c4f5-49fa-a75e-90fb9ba5dac8 ($481 million spent on marketing while there was a $114 million net loss in 2019). SmileDirect's customer data shows that ██████████████ customers reviewed the SmileDirect website in making their decision to purchase SmileDirect aligners. *See* **Ex. 2** (SmileDirect 2021 Customer Tracker) at 4, 9. The data further shows that ██████ customers decided to straighten their teeth sooner after learning about SmileDirect and that ██████████ customers reported that seeing a SmileDirect advertisement caused them to get treatment at the time they did. *Id.* at 4, 17. Indeed, internal SmileDirect data shows that ████████████████████████ ████████████████████. *Id.* at 17.

Defendants' misrepresentations and omissions harmed Plaintiffs and the Class of dentists and orthodontists by diverting customers from them. They also harmed Plaintiffs and the Class reputationally by drawing a false equivalence between SmileDirect's inferior products and services and the metal braces and clear-aligner treatment administered by dentists and orthodontists through in-office visits. Defendants' wrongful conduct has involved the knowingly illegal sale of potentially millions of Class II medical devices in violation of the Food, Drug and Cosmetic Act and other state and federal laws, and the willful omission and concealment of this fact. It has also involved willful misrepresentations in its marketing, as demonstrated by the limited discovery in this case to date and the findings of the Better Business Bureau's National Advertising Division ("NAD") that SmileDirect's marketing statements were unsubstantiated and should be discontinued.

Despite all of this, Defendants continue to make intentional misstatements in marketing their products and services. Given Defendants' aggressive and exceedingly expensive litigation tactics, Defendants' unlawful conduct will go unreviewed and unremedied—absent a class action.

## II.     FACTS RELATED TO THE AT-ISSUE STATEMENTS AND OMISSIONS.

### A.     Defendants' knowingly false statements about customer satisfaction with SmileDirect aligners.

Defendants have long been aware that more than half of SmileDirect customers are not satisfied with its products and services. In 2017, SmileDirect hired a third-party company, Decision Analyst, to perform a survey of its customers. 

" **Ex. 3** (2017 Decision Analyst Customer Survey Report) at 8, 9, 12.

Recent SmileDirect customer data confirms that customer satisfaction has remained low. A 2021 SmileDirect Customer Tracker reported

." *Id.* at 39. Indeed, SmileDirect long succeeded in stifling customer complaints by requiring all customers requesting a refund for SmileDirect products to sign a non-disclosure agreement as to customer complaints— a practice that SmileDirect ended only last week. *See SmileDirectClub forced to drop NDAs blocking customers from leaving bad reviews*, The Verge, https://www.theverge.com/2023/6/23/23771112/smile-direct-club-dental-retainers-nda-customer-refunds (June 23, 2023).

Despite Defendants' actual knowledge that ▮▮▮▮▮▮▮▮ of their customers are not satisfied, and despite ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Defendants have knowingly made specific, false claims about the number of their customers that are satisfied. For example, a July 16, 2018 SmileDirect advertising email with the subject line, "250,000 satisfied grinners and counting," states, "Join the club that has helped over 250,000 people get a smile they love." **Ex. 4** (July 2018 SmileDirect Email). According to the customer data SmileDirect produced in this case, between September 24, 2015 (when the produced data begins) and July 16, 2018, SmileDirect received 259,914 orders.[3] Thus, Defendants falsely claimed that virtually all of their customers were satisfied. Defendants ignored and omitted the highly material fact that ▮▮▮▮▮▮▮▮ of their customers are *not* "satisfied grinners" and did *not* "get a smile they love."

Defendants made numerous similar false statements about customer satisfaction during the class period via email, on SmileDirect's website, on nationwide television broadcasts, and in scripts used by sales employees called "SmileGuides." *See, e.g.*, **Ex. 5** at 11 (SmileDirect website stating "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); **Ex. 6** at 14 (December 4, 2019 SmileGuide script stating ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮")[4]; **Ex. 7** (SmileDirect spreadsheet showing nationwide reach of specific customer satisfaction claims). SmileDirect continues to make similar claims on its website and potentially through other channels. *See* https://smiledirectclub.com/blog/lifetime-smile-guarantee/ (last visited June 19, 2023) ("we've helped over a million satisfied Club members get the smile of their

---

[3] Defendants produced this customer data at SDC_CICCIO_0414685. Plaintiffs have not attached this voluminous data as an exhibit but can submit it upon request.
[4] At this time SmileDirect's customer data produced at SDC_CICCIO_0414685 shows SmileDirect had received only 809,072 orders, so Defendants again were falsely advertising that the vast majority, if not all, of their customers were satisfied.

4

dreams"). All of these are knowingly false marketing statements, and they divert customers from class members' products and services on the false hope that SmileDirect nearly always provides "satisfaction" at a fraction of the price and time commitment of the full service alignment provided by Plaintiffs.

**B.** **Defendants' failure to inform customers that SmileDirect aligners did not have the required 510(k) clearance from the FDA, despite repeated applications.**

SmileDirect aligners are Class II medical devices that require 510(k) clearance from the FDA.[5] Section 510(k) of the FD&C Act "requires device manufacturers who must register, to notify FDA of their intent to market a medical device at least 90 days in advance." FDA, 510(k) Clearances, available at https://www.fda.gov/medical-devices/device-approvals-denials-and-clearances/510k-clearances. For at least three years, Defendants knowingly marketed and sold SmileDirect clear aligners without the required 510(k) clearance. ████████████

████████████████████████████████████

████████████████████████████████████

████ Defendants intentionally hid from their customers their lack of 510(k) clearance ████

████████████████████████████████████ .

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[5] Defendants have admitted this fact on various occasions, including in their S-1. *See* SmileDirectClub, Inc. Form S-1 (Aug. 16, 2019) at 119, https://investors.smiledirectclub.com/sec-filings/sec-filing/s-1/0001047469-19-004785 ("We market our clear aligner products in the U.S. pursuant to 510(k) clearance as they are a Class II medical device.").

5



---

[6] In June 2019, SmileDirect purchased a 510(k) from another company through a subsidiary. *See* Doc. 162-2 at 5 & n.2. While SmileDirect claims that it now operates under that 510(k), Plaintiffs assert that SmileDirect cannot do so because it was not granted based on the

Not only did Defendants fail to inform consumers that SmileDirect did not have the required 510(k) clearance, Defendants took affirmative steps to hide the fact from the public. For example, ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

    ████████████████████████████████████████

███████ ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

Likewise, ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Defendants are still working aggressively to keep this material information about the safety of their product from the public, as evidenced by the rounds of motion practice in this case and their marking as confidential all the relevant FDA documents showing

---

SmileDirect aligner system over which the FDA expressed concern, but rather for a different system, and thus Defendants' unlawful conduct continues.

[7] Registration simply refers to the fact that businesses that are involved in the production or distribution of medical devices must register with the FDA. *See* https://www.fda.gov/industry/fda-basics-industry/registration-and-listing. FDA clearance is an additional, separate step required to market a Class II medical device like teeth aligners. *See* https://www.fda.gov/medical-devices/device-approvals-denials-and-clearances/510k-clearances.

they lacked FDA approval. *See, e.g.*, Docs. 159-162, 166, 170-72 (Motion for Sanctions); Docs. 256, 257, 267-269, 278 (Motion for Judgment on the Pleadings re 510(k) allegations); Docs. 292-295, 325, 330-332, 337 (Privilege Dispute and Defs' Objections to Order re: same).

These omissions and misrepresentations diverted customers from Plaintiffs and the Class, whose aligners have appropriate FDA clearances and approvals. A test and control survey designed by Plaintiffs' expert, Dr. Hibbard, determined that, rather than purchasing aligners from SmileDirect, "15.1% of respondents indicated they would buy metal or ceramic braces or clear aligners from an orthodontist or dentist involving in-office visits if they had known that SDC had not received FDA clearance to market its aligners to potential consumers." **Ex. 16** (Expert Report of Dr. Jonathan D. Hibbard) ¶ 20(c).[8] These statements and omissions also harmed class members' reputation by drawing a false equivalence between class members' FDA-approved services and products and SmileDirect's non-approved, inferior products.

**C.  Defendants' knowingly false statements that SmileDirect customers receive the same level of care as an individual visiting a traditional orthodontist or dentist for treatment.**

Defendants knowingly and falsely represent that individuals who use SmileDirect aligners receive "the same level of care" as an individual visiting a traditional orthodontist or dentist for

---

[8] Dr. Hibbard also explained that the survey methodology he used could be used to show harm for each of the marketing statements at issue. *See* **Ex. 17** (Hibbard Dep.) at 80:18-24; **Ex. 18** (Hibbard Response to Dr. Berger Report) ¶ 30(a)(i). Regarding the representative plaintiffs, customer data produced by SmileDirect at SDC_CICCIO_0414685 reflects that there are over 100 SmileDirect customers in the very same zip code as the location of each of named Plaintiffs' practice locations, and many more in adjoining zip codes, indicating that customers were diverted from those Plaintiffs' practices due to Defendants' wrongful conduct. *See, e.g.*, Doc. 333 at 4 & n.4. This evidence is sufficient to demonstrate harm to the Plaintiffs. *See, e.g.*, *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 825 (9th Cir. 2011); *Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 462–63 (5th Cir. 2001).

treatment. **Ex. 19** (SmileDirect April 2018 blog post) at 3.[9] Defendants make these statements with the endorsement of their Chief Clinical Officer and spokesperson, Defendant Dr. Sulitzer, as well as through other blog posts and emails to customers. *See* **Ex. 20** (examples of other "same level of care" marketing statements).[10]

Defendants know that this statement is false because the BBB's NAD instructed them to stop making it. *See* **Ex. 21** (NAD Case Report #6382) at 4. Upon review, the NAD found that the "same level of care" statement "expressly conveys to the consumer that the standards and practices of SDC's teledentistry model are equal to in-person treatment." *Id.* The NAD instructed Defendants to stop making this statement because SmileDirect had never established the level of care provided through in-person orthodontic treatment, and thus, SmileDirect failed to establish that it provided the "same level" of care. *Id.* Despite the NAD's decision, SmileDirect continues to make a similar claim in its marketing emails. *See* **Ex. 22** (T. Felixbrod Dec.) ¶ 7 and Ex. C thereto ("Get the same standard of care as at any physical practice, all from the comfort of home.").

Defendants' "same level of care" claim is also false because SmileDirect's treatment is inferior to in-person orthodontic treatment in at least the following ways:

---

[9] This blog post is sourced from the exhibits to the ADA's citizen petition against SmileDirect because Defendants failed to preserve and produce a copy of the blog post containing the at-issue statement in this litigation. *See, e.g., Rogers v. T.J. Samson Cmty. Hosp.*, 276 F.3d 228, 232 (6th Cir. 2002) (rebuttable presumption in plaintiff's favor); *EPAC Techs., Inc. v. Thomas Nelson, Inc.*, No. 3:12-CV-00463, 2018 WL 3322305, at *3 (M.D. Tenn. May 14, 2018) (instructing jury on loss of data), *denying defendant's motion for new trial based on instruction*, *EPAC Techs., Inc. v. HarperCollins Christian Publ'g, Inc.*, 810 F. App'x 389, 402-03 (6th Cir. 2020).

[10] Similar to the prior footnote, the "How SmileDirectClub is Bringing Orthodontics to More Americans than Ever Before" blog post containing the "same level of care" statement (Ex. 20 at 2-6) is one Defendants failed to preserve and produce in this case, even though SmileDirect used this blog post offensively in its defamation suit against NBC. *See SmileDirectClub v. NBC Universal Media, LLC*, No. 20C1054 (Circ. Ct. for Davidson Cnty., Tenn. May 18, 2020) (complaint).

| Traditional In-person Orthodontics | SmileDirect |
|---|---|
| A dentist or orthodontist performs an in-person examination before beginning treatment, including probing the patient's gums to discover any evidence of periodontal disease. Periodontal disease is a strong contraindication for orthodontic treatment often discoverable only through an in-person evaluation.[11] | No one conducts an in-person examination or probes for periodontal disease because the treatment is remote. |
| Radiographs (x-rays) are taken in virtually every case because they are the only way to detect certain issues that can impact or contraindicate orthodontic treatment, such as weakened tooth roots or impacted teeth.[12] | Radiographs are not taken as a matter of regular practice. |
| Patients can speak directly to their treating dentist or orthodontist.[13] | SmileDirect tells patients that they cannot speak directly with their treating dentists.[14] |
| Where required, products have FDA clearance.[15] | SmileDirect marketed and sold its aligners without the required FDA clearance for over three years. |
| A dentist or orthodontist can perform inter-proximal reduction ("IPR"), which creates space for teeth to be moved during treatment, | No IPR or attachments or buttons can be used because the treatment is remote. |

[11] *See* **Ex. 23** (AAO Position Paper on Direct-to-Consumer Orthodontic Treatment) at 8-10 (noting periodontal probing has been called "mandatory" before orthodontic treatment); **Ex. 24** (Dr. Markarian Dec. from the ADA's Citizen Petition to the FDA) ¶ 10; **Ex. 25** (Dr. Ciccio Dep.) at 96:16-97:1; 136:19-137:1; **Ex. 26** (Dr. Kapit Dep.) at 81:1-6; 144:23-145:8; **Ex. 27** (Dr. Raj Dep.) at 175:22, 176:23-177:2; 179:1-4; 328:1-5. Defendants recognized that this was a problem. Correspondence from former CEO Doug Hudson discussed ███████████████████████████████████████████████████████████████████████████████ .

[12] *See* Ex. 23 (AAO Position Paper) at 10-15; Ex. 24 (Dr. Markarian Dec. from the ADA's Citizen Petition to the FDA) ¶¶ 11-15; Ex. 25 (Dr. Ciccio Dep.) at 96:16-97:1; 98:16-21; 99:7-15; Ex. 26 (Dr. Kapit Dep.) at 43:4-8; 65:16-24; 82:20-83:8; 129:7-130:1; 139:21-140:4; Ex. 27 (Dr. Raj Dep.) at 95:25-96:4; 140:13-19; 175:19-20; 196:15-17; 328:1-5. Again, Defendants knew that this was a problem because ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ .

[13] *See* Ex. 23 (AAO Position Paper) at 5-10, 18-20; Ex. 25 (Dr. Ciccio Dep.) at 204:7-205:10; Ex. 26 (Dr. Kapit Dep.) at 261:24-262:11; Ex. 27 (Dr. Raj Dep.) at 214:15-24.

[14] See **Ex. 29** (customer chat transcripts); *see also* **Ex. 30** (Depo of SmileDirect Dentist Dr. Tom Shannon) at 131:24-132:4 (stating ██████████████████████████████ ).

[15] *See, e.g.*, https://www.invisalign.com/frequently-asked-questions (noting that Invisalign received 510(k) clearance in 1998); Ex. 25 (Dr. Ciccio Dep.) at 292:16-23; Ex. 26 (Dr. Kapit Dep.) at 88:21-89:5; Ex. 27 (Dr. Raj Dep.) at 216:24-217:10.

10

| Traditional In-person Orthodontics | SmileDirect |
|---|---|
| and can use attachments and buttons, which allow for more control over tooth movement during treatment. Attachments are necessary in the majority of cases to achieve the desired results.[16] | |
| A dentist or orthodontist performs in-person monitoring on a regular basis, as frequently as every 4-10 weeks.[17] | Follow-ups are done remotely based on photographs every 90 days, and it appears the follow-ups are *not* done by the treating dentist or orthodontist but instead are done by SmileDirect employees.[18] |

Even the extremely limited care provided by SmileDirect's "dentists" is inferior to that provided by traditional in-office orthodontics. ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ *see also*

---

[16] *See* Ex. 25 (Dr. Ciccio Dep.) at 263:2-6 (testifying that 99% of cases have attachments because they are required for tooth control); Ex. 26 (Dr. Kapit Dep.) at 196:19-197:22.

[17] *See* Ex. 23 (AAO Position Paper) at 20-25; Ex. 24 (Dr. Markarian Dec.) ¶ 18; Ex. 25 (Dr. Ciccio Dep.) at 205:3-10; Ex. 26 (Dr. Kapit Dep.) at 261:24-262:11; Ex. 27 (Dr. Raj Dep.) at 214:15-24.

[18] *See* **Ex. 31** (SmileDirect treatment record) at 7. ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████. Additionally, papers filed in other litigation suggest that merits discovery would yield even more ways in which SmileDirect has misled the public about the level of care and follow-up. *See* **Ex. 60** (Align Opp. to SmileDirect MTD) at 13–14 (redacted facts supporting Align's assertion that SmileDirect hides the extent to which it sidelines its doctors).

11

Ex. 30 (Dr. Shannon transcript) at 132:9-16 (███████████████████████████ ███████████████████████████); Doc. 246-9 (Hindenburg Research Report) at 3 (SmileDirect store manager stating "the company was sending 75 to 100 cases to one orthodontist's phone, per day, to 'crank out' case decisions"). Further, Dr. Sulitzer recently accepted a four-year probation imposed by the Dental Board of California to settle accusations of gross negligence based on provision of aligner treatment without a proper health history, oral examination and radiographs, and lack of proper follow up and monitoring, among other issues. *See* **Ex. 56** (Sulitzer Accusation); **Ex. 57** (Sulitzer Probation Order). Two other SmileDirect dentists, Drs. Dowling and Moore, voluntarily surrendered their licenses in the face of similar charges. *See* **Ex. 58** (Dowling Surrender Order); **Ex. 59** (Moore Surrender Order).

Care provided by professionals who receive only $50 for a 15-minute case review, and some of whom now lack certain practicing credentials, is not the "same level" as that provided by traditional in-office dentists and orthodontists. But SmileDirect falsely represented a "same level" of care, despite SmileDirect's knowledge of the care provided in the dental field and despite its interactions with the NAD and FDA.

Plaintiffs have evidence that this false statement diverted customers from the class members. A test and control survey designed by Plaintiffs' expert, Dr. Hibbard, determined that "12.8% of respondents indicated they would buy metal or ceramic braces or clear aligners from an orthodontist or dentist involving in-office visits if they had known that SDC customers would <u>not</u> receive the 'same level of care' as with a traditional dentist or orthodontist." Ex. 16 (Report of Dr.

Jonathan D. Hibbard) ¶ 19(c).[19] And of course, the "same level of care" statements harm class members' reputations by equating SmileDirect's inferior products and services with their own.

### D. Defendants' knowingly false statements that SmileDirect's aligner treatment is "3x faster than braces" or is completed "3x sooner than braces."

Defendants have advertised nationwide through various channels that SmileDirect aligner treatment is "3x faster than braces" or that it is completed "3x sooner than braces." **Ex. 35** (Defs.' Supp'l Resp. to Interrog. 5) at 10; *see also* Ex. 7 (SmileDirect Spreadsheet re Certain Ads). SmileDirect knows that these claims are false and misleading for at least three reasons.

First, Defendants know that they do not keep the data necessary to make that claim—*i.e.*, whether patients finished treatment at all, and if they did finish treatment, whether they did so because they were satisfied with the results or prior to completion because they were dissatisfied. For example, the NAD determined that SmileDirect lacked reliable average treatment time data and did not track or confirm whether its customers completed treatment or achieved satisfactory results. Ex. 21 (NAD Case Report #6382) at 3.[20] The NAD thus found no "reasonable basis" for claiming that the results achieved at the end of SmileDirect treatment equaled those achieved through braces. *Id.* The NAD therefore recommended that SmileDirect discontinue the "3x faster"

---

[19] This false equivalence between traditional in-person orthodontics and SmileDirect's inferior products and services also harmed Plaintiffs and the class reputationally. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 138 (2014) ("Courts have therefore afforded relief under § 1125(a) not only where a defendant denigrates a plaintiff's product by name, . . . but also where the defendant damages the product's reputation by, for example, equating it with an inferior product . . . ."); *see also infra* n.22.

[20] Also, SmileDirect internally investigated a random sampling of 300 negative customer reviews. ███████████." *See* **Ex. 37** (SmileDirect email re data on customers with negative reviews); **Ex. 38** (SmileDirect data re customers with negative reviews). While this was a study of customers that left negative reviews, it reiterates the NAD's finding that SmileDirect does not track whether each customer completes treatment or achieves their SmilePlan.

13

claim, *id.*—a recommendation confirmed on appeal to the National Advertising Review Board ("NARB"), *see* **Ex. 36** (Report of NARB Panel # 272).

Second, Defendants know the misleading nature of the "3x faster" claim because they know that many SmileDirect customers have a much longer treatment time than initially promised or require treatment beyond that initially planned. For example, SmileDirect's customer tracker states that 10% of SmileDirect customers would not recommend SmileDirect because the length of treatment was much longer than promised, with quoted responses from customers stating that their treatment took ████████████████████████████████████████ ██████. *See* Ex. 2 (SmileDirect 2021 Customer Tracker) at 39. Additionally, of SmileDirect's internal investigation of 300 negative customer reviews, ████████████████████████ ████████████████████████████████████████████████████████ ████████████. *See* Ex. 37 (SmileDirect email re data on customers with negative reviews) at 2; Ex. 38 (SmileDirect data re customers with negative reviews).

And third, as discussed in the previous section, both the NAD and TPRG have recognized that SmileDirect aligners do not provide equivalent care to traditional orthodontics—meaning that SmileDirect cannot produce equivalent results "3x faster." **Ex. 39** (NAD Case # 6946RO) at 4 (finding that SmileDirect aligners "cannot and will not correct the same range of issues that might be addressed with braces"); *see also* Ex. 12 (████████████████████████████████ ████████████████████████████████████████████████ "").

SmileDirect thus knows that its "3x faster" claims are false and misleading, resulting in the diversion of customers from, and a false equivalence with, the proposed class. *See* Ex. 16 (Report of Dr. Jonathan D. Hibbard) ¶ 19(c). Moreover, SmileDirect falsely stated in a discovery response that it ceased making the "3x faster" claim sometime before July 2020, *see* Ex. 35 (Defs' Supp'l

14

Resp. to Interrog. 5) at 10. In fact, Plaintiffs independently discovered that Defendants made this claim in marketing emails as recently as August 16, 2022, *see* Ex. 22 (T. Felixbrod Dec.) ¶ 6 and Ex. B thereto. The wrongful conduct therefore appears to be ongoing.

**E.      Defendants' misrepresentations regarding the ability of SmileDirect's aligner treatment to address bite issues.**

Defendants have also knowingly made false and misleading statements about the ability of SmileDirect's aligner treatment to address bite issues. When potential customers take the "Smile Assessment" quiz on SmileDirect's website, they must select the biggest concern with their smile, including an option for "Fix a bite problem (overbite, underbite or crossbite)." **Ex. 40** (Smile Assessment). After choosing this option, the quiz directs some potential customers to a web page that states in large print, "Good news, we've helped thousands of people with bite issues." **Ex. 41** (SmileDirect bite landing page).[21] Later, some potential customers receive an email that calls them a "great candidate" and states, "We have helped thousands of people with **bite issues,** just like yours, get a smile they absolutely love." **Ex. 42** (SmileDirect customer bite issues email); *see also* Ex. 22 (same, dated August 16, 2022). SmileDirect has also made other marketing statements suggesting that its product can fix bite issues. *See, e.g.*, **Ex. 43** (other SmileDirect bite ads).

Unsurprisingly, many SmileDirect customers made their purchase believing that SmileDirect's aligner system would fix their bite issues—as traditional orthodontic care can. *See* **Ex. 44** (customer reviews and transcripts of communications related to bite). When these customers discovered that their aligners had not fixed their bite or had made it worse, however, SmileDirect employees responded ████████████████████████████████████████ ████████████████████████████████████████████████████

---

[21]  Again, Defendants failed to preserve and produce this document, and Plaintiffs discovered it independently.

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉ *See id*. These samples of customer complaints and communications with SmileDirect demonstrate both SmileDirect's knowing falsity and deception about correcting bite issues as well as the diversion of customers from the proposed class, who, unlike Defendants, *can* treat bite issues.

\* \* \*

The limited class discovery permitted in this case demonstrates that Defendants have made multiple intentionally false and misleading statements and omissions that have deceived customers, in turn causing financial harm to the class members by diverting customers from them as demonstrated in part by the surveys performed by Dr. Hibbard.[22] Defendants' intentional falsehoods have also injured the reputations of class members by drawing a false equivalence between SmileDirect's inferior products and services and traditional orthodontics administered through in-office doctor visits.[23] Defendants' conduct also remains ongoing, including in cases

---

[22] As noted above, Dr. Hibbard explained that the survey methodology he used could be used to show harm for each of the marketing statements at issue. *See supra* n.8.

[23] *See, e.g.* Ex. 25 (Ciccio Dep.) at 208:9-13; 339:12-343:19 (stating that SmileDirect is "saying that what they do . . . is exactly the same as what we do, which is bringing all of our reputations back down" and noting that patients have expressed concern about whether the clear aligner treatment provided by his office is safe and ultimately decided not to go through treatment due to confusion between SmileDirect and traditional orthodontics such as Invisalign); **Ex. 45** (customer email to Dr. Ciccio confusing SmileDirect and Invisalign); Ex. 26 (Kapit Dep.) at 210:21-211:7, 292:16-293:3 ("there was other information that was disseminated that said that basically you could get the same treatment with SmileDirect at a much cheaper cost than going to private practice or group practice that would provide orthodontic care. . . . [I]t basically hurt my reputation, I felt, because the services that I truly believe I provide is significantly different than can be gotten under the scope of what SmileDirect does."); Ex. 27 (Raj Dep.) at 319:13-18; 320:23-24 ("Reputationally, professionally, financially on several different bas[e]s, their misrepresentation of facts, their deceptive practices, their duplicitous advertising and their

16

where the NAD has recommended that marketing statements be discontinued. Given Defendants'

willful, ongoing misconduct and aggressive litigation tactics, Defendants' behavior is likely to

continue and go unreviewed absent certification of a class.

## III.    THE PROPOSED CLASSES

Plaintiffs have sued Defendants for false advertising and deceptive and unfair practices

under the Lanham Act, the Tennessee Consumer Protection Act of 1977 ("TCPA"), the Florida

Unfair and Deceptive Trade Practices Act ("FUDTPA"), and New York General Business Law §§

349 & 350-a ("NYGBL"). *See* Doc. 246 at 49-51, 56-58, 63-65, & 68-70. Plaintiffs seek

certification of the following class and subclasses:

> Nationwide Provider Class: All dental or orthodontic providers who provided
> traditional orthodontic services or goods similar to those that SmileDirect
> purportedly offers, and/or the practice entities through which they provided such
> services, other than any who are affiliated with Defendants, from the start of the
> applicable statute of limitations through the final disposition of this action.
> (Lanham Act, TCPA)

> Florida Provider Subclass: All dental or orthodontic providers who provided
> traditional orthodontic services or goods similar to those that SmileDirect
> purportedly offers in the state of Florida, and/or the practice entities through which
> they provided such services, other than any who are affiliated with Defendants,
> from the start of the applicable statute of limitations through the final disposition
> of this action. (FUDTPA)

> New York Provider Subclass: All dental or orthodontic providers who provided
> traditional orthodontic services or goods similar to those that SmileDirect
> purportedly offers in the state of New York, and/or the practice entities through
> which they provided such services, other than any who are affiliated with
> Defendants, from the start of the applicable statute of limitations through the final
> disposition of this action. (NYGBL)

## IV.    LEGAL STANDARDS FOR CLASS CERTIFICATION

---

diversion, unfair diversion, of patients away from typical orthodontic practices has harmed the
profession and me as a class representative."). *See also Lexmark*, 572 U.S. at 138 ("Courts have
therefore afforded relief under § 1125(a) . . . where the defendant damages the product's reputation
by, for example, equating it with an inferior product. . . .").

17

A party seeking class certification must satisfy the numerosity, commonality, typicality, and adequacy prerequisites of Rule 23(a). Fed. R. Civ. P. 23(a)(1)-(4). If those requirements are satisfied, then the additional requirements must be met under Rule 23(b)(2) for an injunctive relief class and Rule 23(b)(3) for a damages class.[24] In considering these requirements, "When there is a question as to whether certification is appropriate, the Court should give the benefit of the doubt to approving the class." *In re Workers' Comp.,* 130 F.R.D. 99, 103 (D. Minn. 1990). Consumer protection claims are ideal for class certification. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *System Fed'n No. 91, Ry. Emp. Dept. v. Reed*, 180 F.2d 991, 995 (6th Cir. 1950); *Delahunt v. Cytodyne Techs.*, 241 F. Supp. 2d 827 (S.D. Ohio 2003).

For damages classes, ascertainability must also be met: "[T]he class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537–38 (6th Cir. 2012) (quotation omitted); *but see Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016) ("[A]scertainability is not an additional requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief.").

While the class certification analysis must be rigorous, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). That is especially true here, where class and merits discovery were bifurcated and class discovery was limited after bifurcation. *See* Doc. 265 (Am. Sched. Order

---

[24] As discussed below, Plaintiffs alternatively request that the Court certify a class under Rule 23(c)(4) "with respect to particular issues."

18

Bifurcating Discovery) and Doc. 302 (Order on the Scope of Class Cert. Discovery). Evidentiary proof provided at class certification "need not amount to admissible evidence, at least with respect to nonexpert evidence." *Lyngaas v. Ag*, 992 F.3d 412, 428–29 (6th Cir. 2021).

## V.   ARGUMENT

### A.   The Proposed Classes Are Ascertainable Because They Are Objectively Defined.

"For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." *Young*, 693 F.3d at 538 (quotation omitted); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 524-26 (6th Cir. 2015). Classes need only be discerned with reasonable accuracy, and are ascertainable even if determination of the class would require substantial review of data. *Rikos*, 799 F.3d at 526. "[T]he fact that membership of the class may change over time in no way qualifies or undermines the identity of the class for purposes of Rule 23." *Kensu v. Mich. Dep't of Corr.*, No. 18-CV-10175, 2020 WL 1698662, at *7 (E.D. Mich. Apr. 8, 2020) (quotation omitted).

Here, the classes are defined to include all dental or orthodontic providers who provided traditional orthodontic services or goods similar to those that SmileDirect purportedly offers, other than any who are affiliated with Defendants, either nationwide or in a particular state during the applicable period. As SmileDirect admits in its Prospectus, the "traditional orthodontic model" against which SmileDirect competes "includes both metal braces and clear aligner treatment administered through in-office doctor visits." *See* Doc. 36-6 at 21-22. Plaintiffs therefore define class membership based on the same, objective terms that Defendants define their competitive market: whether the class member provided braces or clear aligner treatment during a particular time period and, for the subclasses, in a particular geographic location.

19

Potential class members in this case can be identified at the appropriate juncture through a two-step process. First, dentists and orthodontists practicing during the relevant period can be identified through data sources such as the National Provider Identifier (NPI) Registry, which is a free directory of National Provider Identifier records, *see* https://www.cms.gov/Regulations-and-Guidance/Administrative-Simplification/NationalProvIdentStand/DataDissemination (last visited June 19, 2023), as well as provider data maintained by state dental boards or clear aligner companies such as Invisalign and 3M. Second, at the claims-administration stage, potential class members can be asked to certify that they provided braces or clear aligners during the relevant period, and can also be asked to certify on a commonplace claims form other relevant information such as the location from which they provided these services. *See Rikos*, 799 F.3d at 526 (review of class membership data "could be supplemented through the use of receipts, affidavits, and a special master to review individual claims"); *see also W. Loop Chiropractic & Sports Inj. Ctr., Ltd. v. N. Am. Bancard, LLC*, No. 16 C 5856, 2018 WL 4762333, at *9 (N.D. Ill. May 16, 2018), *report and recommendation adopted,* No. 16 C 5856, 2018 WL 3738281 (N.D. Ill. Aug. 7, 2018) ("It is enough that the class be ascertainable with class members to be identified during a claims administration process if the class prevails." (internal quotations and marks omitted)).

**B.      Plaintiffs Satisfy Rule 23(a).**

**1.      The Proposed Classes are Sufficiently Numerous.**

Plaintiffs satisfy the numerosity requirement because the class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy [numerosity]." *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004); *Snead v. CoreCivic of Tenn., LLC*, No. 3:17-CV-0949, 2018 WL 3157283, at *11 (M.D. Tenn. June 27,

2018) (Trauger, J.) ("[A]s few as forty class members may satisfy the numerosity requirement.").

Here, the proposed nationwide class consists of tens of thousands of individuals and practices. According to a Fortune Business Insights industry report on the U.S. orthodontics market, there were more than 8,000 orthodontists practicing during the class period. *See* **Ex. 46** (Fortune Business Insights ("FBI") Industry Report) at 27; *see also* AAO 2017 workforce report, https://www.aaoinfo.org/sites/default/files/Orthodontic%20Workforce%20Report_April%202018.pdf at 5 (estimating more than 10,000 orthodontists practicing during the class period). Defendants' expert, Dr. Hitt, also notes that ███████████████████████████ ████████████████████████████████████████████████. *See* **Ex. 47** (Expert Report of Dr. Lorin M. Hitt) at 28 n.109. The state subclasses likewise consist of at least several hundred individuals each. The FBI report states that in 2021 there were 430 orthodontists practicing in Florida and 562 practicing in New York. *See* Ex. 46 at 29. And again, there are also many general dentists in these states providing braces and aligners.

### 2. There are Common Questions of Law and Fact.

Rule 23(a)(2) is satisfied because there are "questions of law or fact common to the class." Plaintiffs must show "only a single issue" that is common to all members of the class. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1080 (6th Cir. 1996); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). "Many courts have held that when the legality of the defendant's standardized conduct toward all members of the proposed class is at issue, the commonality factor is ordinarily met." *Modern Holdings LLC v. Corning, Inc.*, No. 5:13–cv–00405–GFVT, 2018 WL 1546355, at *6 n.5 (E.D. Ky. Mar. 29, 2018).

Commonality is satisfied in false-advertising cases such as this where the Plaintiffs' claims and those of the class they would represent all derive from a single course of conduct by

Defendants. *See Rikos*, 799 F.3d at 507 ("P & G has failed to identify a single false-advertising case where a federal court has denied class certification because of a lack of commonality.") (citing cases finding commonality). Plaintiffs assert that Defendants engaged in a uniform, nationwide advertising campaign in which Defendants made false and misleading statements and omissions about SmileDirect's products and services, resulting in diversion of customers from, and a reputationally harmful false equivalence with, class members. The question of whether Defendants' advertising practices violate the Lanham Act and state consumer-protection statutes is therefore common to all class members.

Insofar as Defendants contend they have made minor variations in their falsehoods during the class period, such contentions do not undermine commonality. Instead, courts properly focus on whether defendants "have engaged in a standardized course of conduct that affects all class members." *In re Checking Acc't Overdraft Litig.*, 307 F.R.D. 630, 640 (S.D. Fla. 2015) (collecting cases). Defendants' statements under the categories identified above, *supra* Section II., form a standardized course of conduct affecting class members uniformly. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (finding that commonality requires only a "common contention . . . that is capable of classwide resolution").

Moreover, as Defendants have conceded, other common questions will include the truth or falsity of the marketing statements and whether false statements were made willfully. *See* Doc. 290 (Defs' Br. re Scope of Class Discovery) at 7 ("[F]or the most part, both proposed inquiries— truth and good faith—naturally lend themselves to proof through common evidence. It is difficult to think of a circumstance in which SmileDirect offered a Statement in good faith for one member of the putative class, but in bad faith for another. . . . Similarly, whether a given Statement is true will generally not vary from one member of the putative class to the next.").

22

### 3. The Class Representatives' Claims are Typical of the Class Claims.

Rule 23(a)(3) is satisfied because "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "[T]he commonality and typicality requirements of Rule 23(a) tend to merge." *Dukes*, 564 U.S. 338 at 349 n.5 (quotation omitted). "Like the test for commonality, the test for typicality is not demanding and the interests and claims of the various plaintiffs need not be identical." *Snead*, 2018 WL 3157283, at *13 (citation omitted). Typicality exists if the claims "stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." *Rikos*, 799 F.3d at 509 (quoting Wright & Miller, 7A Federal Practice and Procedure § 1764 (3d ed. 2005)). Named plaintiffs' "claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

Here, Plaintiffs assert the same claims arising from the same course of unlawful conduct by Defendants—the deceptive marketing of SmileDirect's products and services. They also assert the same injury—that patients were diverted from their practices and their reputations were harmed. The remedy they seek is also the same: a declaration and injunction reforming SmileDirect's advertising, and damages, including disgorgement.

### 4. The Named Plaintiffs Will Adequately Represent the Class.

Rule 23(a)(4) is satisfied because the class representatives will "fairly and adequately protect the interests of the class." This turns on whether the representatives have common interests with the members of the class—a requirement that overlaps with the typicality requirement—and whether the named representatives "will vigorously prosecute the interests of the class through qualified counsel." *Snead*, 2018 WL 3157283, at *10 (quoting *Senter v. Gen. Motors Corp.,* 532

F.2d 511, 525 (6th Cir. 1976)); *Advanced Dermatology v. Plaza Rsch. Corp.*, No. 5:20-CV-2826, 2021 WL 5589281, at *5 (N.D. Ohio Nov. 30, 2021).

Plaintiffs' interests are aligned with those of the class and subclasses, which share a commonality of predicate facts, claims, and damages and are motivated by the same goal of proving Defendants' liability for false and misleading advertising and unfair competition.[25]

Plaintiffs also have demonstrated that they will vigorously prosecute the claims on behalf of the class. Although named plaintiffs must play "more than a nominal role in the lawsuit . . . the burden of showing adequacy on this point is not high." *Stanich v. Travelers Indem. Co.*, 259 F.R.D. 294, 316 (N.D. Ohio 2009) (finding named plaintiff to be adequate based on plaintiff's "answering discovery, submitting to a deposition, and reviewing the complaint," as well as "provid[ing] sensible testimony describing the nature of the [class's] claims"); *Cassell v. Vanderbilt Univ.*, No. 3:16-cv-2086, 2018 WL 5264640, at *5 (M.D. Tenn. Oct. 23, 2018) (same).[26] Each plaintiff has been actively engaged in the litigation, including spending significant time communicating with

---

[25] Defendants recently obtained discovery as to class adequacy based in part on the far-fetched theory that a conflict of interests existed because "an investment organization [i.e., PBIRG], rather than a law firm, sought to recruit plaintiffs for a potential lawsuit." (Doc. 367 at 7). But that discovery—including over 300 pages of documents and a deposition of non-party Selwyn Singer—proved that (1) no one "recruited" plaintiffs for this case, (2) PBIRG was in no way involved in obtaining plaintiffs in this case, (3) Singer's limited email communication with Plaintiff Dr. Arthur Kapit was not undertaken in his capacity with PBIRG, and (4) neither PBIRG nor Singer have any interest in the outcome of this case or the parties thereto. Thus, no such conflict exists.

[26] Insofar as Defendants insist that the named plaintiffs "must satisfy the court that they, and not counsel, are directing the litigation," *see* (Doc. 367 at 5, quoting *Unger v. Amedisys, Inc.*, 401 F.3d 316, 321 (5th Cir. 2005)), no such requirement applies outside the securities class action context. *See In re Heartland Pymt. Sys., Inc. Customer Datta Breach Lit.*, 851 F. Supp. 2d 1040, 1057 (S.D. Tex. 2012) ("Courts outside this circuit do not demand [*Unger*]'s knowledge-and-direction requirement for consumer class actions such as this suit. . . .") (collecting cases); *see also In re Suboxone Antitrust Litigation*, 967 F.3d 264, 273 (3d Cir. 2020) ("[I]t is counsel for the class representative and not the named parties who direct and manage class actions. Every experienced federal judge knows that any statements to the contrary are sheer sophistry.") (quotation and alterations omitted).

24

their attorneys, searching for documents, imaging and producing documents from their email accounts, dedicating their own time and the time of their staff to extensive searches of their practice software, responding to voluminous written discovery,[27] and preparing and appearing for extensive depositions, which lasted the full seven hours under Rule 30(d)(1). *See* **Exs. 48** (Dr. Ciccio Dec.); **49** (Dr. Kapit Dec.); **50** (Dr. Raj Dec.). In other words, the named plaintiffs have done far more than simply "lend their names" to the complaint, as Defendants have argued. (Doc. 372 at 5); *cf. Cassell*, 2018 WL 5264640, at *5 (finding adequacy based on named plaintiffs filing suit, responding to a motion to dismiss, participating in discovery and case management, sitting for depositions, and filing declarations in support of class certification).

Defendants' claim that adequacy does not exist because Plaintiffs' counsel allegedly solicited Plaintiff Dr. Arthur Kapit is baseless. Nine months of motions practice, a third-party subpoena, and a deposition showed only that non-party Selwyn Singer assisted Mr. Richard Stone (Provider Plaintiffs' counsel) in identifying possible expert advisors that could offer opinions about SmileDirect's products and services. **Ex. 61** (Singer Dep. at 147:7–14, explaining Singer's research into SmileDirect's "new model of selling aligners through the mail" by keeping "my eyes and ears open for perhaps an expert that we could find to answer [Stone's questions] and also to provide [Stone] with information that could be useful to him in the case"). As part of that pre-litigation investigation, Dr. Kapit contacted Singer on September 4, 2019, to "find out more," to offer his curriculum vitae, and to discuss his experience as an orthodontist. **Ex. 62** (Kapit email to Singer). Singer repeatedly testified that this limited correspondence concerned only whether Dr. Kapit could assist Singer's pre-litigation research for Stone by seeking to identify an expert advisor

---

[27] Plaintiffs have each responded to 86 requests for production, 40 interrogatories, and 172 requests for admission, as well as an additional 69 requests for production and 5 interrogatories directed to the entities through which they practice. And they have sat for seven-hour depositions.

concerning aligners—not a plaintiff. **Ex. 61** (Singer Dep. at 169:18–24; *id.* at 184:3–8; *id.* at 189:8–190:23; *id.* at 192:4–17).[28] Singer then put Dr. Kapit in touch with Stone around September 5, 2019—nearly three weeks before the complaint was filed. Thus, Singer only connected Dr. Kapit to Plaintiffs' counsel as a potential expert, before the complaint was drafted or filed.

Even if solicitation had occurred (no evidence shows that it did), "there is nothing *per se* improper about counsel soliciting participation of potential class members." *Kennedy v. United Healthcare of Ohio, Inc.*, 206 F.R.D. 191, 197 (S.D. Ohio 2002); *see also Stanich v. Travelers Indem. Co.*, 259 F.R.D. 294, 316, n.18 (N.D. Ohio 2009) (distinguishing authority providing that mere solicitation of plaintiffs undermines adequacy because such authority "represents the minority view on this issue"). In this circuit, the "linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013) (citation omitted). The way Dr. Kapit became a plaintiff (by reaching out to class counsel) creates no concerns as to those issues.

Plaintiffs have also retained counsel experienced in litigating class actions and complex litigation who have already committed significant resources to representing the class. *See* Fed. R. Civ. P. 23(g)(1)(A) (factors for appointing class counsel include work performed; experience handling class actions, complex litigation, and types of claims asserted; knowledge of applicable law; and resources that counsel will commit to representing the class).

---

[28] For example, regarding his email with Kapit, Singer testified: "Q: . . . Dr. Kapit's first email correspondence with you, is there any reference in that email to serving as an advisor? [Counsel objection.] A: I think everything in that email refers to serving as an advisor. He's listing his credentials as an advisor. He's saying, I'm an orthodontist of 40 years. That is somebody that can be a good advisor. He says he's been an adjunct professor at Nova Southeastern Dental School. That is a credential as an advisor. He said he's the advocate for the American Board of Orthdontics. That is a credential as an advisor. And then he wants to send his C.V. That is also a credential as an advisor." (Singer Dep. at 192:4–17).

Plaintiffs' counsel has extensive experience litigating class actions and complex litigation. *See* **Exs. 51**, **52**, and **53** (Declarations of Counsel). Counsel has investigated and fought to obtain key evidence reflected in the attached exhibits—some of which were obtained despite Defendants' failure to preserve or produce such documents. Counsel also have demonstrated knowledge of the applicable law, and commitment to vigorously prosecute this case, as evidenced by the Court's rulings in Plaintiffs' favor. *See, e.g.,* Doc. 95 (denying motion to dismiss) and Doc. 323 (denying motion for judgment on the pleadings). Defendants' recent discovery escapade concerning non-party Singer reaffirmed counsel's commitment to thoroughly investigate and litigate the claims from the case's outset. Plaintiffs have also retained respected and experienced experts to provide market survey results demonstrating injury to the class and computation of classwide harm.

### C. Class Certification is Appropriate Under Rule 23(b)(2).[29]

Rule 23(b)(2) "permits certification when the defendant 'has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 427 (6th Cir. 2012) (quoting the rule). "'All of the class members need not be aggrieved by the defendant's conduct in order for some of them to seek relief under Rule 23(b)(2). What is necessary is that the challenged conduct or lack of conduct be premised on a ground that is applicable to the entire class.'" *Id.* at 428 (quotation omitted). "'It is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole. Even if some

---

[29] Plaintiffs seek certification of a nationwide Rule 23(b)(2) class under the Lanham Act and the Tennessee Consumer Protection Act, and state-specific classes under the Florida and New York consumer protection laws. *See* 15 U.S.C. § 1116(a); Tenn. Code § 47-18-109; Fla. Stat. § 501.211(1); N.Y. Gen. Bus. Law § 350-e. Plaintiffs note that they sought leave to add a claim for class damages under the Tennessee Consumer Protection Act, but that request was denied, *see* Doc. 323 at 18-22, so the issue has been preserved.

27

class members have not been injured by the challenged practice, a class may nevertheless be appropriate.'" *Id.* (quotation omitted).[30] "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or to none of them." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011)) (internal cite omitted).

That is the case here. Should Plaintiffs prove the advertising was false or misleading, injunctive and declaratory relief requiring SmileDirect to reform its advertising will apply equally to all class members. Defendants' "actions generally apply to the class. For that reason, declaratory and injunctive relief—if it is warranted—would uniformly benefit the class. Thus, Plaintiff[s are] entitled to class certification for declaratory and injunctive relief under Rule 23(b)(2)." *Pansiera v. Home City Ice Co.*, 341 F.R.D. 223, 235 (S.D. Ohio 2022).

### D. Class Certification is Also Appropriate Under Rule 23(b)(3).

Certification also is appropriate under Rule 23(b)(3) because "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

#### 1. Questions of Law and Fact Predominate.

Plaintiffs have shown above that there are "common questions that can be proved through evidence common to the class." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 858 (6th Cir. 2013) (citing *Amgen Inc.*, 568 U.S. at 466–467). Plaintiffs have also

---

[30] "Courts in the Sixth Circuit and elsewhere also have noted that plaintiffs seeking class certification under Rule 23(b)(2) are not required to make out the predominance of common issues or the superiority of the class action to other forms of adjudication, as they would be if they sought certification under Rule 23(b)(3)." *Coleman v. Gen. Motors Acceptance Corp.*, 220 F.R.D. 64, 86 (M.D. Tenn. 2004) (Trauger, J.) (collecting authority).

28

shown above that those common questions "predominate" because class members' claims "will prevail or fail in unison" on a common question of law or fact on which "the individual circumstances of particular class members" have no bearing. *Amgen Inc.*, 568 U.S. at 460. "In evaluating predominance, courts look to whether the focus of the proposed class action will be on the words and conduct of the defendants rather than on the behavior of the individual class members." *Kutzman v. Derrel's Mini Storage, Inc.*, No. 1:18-cv-00755-AWI-JLT, 2020 WL 406768, at *7 (E.D. Cal. Jan. 24, 2020).

Predominance does not require "that each element of a claim can be established by classwide proof," but only that "common questions *predominate* over any questions affecting only individual class members." *In re Whirlpool Corp.*, 722 F.3d at 858 (internal quotations omitted). A common issue may predominate even if "other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Hicks v. State Farm Fire & Cas. Co.,* 965 F.3d 452, 460 (6th Cir. 2020) (quoting Wright & Miller, 7AA *Federal Practice and Procedure* § 1778, at 123–24 (3d ed. 2005)).

Although not required, Plaintiffs can prove each element of their claims using common proof.

### a) *Lanham Act Claim*

The elements of a Lanham Act false advertising claim are:

(1) the defendant has made false or misleading statements of fact concerning his own product [or services] or another's;
(2) the statement actually deceives or tends to deceive a substantial portion of the intended audience;
(3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions;
(4) the advertisements were introduced into interstate commerce; [and]
(5) there is some causal link between the challenged statements and harm to the plaintiff.

29

*Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 798 (6th Cir. 2015) (citation omitted).

> **(1)     Plaintiffs will prove false or misleading advertising statements**

Plaintiffs must prove that Defendants made false or misleading statements "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B); *Grubbs*, 807 F.3d at 798. Plaintiffs may prevail by proving that Defendants made false advertising statements or misleading advertising statements. *Id.* at 798. An advertising statement is false if it is "literally false," which means it is "unambiguously deceptive." *Wysong Corp. v. APN, Inc. (17-1975)*, 889 F.3d 267, 271 (6th Cir. 2018) (quoting *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 737 (6th Cir. 2012)). A literally-false advertising statement "may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Innovation Ventures, LLC*, 694 F.3d at 735–736 (quotation omitted). A plaintiff "can establish literal falsity under the Lanham Act by alleging that two products portrayed as comparable in an advertisement are not actually comparable – that the advertisement omits differences which would have been material to recipients." *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 638 (N.D. Cal. 2019).

An advertising statement is also misleading if it is "literally true, yet deceptive, or too ambiguous to support a finding of literal falsity" but deceived "a significant portion of the consumer population" *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614, 616 (6th Cir. 1999) (quotations omitted). Plaintiffs may prove consumer deception by evidence of consumers' actual reaction, including "consumer survey or other market research demonstrating that consumers were deceived." *Id.* at 617; *Serv. Jewelry Repair, Inc. v. Cumulus Broad., LLC*, 145 F. Supp. 3d 737, 748 (M.D. Tenn. 2015).

Plaintiffs will prove that Defendants made the false advertising statements described in Section I and that such statements constituted commercial advertising or promotion. As common proof, Plaintiffs will rely on Defendants' own marketing materials described in Section II above. Plaintiffs will also prove some of these statements and omissions are misleading using the common proof of consumer surveys and evidence of consumers' actual reactions. For example, Plaintiffs will prove that Defendants deceived consumers by failing to disclose that SmileDirect's sale of self-manufactured aligners violates the FD&C Act using consumer survey evidence demonstrating that a "significant portion of the consumer population" would have taken that fact into account in deciding whether to purchase SmileDirect aligners. *Am. Council*, 185 F.3d at 614, 616-17 (internal quotation omitted). *See, e.g.*, Ex. 16 (Expert Report of Dr. Jonathan D. Hibbard) at 6 ¶ 20(c).[31] Plaintiffs will prove both the literal falsity and Defendants' deception about ability to treat bite issues through evidence of consumer's actual reactions, customer complaints, and transcripts of communications between customers and SmileDirect customer service showing that customers were deceived about the ability of the SmileDirect aligner system to correct bite issues.[32]

### (2) Plaintiffs will prove deception or tendency to deceive consumers.

---

[31] An omission is actionable under the Lanham Act when it "renders an affirmative statement false or misleading." *See, e.g.*, *Pegasystems, Inc. v. Appian Corp.*, 424 F. Supp. 3d 214, 223 (D. Mass. 2019) (quotation omitted). Defendants' omission regarding their lack of 510(k) clearance made their "same level of care" statement false because traditional orthodontics uses aligners that have FDA clearance. *See supra* Section II.3. Dr. Hibbard's survey further supports the conclusion that this omission rendered the "same level of care" claim false and misleading, as 15.1% of respondents who viewed the "same level of care" statement with a disclosure about the lack of required FDA clearance would have purchased metal or ceramic braces or clear aligners from an orthodontist or dentist involving in-office visits rather than purchasing SmileDirect. *See* Ex. 16 ¶¶ 20, 63. Moreover, as discussed in Section II.2, Defendants took affirmative steps, including making statements about FDA approval and "registration," to conceal their lack of 510(k) approval from the public.

[32] Alternatively, Plaintiffs could present survey data for this and any other claim in the event it is determined to be misleading rather than literally false. *See supra* n.8 (Dr. Hibbard explained that his survey method could be used for any of the at-issue statements).

31

Plaintiffs will establish deception using common proof in three ways. First, for each advertising statement Plaintiffs prove is literally false, "[a]ctual deception is presumed." *Am. Council*, 185 F.3d at 614.[33] Thus, the common proof that establishes literal falsity also establishes the elements of deception and materiality. *Haas Door Co. v. Haas Garage Door Co.*, No. 3:13 CV 2507, 2016 WL 1047242, at *16 (N.D. Ohio Mar. 16, 2016) ("Because the advertisement is literally false, there is no need for evidence on the issue of the impact of the statement on consumers. The Court will presume the statement actually deceived the consumers."). As discussed in Sections I and II above, Plaintiffs assert that most if not all of the claims at issue were literally false, and that the omission regarding SmileDirect's 510(k) status also made the "same level of care" claim literally false.

Second, a presumption of deception and money damages is available where the defendant engaged in "comparative advertising" that targeted the plaintiff's product and the plaintiff proves the defendant engaged in willful deception. *See Balance Dynamics Corp. v. Schmitt Indus., Inc.,* 204 F.3d 683, 694 (6th Cir. 2000); *Innovation Ventures, LLC v. Bhelliom Enterprises Corp.,* 529 F. App'x 560, 566 (6th Cir. 2013). Plaintiffs will establish the applicability of this presumption with common proof, such as Defendants' advertising materials claiming that SmileDirect's aligner treatment provided the same level of care as traditional orthodontics and is three times faster than braces and common evidence showing that Defendants knew these claims were false.[34]

---

[33] In addition to Defendants' concession that common proof can be used to show falsity and willfulness, *see* Doc. 290 at 7, with respect to the presumptions of injury and damages, Defendants have conceded that, at the class certification stage, "each individual element of the claim or the presumption does not need to be proved, it just needs to be shown that there is common proof that can trigger the presumptions." *See* **Ex. 54** (Dec. 8, 2021 Hearing with Special Master) at 79:13-20.

[34] Plaintiffs do not have to show that Defendants targeted them or their products by name because the proof will show that (1) Defendants targeted **all** class members, (2) Defendants consider these providers to be SmileDirect's competitors, (3) Defendants represent 95% of the at-

32

SmileDirect's own litigation also shows "comparative advertising" by alleging that it competes directly with providers offering traditional orthodontics. *See* Doc. 174-8 (SmileDirect v. Jacqueline I. Fulop, D.M.D., P.C., et al.); Doc. 174-9 (SmileDirect v. Diamond Braces, et al.).

"Willfulness includes both knowing and reckless behavior and requires at least that the party accused of false advertising acted despite an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Act, Inc. v. Worldwide Interactive Network*, No. 3:18-CV-186, 2020 WL 4195269, at *7 (E.D. Tenn. July 21, 2020) (quotation omitted). The presumption satisfies the elements of "influence on consumer purchasing decisions and harm to the plaintiff." *Louisiana-Pac. Corp. v. James Hardie Bldg. Prod., Inc.,* 335 F. Supp. 3d 1002, 1016 (M.D. Tenn. 2018), *aff'd*, 928 F.3d 514 (6th Cir. 2019). Plaintiffs will also prove that Defendants intentionally deceived consumers using common proof that Defendants knew (1) SmileDirect's level of care was inferior to that of traditional dentists and orthodontists, (2) SmileDirect's sale of its self-manufactured aligners violates the FD&C Act, unlike the FDA clearance held by traditional dentists and orthodontists, and (3) Defendants' claim that SmileDirect's treatment was "three times faster than braces" was unsubstantiated, as determined by the NAD and confirmed on appeal to the NARB.

Third, for each advertising statement Plaintiffs prove is misleading using the common proof of consumer surveys or other evidence of actual consumer reaction, they will necessarily establish deception and materiality as well. *See Wysong Corp.*, 889 F.3d at 271; *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012).

---

home aligner market, and (4) SmileDirect and the class members are "obviously in direct competition." *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 260 (2d Cir. 2014); *see also* Doc. 95 at 24 ("SmileDirect cannot reasonably dispute that it was placing its services in competition with orthodontists like the orthodontist plaintiffs and that such an orthodontist's loss of business could constitute an economic harm.").

**(3)** ***Plaintiffs will prove that Defendants' statements were material.***

Plaintiffs must prove Defendants' advertising statements had a "propensity to have some effect on consumers' purchasing decisions." *Fed. Exp. Corp. v. U.S. Postal Serv.*, 40 F. Supp. 2d 943, 953 (W.D. Tenn. 1999) (citation omitted); *Medison Am., Inc. v. Preferred Med. Sys., LLC*, 548 F. Supp. 2d 567, 582 (W.D. Tenn. 2007), *aff'd*, 357 F. App'x 656 (6th Cir. 2009).

Plaintiffs will establish materiality using common proof in four ways. First, for each advertising statement Plaintiffs prove is literally false, materiality is presumed. *See Ashley Furniture Indus., Inc. v. Am. Signature, Inc.*, No. 2:11-CV-427, 2015 WL 12999664, at *7 (S.D. Ohio Mar. 12, 2015); *Haas Door Co.*, 2016 WL 1047242, at *16. Second, if Plaintiffs establish Defendants' "intentional deception" in comparative advertising, the presumption of money damages for intentional deception will necessarily establish the materiality of Defendants' intentionally deceptive statements. *See Louisiana-Pac. Corp.*, 335 F. Supp. 3d at 1016. Third, for each statement Plaintiffs prove is misleading using the common proof of consumer surveys or evidence of actual consumer reaction, they will necessarily establish materiality as well. *Wysong Corp.*, 889 F.3d at 271.

Fourth, Plaintiffs can establish that Defendants' statements were material because they "concerned an inherent quality or characteristic of a product," which "is evidence of a likely influence on purchasing decisions." *Mahindra & Mahindra Ltd. v. FCA US LLC*, No. 18-CV-12645, 2021 WL 323253, at *8 (E.D. Mich. Feb. 1, 2021) (quotation omitted); *see also Midlothian Lab'ys, L.L.C. v. Pamlab, L.L.C.*, 509 F. Supp. 2d 1065, 1082 (M.D. Ala.), *order vacated in part on reconsideration on other grounds,* 509 F. Supp. 2d 1095 (M.D. Ala. 2007) ("questions of safety and efficacy are likely to satisfy automatically the materiality prong" including "in the context of drugs and medical foods, where safety and efficacy are perhaps the primary concerns of

34

consumers"). Plaintiffs' common proof of the at-issue statements (as to "same level of care," FDA approval, customer satisfaction, bite issues, and "three times faster") also proves misrepresentation as to the "quality or characteristics" of the SmileDirect aligner system product, and thus, materiality.

### (4)    Plaintiffs will prove introduction in interstate commerce.

Plaintiffs will prove this element using the common proof of SmileDirect's nationwide, pervasive, omnichannel advertising campaign via print, television, and social media.

### (5)    Plaintiffs will prove causation and damages.

Class certification does not require identical economic injury when a common policy causes the claimed injury. *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 943 (C.D. Cal. 2015), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), *and aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 674 F. App'x 654 (9th Cir. 2017); *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010); *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405, 409 (2d Cir. 2015). Instead, all that is required is that Plaintiffs show, after discovery, that a classwide measure of damages resulting from Defendants' advertising statements is calculable. *See Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cnty., Tennese v. Momenta Pharm., Inc.*, 333 F.R.D. 390, 413 (M.D. Tenn. 2019); *Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 929 (7th Cir. 2016) ("[A]t the class certification stage, plaintiffs are not obliged to drill down and estimate each individual class member's damages.").

Plaintiffs can establish classwide damages in three ways. First, as explained, Plaintiffs can benefit from the presumption of money damages because they can demonstrate through common proof that Defendants willfully deceived customers through comparative advertising. *See Balance Dynamics Corp.*, 204 F.3d at 694.

Second, Plaintiffs' damages expert, Dr. Russell Mangum, has demonstrated classwide damages models for lost profits. As explained more fully in his report, to calculate lost profits Plaintiffs would (1) use consumer survey evidence to calculate the number of SmileDirect customers who would have sought treatment from class members but for Defendants' false or misleading advertising statements[35]; (2) use industry data to calculate the average cost of treatment through traditional orthodontics; (3) use industry data to calculate the average profit margin for that treatment; and (4) calculate total lost profits for the class by multiplying those three numbers. *See* **Ex. 55** (Expert Report of Dr. Russell W. Mangum III) ¶¶ 42-52. Each number would be proven using the common evidence of survey or industry data.

Third**,** Plaintiffs may seek disgorgement of Defendants' profits using the common proof of Defendants' revenue, at which point Defendants have the burden of showing reductions to the aggregate revenue-based damages by showing their expenses. *See* 15 U.S.C. § 1117(a) (requiring plaintiff to prove sales and defendant to prove "all elements of cost or deduction claimed"); *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 831 (9th Cir. 2011); *see also Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 876 (5th Cir. 2019); *Watkins Inc. v. McCormick & Co., Inc.*, 574 F. Supp. 3d 644, 656 (D. Minn. 2021) ("Disgorgement imposes a lower burden than money damages and injunctive relief because it serves a different purpose. Disgorgement, an equitable remedy, targets the wrongdoer and seeks to deter improper conduct and prevent unjust enrichment.").

Plaintiffs are entitled to disgorgement when they can "show that defendant gained additional sales due to the advertisement, or that plaintiff lost sales, or was forced to see its product

---

[35] Plaintiffs have demonstrated that such surveys can be conducted through the report of their expert Dr. Hibbard, and Dr. Hibbard has performed two such surveys already. *See* Ex. 16.

36

at a lower price." *Balance Dynamics Corp.*, 204 F.3d at 695. Disgorgement is particularly appropriate here because (1) Plaintiffs will show through common evidence that the Defendants diverted sales by their intentionally false and misleading statements, and (2) quantifying the full measure of harm to the class may be difficult because many customers were exposed to multiple statements in varying combinations. Also, the public has a strong interest in making misconduct related to the safety and efficacy of a medical device unprofitable, including curbing Defendants' false equivalence between their inferior product and traditional in-person orthodontics. Plaintiffs' expert, Dr. Mangum, has proposed a classwide damages model for disgorgement. *See* Ex. 55 (Expert Report of Dr. Mangum) ¶¶ 29-41.

> **b)** ***Florida Deceptive and Unfair Trade Practices Act (FDUTPA) and New York General Business Law §§ 349 and 350 claims***

Plaintiffs can prove their Florida and New York claims by common proof because each claim requires proof that Defendants made an objectively misleading statement; neither claim requires proof that a consumer relied on the statement. Plaintiffs may recover damages based on a classwide damages model or statutory damages.

A FDUTPA damages claim has three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Fla. Emergency Phys. Kang & Assocs., M.D., Inc. v. United Healthcare of Fla., Inc.*, 526 F. Supp. 3d 1282, 1300–01 (S.D. Fla. 2021). The first element is an objective test: whether "the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983–984 (11th Cir. 2016). The plaintiff "need not show actual reliance on the representation or omission at issue." *Id.*

A claim under NYGBL § 349 has three elements: "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *New World Sols., Inc. v. NameMedia Inc.*,

150 F. Supp. 3d 287, 329 (S.D.N.Y. 2015). While § 350 is specific to false advertising, the elements are otherwise the same as § 349. *Id.* Whether an act or practice is materially deceptive or misleading is determined under an objective standard: "whether acts or practices are materially deceptive or misleading to a reasonable consumer acting reasonably under the circumstances." *Dash v. Seagate Tech. (U.S.) Holdings, Inc.*, 27 F. Supp. 3d 357, 360 (E.D.N.Y. 2014); *see also In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409 (S.D.N.Y. 2015). Neither statute requires "proof of reliance, nor proof that defendants intended to mislead consumers." *New World Sols., Inc.*, 150 F. Supp. 3d at 330 (citation and ellipses omitted); *Ackerman v. Coca-Cola Co.*, No. 09 CV 395(DLI)(RML), 2013 WL 7044866, at *10 (E.D.N.Y. July 18, 2023) (claims under N.Y. Gen. Bus. L §§ 349 and 350 "are considered ideal for class certification").

The foregoing analysis shows that Plaintiffs' FDUTPA claim and NYGBL claims may be proven by evidence of an objectively deceptive statement or omission—one that would mislead a reasonable consumer—and do not require evidence of individual consumer reliance on that statement or omission. Thus, Plaintiffs may prove these elements by common evidence.

Plaintiffs may also prove their damages by common evidence. The FDUTPA authorizes a plaintiff to recover "actual damages," Fla. Stat. Ann. § 501.211(2), which courts have found includes lost profits. *See Tymar Distrib. LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1283-85 (S.D. Fla. 2021). Plaintiffs may prove these damages using the same classwide lost-profits model they will use to prove lost-profits damages under the Lanham Act. Plaintiffs likewise can prove their damages under the NYGBL by common proof through their damages model and because the statute authorizes minimum statutory damages for each violation: $50 under § 349(h) and $500 under § 350-e(3).

### 2. A Class Action is Superior to Other Available Methods.

Rule 23(b)(3) requires the Court to determine "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" and states that the "matters pertinent" to that determination include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

Here, each factor weighs in favor of finding that a class action is superior to individual actions. First, Plaintiffs are not aware of any evidence that individual class members have an interest in pursuing individual actions against Defendants. Second, Plaintiffs are not aware of any similar litigation pending in another court. Third, given the nationwide scope of the Lanham Act Provider Class and the statewide scope of the Florida and New York Provider Subclasses, resolving these claims by class action serves judicial efficiency. Fourth, because the elements can be established by common proof, a class action poses no likely difficulties of management.

In addition, superiority is met "where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits." *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 464 (6th Cir. 2020) (quotation omitted); *see also Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 486 (C.D. Cal. 2012) (superiority is met where "recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis") (quotation omitted). Defendants aggressive defense of this action involved exhaustive discovery motion practice and a wasteful discovery campaign against third-party Selwyn Singer, which delayed this class certification motion for nine months. And Defendants seek to deter individual orthodontists from competing against them by pursuing anticompetitive litigation of their own. No individual

39

could economically afford to litigate against such parties. Put simply, a class action is the only way Plaintiffs' Lanham Act and DTPA claims will be litigated.

### E.    Alternatively, The Common Issues of Liability Should Be Certified Under Rule 23(c)(4).

In the event the Court holds that the requirements of Rule 23(b)(3) are not met, Plaintiffs alternatively move for certification of relevant issues pertaining to liability under Rule 23(c)(4). The Sixth Circuit has held that issue certification is appropriate "where common questions predominate within certain issues and where class treatment of those issues is the superior method of resolution." *Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 413 (6th Cir. 2018).

The common issues that could be certified under Rule 23(c)(4) are: (1) SmileDirect's liability for false advertising under the Lanham Act; and (2) SmileDirect's liability for unfair and deceptive practices under the state consumer protection statutes. Any individual issues regarding determination of damages could be deferred until after liability is determined. It would be far more efficient to litigate liability on a classwide basis, when it depends on classwide facts, than to force each class member to bring their own claims individually. *See Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 545 (6th Cir. 2012) (Class actions "overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (quotation omitted).

### VI.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for class certification and appoint Plaintiffs' counsel as class counsel.

DATED: June 30, 2023      Respectfully submitted,

s/  W. Justin Adams
W. Justin Adams, TNBPR#022433
Edward M. Yarbrough, TNBPR#004097
SPENCER FANE LLP
511 Union Street, Suite 1000
Nashville, Tennessee 37219
TEL: (615) 238-6300
FAX: (615) 238-6301
eyarbrough@spencerfane.com
wjadams@spencerfane.com

Robert K. Spotswood, Alabama Bar # ASB-7015-P76R
Michael T. Sansbury, Alabama Bar # ASB-6473-A53S
Morgan Franz, Alabama Bar # ASB-0488-S13E
SPOTSWOOD SANSOM & SANSBURY LLC
Financial Center
505 20th Street North, Suite 700
Birmingham, Alabama 35203
TEL: (205) 986-3620
FAX: (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
mfranz@spotswoodllc.com

Richard Stone, U.S. Dist. Ct. S.D.N.Y. Bar # RS5324
RICHARD L. STONE, PLLC
11 East 44th St., Suite 1900
New York, NY 10017
TEL: 561-804-9569
rstoneesq@rstoneesq.com

*Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via the Court's ECF Filing System on June 30, 2023, as follows:

John R. Jacobson
Elizabeth O. Gonser
RILEY WARNOCK &
JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
jjacobson@rwjplc.com
egonser@rwjplc.com

David Rammelt
Nicholas J. Secco
Emily N. Dillingham
Carl M. Johnson
Hannah Stowe
BENESCH, FRIEDLANDER,
COPLAN AND ARONOFF, LLP
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
drammelt@beneschlaw.com
nsecco@beneschlaw.com
edillingham@beneschlaw.com
cmjohnson@beneschlaw.com
hstowe@beneschlaw.com

Michael D. Meuti
Andrew G. Fiorella
Mark K. Norris
James R. Bedell
BENESCH, FRIEDLANDER,
COPLAN AND ARONOFF, LLP
200 Public Square, Suite 2300
Cleveland, OH 44114
mmeuti@beneschlaw.com
afiorella@beneschlaw.com
mnorris@beneschlaw.com
jbedell@beneschlaw.com

Michael B. Silverstein
BENESCH, FRIEDLANDER,
COPLAN AND ARONOFF, LLP
41 South High Street, Suite 2600
Columbus, OH 43215-6164
msilverstein@beneschlaw.com

*Attorneys for the Defendants*

s/      W. Justin Adams