# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| DR. JOSEPH CICCIO et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:19-cv-00845 |
| | ) | Judge Aleta A. Trauger |
| | ) | |
| SMILEDIRECTCLUB, LLC et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

The dentist and orthodontist plaintiffs have filed a Motion for Class Certification Order (Doc. No. 405), to which the defendants have filed a Response (Doc. No. 428), and the plaintiffs have filed a Reply (Doc. No. 445). The defendants have filed a Motion to Exclude the Surveys, Reports, and Testimony of Dr. Jonathan D. Hibbard (Doc. No. 424), to which the plaintiffs have filed a Response (Doc. No. 443), and the defendants have filed a Reply (Doc. No. 452). The defendants have also filed a Motion to Exclude the Report and Testimony of Dr. Russell W. Mangum III (Doc. No. 426), to which the plaintiffs have filed a Response (Doc. No. 444), and the defendants have filed a Reply (Doc. No. 453). Finally, a consumer plaintiff, Dena Nigohosian, has filed a Motion for Scheduling Order for Claims Against Defendant Camelot Venture Group (Doc. No. 468), to which Camelot Venture Group ("CVG") has filed a Response (Doc. No. 478), Nigohosian has filed a Reply (Doc. No. 480), and CVG has filed a Sur-Reply (Doc. No. 483). For the reasons set out herein, the motion to certify and motion for scheduling order will be denied, and the motions to exclude will be denied as moot.

# I. BACKGROUND

Defendant SmileDirectClub, LLC[1] ("SmileDirect") is a Nashville-based Delaware corporation that sold plastic aligners for orthodontic use in connection with teledentistry services. (Doc. No. 246 ¶¶ 2, 95.) Defendant CVG is SmileDirect's largest shareholder. (*Id.* ¶ 54.) The plaintiffs consist of two groups: dental care providers[2] who take issue with the way SmileDirect has marketed its services; and consumers who feel that they have been harmed by their reliance on SmileDirect for their dental care services. The procedural history of this case is winding and complex, and the court will not recount it here, because most of it has limited bearing on the two matters currently at issue: (1) consumer plaintiff Dena Nigohosian's request for a scheduling order allowing her to proceed with her long-dormant claims against CVG; and (2) the dental care provider plaintiffs' request for class certification.

# II. REQUEST FOR SCHEDULING ORDER

## A. Procedural History

The initial Complaint in this case was filed by Nigohosian and three dental care providers, Dr. Joseph Ciccio, Dr. Arthur Kapit, and Dr. Vishu Raj. (Doc. No. 1 ¶¶ 13–16.) It pleaded eight counts under various common law and statutory theories of false advertising, consumer protection, and fraud. (*Id.* ¶¶ 118–92.) The plaintiffs named as defendants SmileDirect, CVG, and SmileDirect executives David and Steven Katzman. (*Id.* ¶¶ 18–20.)

---

[1] SmileDirect's operations and assets appear to be spread across multiple business entities, several of which have been named as defendants. The court will refer to the business, as a whole, as "SmileDirect," with the understanding that some actions may be performed by different related entities. For the purposes of this opinion, however, the court will discuss defendant CVG separately.

[2] The court will use the phrase "dental care providers" as an umbrella term to include both dentists and orthodontists.

2

On October 25, 2019, counsel for the defendants—who have shared attorneys throughout this litigation—filed three motions: a Motion to Compel Arbitration directed at Nigohosian's claims (Doc. No. 26); a Motion to Dismiss directed at all claims against CVG (Doc. No. 24); and a Motion to Dismiss directed at all claims stated by the dental care providers (Doc. No. 29).

Because the parties now disagree regarding the scope of the defendants' arbitration request and the resulting referral—specifically, whether they applied to all claims by Nigohosian, including those against CVG—it is necessary to describe certain aspects of that motion in detail. The text of the motion characterized the request as made by "Defendant SmileDirectClub, LLC," but the motion was signed by counsel as "Attorneys for the Defendants." (Doc. No. 26 at 1–2.) The motion referred to Nigohosian's "claims" without qualification, and the Memorandum in Support confirmed that the request was directed at "all of [Nigohosian's] claims." (*Id.* at 1; Doc. No. 27 at 14.) The motion was premised on an arbitration agreement between SmileDirect and Nigohosian, which did not expressly limit itself to claims between those parties, but, rather, reached "any dispute regarding the products and services offered my SmileDirectClub and/or affiliated dental professionals." (Doc. No. 28-1 at 4.)

While the aforementioned motions were pending, the plaintiffs filed an Amended Complaint, which, among other things, added several additional consumer plaintiffs. (Doc. No. 36.) The court denied the pending motions to dismiss as moot in light of the superseding allegations. (Doc No. 50.) The court did not deny the arbitration motion as moot, because it was unaffected by the filing of a superseding complaint.

On December 2, 2019, the court granted the pending arbitration motion and ordered that "Nigohosian's claims are hereby **REFERRED** to arbitration, without prejudice to Nigohosian's objecting to the applicability of the mandatory arbitration provision before the arbitrator." (Doc.

No. 58 at 6.) The phrase "Nigohosian's claims" included no qualification suggesting that it was referring to only some of those claims. (*Id.*) The court stayed its "[c]onsideration Nigohosian's claims" to allow the arbitration process to proceed. (*Id.*)

Most of the newly added consumer plaintiffs voluntarily dismissed their claims on December 12, 2019. (Doc. No. 64.) On January 13, 2020, Nigohosian and the only other remaining consumer plaintiff followed suit, stating that they were "voluntarily dismissing their claims in this action without prejudice." (Doc. No. 78 at 1.) With all the consumer plaintiffs out of the litigation, only the claims raised by the dental care provider plaintiffs remained.

On March 3, 2020, however, Nigohosian and another consumer plaintiff, Dana Johnson, filed a Motion to Rejoin Plaintiffs, or, In the Alternative, to Intervene, in which they asked to bring Nigohosian and Johnson back into the action. (Doc. No. 85) In her briefing, Nigohosian described the effect of the court's referral order as follows: "In its December 2, 2019, ruling, the Court referred Nigohosian's claims to arbitration on the basis of the arbitration agreement's provision stating that any arbitration thereunder shall be resolved using the rules of the [American Arbitration Association ('AAA')]." (Doc. No. 85 at 5.) Nigohosian gave no indication that she believed that some of the claims that she was seeking to have reinstated had been carved out of the referral order. Rather, the plaintiffs' briefing makes clear that Nigohosian simply believed that intervening events involving Johnson—namely, the AAA's administrative rejection of Johnson's own arbitration demand on the ground that the dispute was not subject to mandatory arbitration—would permit Nigohosian to bypass the court's earlier order. (*Id.* at 5–6.) The defendants opposed allowing Nigohosian to rejoin the case. (Doc. No. 87 at 1.)

On June 2, 2020, the court granted the plaintiffs leave to place Nigohosian's claims back before the court, but the court held that its original arbitration order directed at Nigohosian was

still in effect. The court again stayed consideration of Nigohosian's claims and ordered her to comply with the original order. Again, the court made no indication that any of Nigohosian's claims were exempt. (Doc. No. 96 at 1.)

Although Johnson's claims are not at issue here, the way that they were handled by plaintiffs' counsel is relevant to any effort to reconstruct the understanding of the court and parties regarding the scope of claims potentially subject to arbitration. Shortly after Johnson rejoined the case, the defendants filed a Motion to Compel directed at Johnson. (Doc. No. 97.) As was the case with the earlier arbitration motion directed at Nigohosian, the request was made by SmileDirect, but was signed by "Attorneys for the Defendants" and indicated in no way that it was not intended to encompass claims against CVG. (*Id.* at 1–2.) The court initially denied that motion based on the fact that Johnson had already submitted his claims to arbitration, only to have them rejected. But, on March 11, 2021, the Sixth Circuit reversed this court's decision on the ground that the arbitration provision required any decision to accept or reject the arbitration be made by an arbitrator, not by the AAA's administrative personnel. *See Ciccio v. SmileDirectClub, LLC*, 2 F.4th 577, 588 (6th Cir. 2021). On July 20, 2021, this court, consistent with the Sixth Circuit's ruling, entered an Order referring "Johnson's claims" to arbitration. (Doc. No. 233 at 1.) Johnson, unlike Nigohosian, complied with the referral of his claims, and the defendants have provided a copy of the Arbitration Demand he filed with the AAA. That Demand expressly covered claims against SmileDirect, CVG, and the individual defendants—not merely claims against SmileDirect. (Doc. No. 478-3 at 2, 4.)

Litigation continued, and, on October 4, 2023, the defendants informed the court that some SmileDirect entities have filed for Chapter 11 bankruptcy. (Doc. No. 464 at 1.) The court stayed

5

proceedings as to SmileDirect, but the plaintiffs elected to continue pursuing their claims against other defendants, particularly CVG. (Doc. No. 465.)

On December 6, 2023, Nigohosian filed a Motion for Scheduling Order for Claims Against [CVG]. (Doc. No. 468.) Nigohosian suggests, for the first time, that she "has never been ordered to arbitrate her claims against" CVG and that CVG has now waived any argument that those claims should be subject to arbitration. Accordingly, Nigohosian argues, she should now be permitted to pursue those claims outside of arbitration. (*Id.* at 1–5.)

**B. Analysis**

Nigohosian's position that her claims against CVG were never referred to arbitration is inconsistent with the record and unconvincing. Neither the order initially referring the claims to arbitration nor the order reinstating that referral made any such distinction. It is, moreover, well-established that arbitration agreements may grant rights to third parties consistently with "the relevant state's common law," *AtriCure, Inc. v. Meng*, 12 F.4th 516, 524 (6th Cir. 2021) (collecting cases), so there would have been no basis for simply assuming that claims against CVG were not subject to the referral. Although the court takes responsibility for the fact that its language could have been clearer, the most natural reading of the court's orders is that all of Nigohosian's claims were referred.

That is particularly true, given that Nigohosian does not dispute that consideration of her claims against CVG were *stayed*. (*See, e.g.*, Doc. No. 480 at 1.) Nigohosian needs to be able to argue that the court's consideration of her claims against CVG was stayed, because, otherwise, she would have no excuse for the fact that she has let those claims languish for several years. Her acceptance of the stay, however, cannot be reconciled with her position on the referral. The court used the exact same language, in the exact same orders, to describe the claims referred and the

6

claims for which the court's consideration was stayed: "Nigohosian's claims." (Doc. No. 58 at 6; Doc. No. 96 at 1.) There is nothing in either relevant order suggesting that the phrase was being used differently in any of the relevant instances.

If Nigohosian believed that her claims against CVG were not referred or should not have been referred, she could have brought that up, at the time, through a motion for clarification or a motion to reconsider. Instead, she has sprung this idiosyncratic reading of events on the defendants and the court over 40 months later. The defendants, moreover have identified a long list of instances in which the plaintiffs behaved in ways that appear inconsistent with the belief that Nigohosian's claims were not referred. (Doc. No. 478 at 5–9.) Indeed, Nigohosian's own attorneys treated the claims against CVG as subject to arbitration with regard to Johnson. It should be overwhelmingly apparent to anyone who reads this docket that the court and the parties were proceeding under the objectively manifested, shared understanding that all of Nigohosian's claims had been referred.

The court notes, also, that, when Nigohosian came to the court seeking reinstatement as a plaintiff, she did nothing to suggest that she believed that some of her claims had not been referred. If Nigohosian actually believed, at the time, that her claims against CVG had not been referred, then her choice not to disclose that fact was a conscious decision to mislead the court on a matter relevant to her request. That conduct would, if anything, warrant a sanction—not a reward in the form of an opportunity to resurrect seemingly abandoned claims years later. The request for a briefing schedule will be denied, Nigohosian's claims will remain referred to arbitration, and consideration of those claims—all of them—will remain stayed.

### III. MOTION FOR CLASS CERTIFICATION

#### A. Procedural History

On June 30, 2023, the dental care provider plaintiffs filed a Motion for Class Certification, asking the court to certify the following class and subclasses:

> <u>Nationwide Provider Class</u>: All dental or orthodontic providers who provided traditional orthodontic services or goods similar to those that SmileDirect purportedly offers, and/or the practice entities through which they provided such services, other than any who are affiliated with Defendants, from the start of the applicable statute of limitations through the final disposition of this action. . . .
>
> <u>Florida Provider Subclass</u>: All dental or orthodontic providers who provided traditional orthodontic services or goods similar to those that SmileDirect purportedly offers in the state of Florida, and/or the practice entities through which they provided such services, other than any who are affiliated with Defendants, from the start of the applicable statute of limitations through the final disposition of this action. . . .
>
> <u>New York Provider Subclass</u>: All dental or orthodontic providers who provided traditional orthodontic services or goods similar to those that SmileDirect purportedly offers in the state of New York, and/or the practice entities through which they provided such services, other than any who are affiliated with Defendants, from the start of the applicable statute of limitations through the final disposition of this action.

(Doc. No. 405 at 1–2.) The members of those classes would pursue claims against CVG under the Lanham Act, the Tennessee Consumer Protection Act of 1977 ("TCPA"), the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), and New York General Business Law §§ 349 & 350-a ("NYGBL"). (*Id.*)

The plaintiffs supported their request with a number of documents, many of which address the topic of how a dental care provider plaintiff might establish injury and damages related to his claims. CVG has filed two Motions to Exclude directed at portions of those materials. (Doc. No. 424; Doc. No. 426.) CVG argues that the challenged documents are methodologically flawed and unable to assist the court with resolving any question related to class certification. (*Id.*)

8

**B. Legal Standard**

The principal purpose of class actions is to achieve efficiency and economy of litigation, both with respect to the parties and the courts. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 159 (1982). The Supreme Court has observed that, as an exception to the usual rule that litigation is conducted by and on behalf of individual named parties, "[c]lass relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" *Id.* at 155 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). The Court directs that, before certifying a class, district courts must conduct a "rigorous analysis" of the prerequisites of Rule 23. *Id.* at 161.

Although a court considering class certification should not inquire into the merits of the underlying claim, a class action may not be certified based merely on its designation as such in the pleadings. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). In evaluating whether class certification is appropriate, "it may be necessary for the court to probe behind the pleadings," as the issues concerning whether it is appropriate to certify a class are often "enmeshed" within the legal and factual considerations raised by the litigation. *Falcon*, 457 U.S. at 160; *see also In re Am. Med. Sys.*, 75 F.3d at 1079; *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974). Ultimately, the party seeking class certification bears the burden of establishing that the requisites are met. *See Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003); *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 522 (6th Cir. 1976). "[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23 . . . ." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014).

9

Specifically, a class action will be certified only if, after thorough analysis of the evidence presented, the court is satisfied that the prerequisites of Fed. R. Civ. P. 23(a) have been met and that the action falls within one of the categories described in Fed. R. Civ. P. 23(b). *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016). Compliance with Rule 23(a) requires the proposed class to satisfy each of four requirements, typically referred to as (1) numerosity, (2) commonality, (3) typicality and (4) adequacy of representation. *Comcast v. Behrend*, 569 U.S. 27, 33 (2013). Then, if putative class representatives are able to meet all four of the requirements of Rule 23(a), they next must produce evidence sufficient to establish that their case falls within at least one of the three types of case listed as appropriate for class resolution in Rule 23(b). *Id.* at 34.

The plaintiffs argue that they can satisfy both Rule 23(b)(2) and Rule 23(b)(3). Rule 23(b)(2) allows for certification of a Rule 23(a)-compliant class if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3), in contrast, allows for certification of a Rule 23(a)-compliant class if

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

10

(D)  the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

## B. Analysis

Although Rule 23 calls on the court to consider an array of issues, CVG's arguments against class certification are, in large part, focused on a single, foundational problem that, CVG argues, prevents the plaintiffs from satisfying several separate requirements of Rule 23. "[A] plaintiff suing under [the false advertising provision of the Lanham Act] ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising," which is usually accomplished by showing that the defendant's "deception of consumers cause[d] them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 133 (2014). Each individual member of the putative class, therefore, would need to establish an actual effect on consumers resulting in injury—not to the broad community of dentists and orthodontists—but specifically to him/her and his/her practice. CVG argues that the plaintiffs' "attenuated theory of injury and causation" is too context-dependent and individualized for such issues to be addressed on a classwide basis. (Doc. No. 428 at 1.)

Consumer motivations are complex, and a court cannot simply "assume[] . . . that every [purchase] during the relevant time period was the result of [the defendant's] allegedly false statements." *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 300–01 (4th Cir. 2017). A false advertising class action, moreover, typically will not hinge on the behavior of just one consumer or a handful of consumers, but a large number of diverse consumers with different needs and preferences. That would be the case here, as the plaintiffs' claims would implicate thousands of individual consumer decisions. The resultant difficulties, CVG argues, not only prevent shared

11

issues from predominating over individual ones—thereby preventing the plaintiffs from relying on Rule 23(b)(3)—they also prevent the plaintiffs from satisfying Rule 23(a), because, among other things, the lead plaintiffs' own claims, which reflect their own unique circumstances, would not be typical of those of the diverse class, as required Rule 23(a)(3), and would not position them to represent the interests of other class members adequately, as required by Rule 23(a)(4).

The plaintiffs' Response focuses, first, on highlighting the issues that would be common to the class. In particular, the plaintiffs emphasize that the question of whether the content of any SmileDirect statement or omission was false or misleading can likely be decided on a classwide basis. There is still room for some complications in that regard, given that members of the class would be relying not only on the nationwide jurisdiction of the Lanham Act but also on a number of state-specific statutes that might differ in their standards for assessing whether something is false or misleading. Broadly speaking, though, the plaintiffs are correct that whether any statement was facially false or misleading is not a question that would vary from plaintiff to plaintiff.

The presence of a few shared issues might be enough to establish commonality under Rule 23(a)(2), which requires only at least one shared issue and does not require the court to weigh shared issues versus unshared ones. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). The fact that SmileDirect's statements themselves can be considered collectively, however, does not change the fact that the question of whether, and to what extent, any given plaintiff was actually injured by one or more of the statements will depend on plaintiff-specific contextual factors. Drawing a coherent, factually supported line from a single misleading statement in a company's advertisement to an actual economic injury by a competitor is inherently difficult to do, and, insofar as it would be possible at all for the kinds of statements at issue in this case, it would be

particularly difficult to do on a class-wide basis.[3] The process for making such an assessment, moreover, would be far more demanding than the process of simply evaluating particular marketing statements. Unless the plaintiffs are able to simplify the issues of injury and damages, then, those individual issues will predominate over the shared ones.

The plaintiffs argue that the injury and damages issues can, in fact, be streamlined. In support of that argument, they rely, in large part, on the reports of the experts whose opinions the defendants have challenged as inadmissible under *Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579 (1993), and its progeny. The parties disagree regarding whether the court should apply *Daubert* at this stage, but that disagreement is mostly beside the point, given that most of the defendants' arguments work just as well, whether directed at the admissibility of the experts' opinions or, instead, at the weight those opinions should be afforded. For the sake of brevity, the court will not undergo a distinct evidentiary analysis to determine whether those opinions should be excluded altogether. Rather, the court will consider whether the experts' opinions, if admitted, would be sufficient to support class certification, in light of the flaws and limitations that the defendants have identified. *See J&R Passmore, LLC v. Rice Drilling D, LLC*, No. 2:18-CV-01587, 2023 WL 2667749, at *5 (S.D. Ohio Mar. 28, 2023) (noting that a court making a Rule 23 determination is "not required to conduct a *Daubert* analysis" but considering arguments regarding the flaws of an expert report as part of the court's "assessment of class certification").

---

[3] The plaintiffs seek to bypass some of this difficulty by relying on a presumption of injury from "comparative advertising." *See Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 694 (6th Cir. 2000). That type of comparative advertising, however, typically involves situations in which "the plaintiff's product was specifically targeted." *Id.* SmileDirect did not compare itself to these plaintiffs or any class members specifically; it merely compared its services to ordinary dental and orthodontic services generally. In any event, the presumption would, at most, help the plaintiffs and class members establish some minimally sufficient injury—not the extent of the injury or how it was distributed among class members.

First, the plaintiffs seek to rely on the Report of an economics professor, Dr. Russell W. Mangum III of Concordia University Irvine, who offers two potential damages formulas that could be used in tandem: one intended to calculate the class members' lost profits and one intended to calculate a percentage of SmileDirect's profits subject to disgorgement.[4] (Doc. No. 416-15 ¶¶ 29–52.) However, each formula would require Dr. Mangum to provide a number of individual consumers who were, respectively, "diverted" or "affected" by the improper marketing—an inherently difficult problem, given the complex and diverse motivations, behaviors, and memories of individual consumers.[5] (Id. ¶¶ 30, 43.) In Dr. Mangum's Report, he makes a number of vague claims about the possibility that a "market survey" could produce those numbers, but the only actual survey on which he relies is one performed by another expert for plaintiffs, Dr. Jonathan Hibbard. (Id. ¶¶ 32, 44–45, 59–60.) Without survey results, Dr. Mangum would have no way to assess the extent to which any potential consumer was even exposed to an improper statement, let alone actually swayed by it. Therefore, even aside from any flaws in Dr. Mangum's own analysis—which the court will address—the reliability of his conclusions depends on the quality and appropriateness of his survey data. *See Hamilton Cnty. Emergency Commc'ns Dist. v. Level 3 Commc'ns, LLC*, 845 F. App'x 376, 388 (6th Cir. 2021) (upholding the exclusion of one expert's

---

[4] Both forms of damages could be available under the Lanham Act. Lost profits damages would focus on SmileDirect's diversion of business away from the plaintiffs. Disgorgement would focus on SmileDirect's wrongful profits, even if the profits were not attributable to patients who would have turned to the plaintiffs or to class members, instead of SmileDirect. If both measures of damages were used, the disgorgement calculation would include a carveout of profits attributable to customers captured by the lost profits calculation, in order to avoid double-counting. (*See* Doc. No. 416-15 ¶ 58.)

[5] That such a showing would be necessary for compensatory damages based on a plaintiff's actual loss of business is self-evident; one cannot know how much money was lost without knowing, at least roughly, how many plaintiffs were diverted. The Sixth Circuit, however, has also held that, for a Lanham Act plaintiff to be entitled to a portion of a competitor's disgorged profits, the plaintiff must establish "that plaintiff lost sales or profits, or that defendant gained them." *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 695 (6th Cir. 2000). Reliance on disgorgement-based damages would, therefore, not wholly relieve the members of the class of the need to demonstrate the actual effects of the allegedly improper statements in a sufficiently quantifiable manner.

report because it relied on the same ill-founded assumption that led to the exclusion of" another expert's report.").

Dr. Hibbard's survey, however, falls far short of answering the questions that would be necessary to assist the court in assessing and allocating classwide damages. Dr. Hibbard's survey was of a group of U.S. individuals who had "shopped for a clear aligner for teeth in the past five years." (Doc. No. 408-6 ¶ 24.) Dr. Hibbard did not, however, determine what that "shopping" actually entailed or even whether the individuals surveyed actually saw, or were likely to have seen, any of the allegedly false or misleading statements by SmileDirect. Rather, Dr. Hibbard simply used an electronic interface to show the selected individuals a mostly non-functional replica of SmileDirect's website that they were told to "imagine" they had come across while researching treatment options. (*Id.* ¶ 38.) Dr. Hibbard could have permitted the participants to browse the website or any other materials freely, but he did not; rather, he specifically led them to follow a particular link and directed them to focus on either the challenged language or an alternative, supposedly non-misleading alternative, depending on whether the participant was part of a "test" group or a "control" group.[6] (*Id.* ¶¶ 40–53, 56–57, 61–63.) Dr. Hibbard then asked the participants to choose between various hypothetical treatment options and answer a few questions. Those responses form the basis for Dr. Hibbard's conclusions regarding the effect of the statements at issue. (*Id.* ¶¶ 54–55, 59–60, 64–66.)

The defendants have identified a number of problems with relying on Dr. Hibbard's survey, which they have supported with a Report by Dr. Jonah Berger, a Marketing Professor at the

---

[6] There are eight alleged misrepresentations at issue in this case, but Dr. Hibbard tested only two, one of which involved an omission. He tested the omission-based misrepresentation by showing some participants a disclaimer and showing alternative language to others. The presentation of the disclaimer was done in such a way that made it significantly more prominent than any such disclaimer would likely be in the real world. (Doc. No. 408-6 ¶ 63.)

15

Wharton School at the University of Pennsylvania, who found Dr. Hibbard's survey "fundamentally unreliable" for several reasons. (Doc. No. 425-1 ¶ 71.) For one thing, Dr. Hibbard relied on an artificially created situation that was plainly designed to induce the survey respondents to place particular weight on the statement or omission at issue. "A survey that fails to adequately replicate market conditions is entitled to little weight, if any." *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 766 (E.D. Mich. 2003) (collecting cases). The plaintiffs' actual potential customers, however, made whatever decisions they made under far different conditions and without having been aggressively prodded to focus on particular, allegedly problematic statements. It is unsurprising that some consumers were affected by SmileDirect's statements after those statements were foisted on them, mostly in isolation and immediately before making a decision. There is no basis for assuming, however, that such a setup can accurately gauge the rate of patient diversion (or persuasion) in the real world, where the allegedly misleading statements by SmileDirect would be only a handful of the potentially numerous messages that the plaintiffs received while "shopping." As Dr. Berger convincingly argues, the survey's "forced exposure to the At-Issue Marketing . . . unrealistically focused respondents on the At-Issue Marketing claims . . . and made no attempt to estimate what percentage of [SmileDirect] customers were actually exposed to the At-Issue Marketing." (Doc. No. 425-1 ¶ 70.c.i.) Dr. Hibbard's failure to answer this basic question carried over to Dr. Mangum, who, when asked whether he had any "estimate of the percent of SmileDirectClub customers that saw at least one of the at-issue marketing statements," conceded that he did not. (Doc. No. 434-6 at 173.)

There is also little assurance that the hypothetical treatment options that the participants were asked to consider actually approximated the options of any particular consumer—let alone that the participants' choices between those hypothetical options could be used to understand the

16

likely behavior of differently situated class members. Those ostensible options were presented to the survey participants with very little explanation and, particularly troublingly, did not include the option of giving up on the search for teeth-straightening treatment altogether. As Dr. Berger has explained, "many SDC customers may have chosen not to purchase any teeth straightening products if SDC were not an option." (Doc. No. 425-1 ¶ 112.) The survey, however, required the participant to either make a purchase of some sort, "[c]ontinue to shop," or answer "I don't know." (*Id.* ¶ 109.) Dr. Hibbard, in other words, followed his unrealistic, tilted presentation of the statements at issue with an unrealistic, tilted set of options to choose from.

Even if one sets aside the question of whether those flaws are so severe that they would preclude admission of Dr. Hibbard's survey into evidence altogether, it is difficult to see how the surveys could offer more than general proof of *some* potential effect of the tested statements on *some* customers. That information would not be worthless; a statement's capacity to mislead customers is an important fact in a false advertising case. That bare showing of misleading potential, however, is far from a demonstration of the actual quantitative effect of any particular statement in the real world. Of course, no survey can perfectly replicate actual conditions, and a plaintiff's quantitative evidence of injury does not need to be perfect—only good enough. The extreme artificiality of Dr. Hibbard's test scenario, however, makes these surveys an especially poor source for specific conclusions regarding actual diversion or effect rates among the public at large. A better survey design might well be possible; indeed, Dr. Hibbard's survey was so artificially constructed that it would likely be easy to find areas for potential improvement. It is the plaintiffs' burden, however, to establish that any such survey would not only be better but would actually be good enough to serve its intended purposes. They have not done so.

Dr. Mangum's analysis only worsens the problem by failing to bridge the gap between the already-flawed survey results and the actual task of allocating damages. Dr. Mangum concedes that dental and orthodontic practices are not all the same, and he states that a formula for allocation could be "prorate[d] according to the number of procedures the Class Member performed" and adjusted to account for "[p]otential differences in the prices for" the relevant services "in different parts of the country and in urban versus rural areas." (Doc. No. 416-15 ¶¶ 54, 57.) Individual dental and orthodontic practices, however, are likely to differ in other ways that would be just as relevant—if not more relevant—to whether and to what extent any given practice was likely to be affected by SmileDirect's allegedly improper marketing. For example, some practices may serve a wealthier patient population than others in the same geographic area, and one cannot assume that SmileDirect's pitch—which focused significantly on costs—would affect each practice's potential patients in the same way. Similarly, different patient populations might have different media diets, resulting in different levels of exposure to the challenged SmileDirect statements.

Dr. Mangum, however, offers no proposal for dealing with those kinds of variation. Rather, he relies simply on his supposed ability to determine the average injury to class members, controlled for a few factors and prorated. There is a difference, though, between the actual truth of a situation and an average intended to loosely approximate what the truth is likely to be under normal conditions. *See Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 311 F. Supp. 3d 653, 665 (S.D.N.Y. 2018) (holding that expert "has not persuasively explained the reliability of a single, across-the-board figure for calculating lost profits"). Absolute precision may be impossible when thousands of claims are involved, and, as the plaintiffs point out, some degree of statistical approximation is acceptable in false advertising damages models. There is, however, a point at which approximation eclipses the truth so fully that the numbers produced cannot serve the

purpose they were intended to serve. The plaintiffs have not shown that Dr. Mangum has produced, or can produce, a model that would allocate injury or damages with sufficient accuracy to permit classwide resolution.

Indeed, Dr. Mangum conspicuously does not offer any full proposal for how allocation should be done at all; he merely states that many options are available and describes a handful of choices that *could* be made in the allocation process. But when Dr. Mangum was asked, during his deposition, to identify even a single "dentist or orthodontist in the United States that lost customers because of anything that SmileDirectClub said or did," he could not. (Doc. No. 434-6 at 33.) And that is unsurprising; tracing any consumer decision to any particular marketing statement is undoubtedly challenging. The plaintiffs, however, suggest that the court will be able to do something even more difficult: identify the effects of specific marketing statements on a vast universe of consumers; determine which class members would have benefited from different actions by those consumers; and then determine how much each of those class members was harmed. The court cannot simply take the plaintiffs' and Dr. Mangum's word that such a manifestly difficult thing will be possible.

Insofar as such individualized calculations are possible, moreover, they would have to be reached by engaging in precisely the kind of detail-oriented, individualized investigation that the plaintiffs claim to be able to avoid. For example, Dr. Mangum conceded, during his deposition, that, for his calculations to accurately capture lost profits, he would need individual practices to provide information regarding the practice's "profit level for braces." (Doc. No. 434-6 at 262.) Determining a practice's profits associated with a specific procedure, however, is itself a complex question, because, among other things, most dental practices have some costs—such as capital and wage costs—that cannot inherently be attributed to one particular type of procedure. Each practice,

therefore, would need to engage in a detailed, potentially contestable financial analysis before it could even give Dr. Mangum the information that he would need to begin an allocation.

If these issues were relevant solely to the merits of the plaintiffs' or class members' claims, the court could leave them for another day and focus only on simply questions like whether the proposed class and subclasses would have enough members. That, though, is not the case, because, as the defendants point out, the flaws in the plaintiffs' approaches to injury and damages bear directly on multiple Rule 23 requirements. To start with, the plaintiffs' proffered evidence leaves the court with no confidence that any one plaintiff could be considered to have a "typical" claim, as a lead plaintiff must pursuant Rule 23(a)(3). For similar reasons, the court cannot conclude that the plaintiffs have shown that they would be adequate representatives of other class members, as is required by Rule 23(a)(4). The variations between practices also prevent the plaintiffs from satisfying Rule 23(b)(3), because those variations would significantly predominate over any shared questions, such as whether particular statements were false or misleading.

The plaintiffs' alternative basis for satisfying Rule 23(b) provides no help. Rule 23(b)(2), on its face, requires only that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). As a practical matter, however, injunctive and declaratory relief, which are the only types of relief discussed in Rule 23(b)(2), are often sought alongside a request for monetary damages, and, as the advisory committee's note on Rule 23 acknowledges, it would make little sense to permit a party to satisfy Rule 23(b) based on his request for injunctive relief, when that request for injunctive relief was not, in fact, a particularly central or important part of his case. Accordingly, courts have held that Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates . . .

predominantly to money damages." *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002) (quoting Fed. R. Civ. P. 23(b)(2) adv. comm. n. to 1966 amend.).

Money damages, however, are central to this case. For one thing, if the object of this case were simply to enjoin SmileDirect from making certain statements, then there would be no need for a class action at all. Second, the plaintiffs' allegations have focused significantly on the actual economic harm done to them, and that harm could not be remedied by injunctive relief. Third, the fact that these claims would be proceeding against CVG, not SmileDirect, makes any need for injunctive relief even less significant, given that CVG is not the party that made, or would be expected to make, improper marketing statements. Fourth, the types of communications that would be subject to injunctive relief are already subject to regulation by state attorneys general under state consumer protection laws and, in some instances, by the United States under federal laws relating to medical products. Other aspects of SmileDirect's business model that have been addressed in this case implicate state dental licensure authorities. There are, accordingly, many entities already charged with setting the boundaries of permissible dental marketing. The only reason why these plaintiffs—and, by extension, this court—have any special role in determining what the defendants can or cannot say is that the plaintiffs claim to have been actually harmed by SmileDirect's past statements. The remedy for those harms, however, would be money—not injunctive relief, which would be a secondary consideration, particularly with regard to CVG. Accordingly, Rule 23(b)(2) is unavailable.

The plaintiffs ask, in the alternative, that the court certify what is often referred to as an "issue class," pursuant to Rule 23(c)(4). "Rule 23(c)(4) contemplates using issue certification to retain a case's class character where common questions predominate within certain issues and where class treatment of those issues is the superior method of resolution." *Martin v. Behr Dayton*

*Thermal Prod. LLC*, 896 F.3d 405, 413 (6th Cir. 2018) (citing Fed. R. Civ. P. 23(c)(4) adv. comm. n. to 1966 amend.; *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006)). In other words, a court may, where appropriate, certify a Rule 23(c)(4) class that is limited to issues for which shared questions predominate, while leaving aspects of the class members' cases in which unshared issues predominate to be decided separately. *Id.*

The plaintiffs identify the following issues as the subject of their proposed issue class: "(1) SmileDirect's liability for false advertising under the Lanham Act; and (2) SmileDirect's liability for unfair and deceptive practices under the state consumer protection statutes." (Doc. No. 406 at 40.) The plaintiffs, therefore, would have the court institute an essentially bifurcated proceeding, with a class-level determination of liability, followed by individual determinations of damages. The problem with that approach is that the shortcomings that the court has described are not limited to the issue of damages. They also bear on liability, because liability, at least for many claims, would require each plaintiff to show an actual injury. *See, e.g., Lexmark,* 572 U.S. at 133. Setting aside the issue of damages would mitigate some of the issues that the defendants have identified, because a finding of liability would not require the level of quantitative precision that a damages award would. It would not, however, eliminate those issues, because the court would still need to determine—for each class member—whether there was any actual injury at all. The court, therefore, does not find that resorting to an issue class can salvage the plaintiffs' request. The plaintiffs having failed to satisfy either Rule 23(a) or Rule 23(b), their request for class certification will be denied.

## IV. CONCLUSION

For the foregoing reasons, the dental care provider plaintiffs' Motion for Class Certification Order (Doc. No. 405) and Nigohosian's Motion for Scheduling Order for Claims Against

22

Defendant Camelot Venture Group (Doc. No. 468) will be denied, and the defendants' Motion to Exclude the Surveys, Reports, and Testimony of Dr. Jonathan D. Hibbard (Doc. No. 424) and Motion to Exclude the Report and Testimony of Dr. Russell W. Mangum III (Doc. No. 426) will be denied as moot.

ALETA A. TRAUGER
United States District Judge